# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| MAZ PARTNERS LP, Individually and On Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND DEMAND FOR JURY TRIAL** |
| FIRST CHOICE HEALTHCARE SOLUTIONS, INC. and CHRISTIAN ROMANDETTI, SR., | |
| Defendants. | |

Plaintiff MAZ Partners LP ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, hereby brings this Complaint for violations of the federal securities laws ("Complaint") against defendants First Choice Healthcare Solutions, Inc. ("First Choice," "FCHS" or the "Company") and Christian Romandetti, Sr. ("Romandetti," collectively with First Choice, the "Defendants").

Plaintiff's allegations are based upon its personal knowledge as to itself and its own acts, and information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and through its attorneys, which included, among other things, a review of (1) the public filings by First Choice with the United States Securities and Exchange Commission ("SEC"); (2) conference calls and announcements made by Defendants; (3) wire and press releases published by, and regarding, FCHS; (4) analysts' reports and advisories about the Company; and (5) information readily obtainable on the Internet.

This Complaint also incorporates by reference the following respective documents: the criminal indictment of defendant Romandetti – who was First Choice's Chairman of the Board of Directors ("Board"), President and Chief Executive Officer ("CEO") – for committing securities fraud, conspiracy to commit wire fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering filed in *United States v. Romandetti*, CR 18-614-JS-GRB, ECF No. 1 (E.D.N.Y. Nov. 14, 2018) ("DOJ Indictment"), and the complaint filed in *Securities and Exchange Commission v. Burnett*, Case No. 2:18-CV-6501-JS-AKT, ECF No. 1 (E.D.N.Y. Nov. 15, 2018) ("SEC Complaint"), also charging Romandetti with participating in a fraudulent "pump and dump" scheme along with Elite Stock Research, Inc. ("Elite Stock Research"), Anthony Vassallo ("Vassallo"), Mark Burnett ("Burnett"), Jeffrey Miller ("Miller"), and Frank Sarro ("Sarro"), and violating (i) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"); (ii) Section 17(a)(1) of the Securities Act of 1933 (the "Securities Act"); and (iii) Section 17(a)(3) of the Securities Act.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired First Choice common stock from April 1, 2014 through November 14, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal

securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, against Defendants.

2.      First Choice is a non-physician-owned, healthcare services company focused on the delivery of Orthopaedic care and treatment.

3.      Prior to, and during, the Class Period, Romandetti participated in, and profited from, a classic pump and dump scheme that manipulated and artificially inflated the stock price of First Choice, along with Elite Stock Research, Burnett, Miller, Sarro, and Vassallo.

4.      Unbeknownst to the public, including First Choice investors, beginning no later than September 2013, Burnett, Miller, Sarro, and Vassallo, with the help of Romandetti, acquired large blocks of First Choice shares.   Next, Burnett, Miller, Romandetti and Sarro engaged Elite Stock Research, a "boiler room" company operated and controlled by Vassallo, to artificially promote, or fraudulently "pump," the market price and trading volume of First Choice shares.   SEC Complaint, ¶2; DOJ Indictment, ¶15. Burnett, Miller, Romandetti and Sarro paid Vassallo and Elite Stock Research in cash and large blocks of First Choice securities for their services.

5.      Elite Stock Research and Vassallo implemented a large-scale promotional campaign that included fawning over the Company when they communicated with retail investors to purchase First Choice stock.   Elite Stock Research and Vassallo also engaged in manipulative trades designed to artificially increase the trading volume and market price of First Choice common stock while their co-conspirators simultaneously dumped their

First Choice stock at the inflated price as unsuspecting investors were purchasing First Choice stock.

6.     On November 14, 2018, the United States Department of Justice ("DOJ") filed a criminal indictment, and on November 15, 2018, the SEC filed a civil action against Romandetti and his co-conspirators – Elite Stock Research, Vassallo, Burnett, Miller and Sarro – for, among other charges, securities fraud in connection with their conducting a multi-million dollar pump and dump scheme from May 2013 through June 2016, to defraud investors in FCHS stock.  Through various manipulative trading practices, Romandetti and his co-conspirators, defrauded investors in First Choice "by artificially controlling the price and volume of traded shares in FCHS through, *inter alia*: (a) artificially generating price movements and trading volume in the shares; and (b) material misrepresentations and omissions in their communications with victim investors about the stock of FCHS. . . ." DOJ Indictment, ¶15.  The pump and dump scheme alone caused at least $2.5 million in losses "to more than 100 unsuspecting retail investors" (SEC Complaint, ¶1), while generating more than $3.3 million of illegal profits for the participants in the pump and dump scheme, including $560,000 in kickbacks for Romandetti.

7.     But the retail investor victims of the pump and dump scheme were not the only First Choice investors harmed by Defendants.  During the Class Period, First Choice's SEC filings, all of which were certified by Romandetti pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") (15 U.S.C. § 7241), repeatedly discussed the volatility and fluctuations of the Company's stock prices, attributing such

volatility/fluctuations to a number of possible factors, but not the fact that the price was being manipulated by Romandetti and his co-conspirators.

8.    Moreover, First Choice's SEC filings touted the Company's "Compliance Program," including its Code of Conduct and Ethics put in place "to deter wrongdoing" and "conflicts of interest," all while Romandetti, the leader of First Choice, was willfully engaging in such misconduct and conflicts of interest.

9.    Additionally, Romandetti's signed SOX certifications that misleadingly stated that Romandetti had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."   However, Romandetti failed to disclose his own fraudulent conduct and involvement in the pump and dump scheme.

10.    Finally, First Choice's SEC filings touted Romandetti as a valuable asset of FCHS, when in fact he was a liability due to his undisclosed illegal activities.

11.    When news of the pump and dump scheme involving Romandetti was revealed to the public in the November 14, 2018 DOJ Indictment, November 15 SEC Complaint, and November 15, 2018 DOJ and SEC press releases, First Choice common stock declined $0.66 per share or *nearly 65%*, to close at $0.35 per share on November 15, 2018.

12.    Therefore, as a result of Defendants' wrongful acts and misleading statements caused by the material omissions detailed herein, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 because the action arises under the laws of the United States.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the Company's principal place of business, as well as defendant Romandetti's residence, are located within this District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

17.     Plaintiff MAZ Partners LP is a limited liability partnership, typically called a hedge fund, which primarily invests in equities.  Plaintiff purchased 250,859 shares of First Choice common stock at artificially inflated prices in reliance on Defendants' misleading statements due to omissions of material facts during the Class Period, and was damaged when the truth about First Choice was publicly revealed.  The certification of Plaintiff, with a listing of its transactions in First Choice common stock during the Class Period, is annexed hereto.

18.     Defendant First Choice is a Florida corporation with its principal executive offices located in Melbourne, Brevard County, Florida.  First Choice common stock trades on the Over-The-Counter ("OTC") market under the ticker symbol "FCHS."

19.     Defendant Romandetti served as the Company's Chairman of the Board from December 2010 through December 4, 2018.  Romandetti served as the Company's President and CEO until November 16, 2018.  As of March 23, 2018, Romandetti beneficially owned 6,931,578 shares of FCHS stock, or 21.5% of the Company's outstanding shares.  Romandetti resides in Indialantic, Brevard County, Florida.

## SUBSTANTIVE ALLEGATIONS

**A.     Company Background**

20.     According to the Company's Annual Report on Form 10-K for the year ended December 31, 2017 ("2017 10-K"), filed with the SEC on April 2, 2018, First Choice engages:

> in implementing a defined growth strategy aimed at building a network of localized, integrated healthcare services platforms comprised of non-physician-owned medical centers of excellence, which concentrate on treating patients in the following specialties: Orthopaedics, Spine Surgery, Interventional Pain Medicine and related diagnostic and ancillary services in key high growth markets throughout the Southeastern U.S.

**B.     Materially Misleading Statements Issued During the Class Period**

**1.     Fiscal Year Ended December 31, 2013**

21.     On March 31, 2014, after the market closed, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2013 with the SEC ("2013 10-K").  In addition, Romandetti signed certifications in the 2013 10-K pursuant to SOX that represented that the 2013 10-K did "not contain any untrue statement of a material fact

or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that he had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

22.     The Company represented in its 2013 10-K that the market price of First Choice's common stock could "be subject to wide fluctuations in response to many risk factors described in this section and other matters, including:

- changes by securities analysts in financial estimates of our operating results and the operating results of our competitors;

- publications of research reports by securities analysts about us, our competitors or our industry;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- actual or anticipated fluctuations in our quarterly or annual operating results;

- retention and departures of key personnel;

- our failure or the failure of our competitors to meet analysts' projections or guidance that we or our competitors may give to the market;

- strategic decisions by us or our competitors, such as acquisitions, divestitures, spin-offs, joint ventures, strategic investments or changes in business strategy;

- the passage of legislation or other regulatory developments affecting us or our industry;

- speculation in the press or investment community; and

- natural disasters, terrorist acts, acts of war or periods of widespread civil unrest."

23.     The 2013 10-K also stated the following:

***Loss of key executives and failure to attract qualified managers and sales persons could limit our growth and negatively impact our operations***

We depend upon our management team to a substantial extent. In particular, we depend upon Christian Charles Romandetti, our President and Chief Executive Officer for his skills, experience and knowledge of our Company and industry contacts. Mr. Romandetti does not have an employment agreement with the Company and we currently do not have key employee insurance policies covering any of our management team. The loss of Mr. Romandetti or other members of our management team could have a material adverse effect on our business, results of operations or financial condition.  [Emphasis in original.]

24.     The above statement created the misleading impression that Romandetti was a valuable, indeed critical member of management who was indispensable to the Company while failing to disclose his fraudulent conduct and market manipulation.

**2.      Fiscal Year Ended December 31, 2014**

25.     On April 15, 2015, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 with the SEC ("2014 10-K") which was signed by Romandetti.  In addition, the 2014 10-K contained signed certifications pursuant to SOX by Romandetti.  Romandetti's certification pursuant to Section 302 of SOX represented that the 2014 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that he had disclosed "[a]ny fraud, whether or not material, that involves

management or other employees who have a significant role in the Company's internal control over financial reporting."

26.     The Company also represented in the 2014 10-K that the "market price of our common stock is likely to be similarly volatile, and investors in our common stock may experience a decrease, which could be substantial, in the value of their stock."  Further, the Company represented that the following factors "may have a significant impact on the market price of the common stock:  our limited operating history, lack of profitability, negligible stock liquidity, potential extreme price and volume fluctuations, and regulatory burdens . . . ."

27.     The Company also represented in its 2014 10-K that "On September 18, 2014, the Company entered into a cancelable 4-month agreement (the "Agreement") to engage the services of Elite Stock Research, Inc."  Undisclosed was that Elite was a boiler room operation hired to engage in a pump and dump scheme.

28.     The 2014 10-K also stated the following:

***Loss of key executives and failure to attract qualified managers and sales persons could limit our growth and negatively impact our operations***

We depend upon our management team to a substantial extent. In particular, we depend upon Christian Charles Romandetti, our President and Chief Executive Officer for his skills, experience and knowledge of our Company and industry contacts. Mr. Romandetti does not have an employment agreement with the Company and we currently do not have key employee insurance policies covering any of our management team. The loss of Mr. Romandetti or other members of our management team could have a material adverse effect on our business, results of operations or financial condition.  [Emphasis in original.]

29.     The above statement created the misleading impression that Romandetti was a valuable, indeed "key" member of management who was indispensable to the Company while failing to disclose his fraudulent conduct and market manipulation.

### 3.     Fiscal Year Ended December 31, 2015

30.     On April 14, 2016, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 with the SEC ("2015 10-K") which was signed by Romandetti.  In addition, the 2015 10-K contained signed certifications pursuant to SOX by Romandetti.  Romandetti's certification pursuant to Section 302 of SOX represented that the 2015 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that he had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

31.     The Company represented in the 2015 10-K that the "market price for our common stock may be volatile, and your investment in our common stock could decline in value."   Further, the Company represented that the following factors, "may have a significant impact on the market price of our common stock:

- changes in government regulation of the medical industry;

- changes in reimbursement policies of third-party insurance companies, self-insured companies or government agencies;

- actual or anticipated fluctuations in our operating results;

- changes in financial estimates or recommendations by securities analysts;

- developments involving corporate collaborators, if any;

- changes in accounting principles; ·

- the loss of any of our key physicians or management personnel."

32.     The Company represented in its 2015 10-K that the Company's "quarterly results of operations will fluctuate, and this fluctuation could cause our stock price to decline." Specifically, the Company represented the following concerning fluctuation of its stock price in connection with its operations:

> Our quarterly operating results are likely to fluctuate in the future. These fluctuations could cause our stock price to decline. The nature of our business involves variable factors, such as the timing of the research, development and regulatory pathways of our product candidates, which could cause our operating results to fluctuate. Due to the possibility of fluctuations in our revenues and expenses, we believe that quarter-to-quarter comparisons of our operating results are not a good indication of our future performance.

33.     The 2015 10-K also stated the following:

> ***Loss of key executives, limited experience in operating a public company and failure to attract qualified managers and sales persons could limit our growth and negatively impact our operations***
>
> We depend upon our management team to a substantial extent. In particular, we depend upon Christian C. Romandetti, our President and Chief Executive Officer, for his skills, experience and knowledge of our Company and industry contacts. The loss of Mr. Romandetti or other members of our management team could have a material adverse effect on our business, results of operations or financial condition. [Emphasis in original.]

34.     The above statement created the misleading impression that Romandetti was a valuable, indeed "key" member of management who was indispensable to the Company while failing to disclose his fraudulent conduct and market manipulation.

**4.      Fiscal Year Ended December 31, 2016**

35.      On April 3, 2017, the Company filed its Annual Report on Form 10-K/A for the fiscal year ended December 31, 2016 with the SEC ("2016 10-K") which was signed by Romandetti.  The Company filed an "Amendment No. 1 on Form 10-K/A because the original 10-K filed (the "Original Filing") was an internal draft inadvertently filed by the Company's filing agent.  The purpose of this Amendment No. 1 is to supersede the Original Filing in its entirety."  The 2016 10-K contained signed certifications pursuant to SOX by Romandetti.  Romandetti's certification pursuant to Section 302 of SOX represented that the 2016 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that he had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

36.      The Company represented in its 2016 10-K that the "market price for our common stock may be volatile, and your investment in our common stock could decline in value."   Further, the Company represented that the following factors, "may have a significant impact on the market price of our common stock:

- changes in government regulation of the medical industry;

- changes in reimbursement policies of third-party insurance companies, self-insured companies or government agencies;

- actual or anticipated fluctuations in our operating results;

- changes in financial estimates or recommendations by securities analysts;

- developments involving corporate collaborators, if any;

- changes in accounting principles; and·

- the loss of any of our key physicians or management personnel."

37.     The Company represented in its 2016 10-K that the Company's "quarterly results of operations will fluctuate, and this fluctuation could cause our stock price to decline."  Specifically, the Company represented the following concerning fluctuations of its stock price in connection with its operations:

> Our quarterly operating results are likely to fluctuate in the future.  These fluctuations could cause our stock price to decline.  The nature of our business involves variable factors, such as the timing of the research, development and regulatory pathways of our product candidates, which could cause our operating results to fluctuate.  Due to the possibility of fluctuations in our revenues and expenses, we believe that quarter-to-quarter comparisons of our operating results are not a good indication of our future performance.

38.     The 2016 10-K also stated the following:

> ***Loss of key executives, limited experience in operating a public company and failure to attract qualified managers and sales persons could limit our growth and negatively impact our operations***
>
> We depend upon our management team to a substantial extent. In particular, we depend upon Christian C. Romandetti, our Chairman, President and Chief Executive Officer, for his skills, experience and knowledge of our Company and industry contacts. The loss of Mr. Romandetti or other members of our management team could have a material adverse effect on our business, results of operations or financial condition.  [Emphasis in original.]

39.     The above statement created the misleading impression that Romandetti was a valuable, indeed "key" member of management who was indispensable to the Company while failing to disclose his fraudulent conduct and market manipulation.

**5.     Fiscal Year Ended December 31, 2017**

40.     On April 2, 2018, the Company filed its 2017 10-K with the SEC, which was signed by Romandetti.  In addition, the 2017 10-K contained signed certifications pursuant to SOX by Romandetti.  Romandetti's certification pursuant to Section 302 of SOX represented that the 2017 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that he had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

41.     The Company represented in its 2017 10-K that the "market price for our common stock may be volatile, and your investment in our common stock could decline in value."  Further, the Company represented that the following factors, "may have a significant impact on the market price of our Common Stock:

- changes in government regulation of the medical industry;

- changes in reimbursement policies of third-party insurance companies, self-insured companies or government agencies;

- actual or anticipated fluctuations in our operating results;

- changes in financial estimates or recommendations by securities analysts;

- developments involving corporate collaborators, if any;

- changes in accounting policies; and·

- the loss of any of our key physicians or management personnel."

42. The 2017 10-K represented that the Company's "quarterly results of operations will fluctuate, and this fluctuation could cause our stock price to decline." Specifically, the Company represented the following concerning fluctuations of its stock price in connection with its operations:

> Our quarterly operating results are likely to fluctuate in the future. These fluctuations could cause our stock price to decline. The nature of our business involves variable factors, such as the timing of the research, development and regulatory pathways of our product candidates, which could cause our operating results to fluctuate. Due to the possibility of fluctuations in our revenues and expenses, we believe that quarter-to-quarter comparisons of our operating results are not a good indication of our future performance.

43. The 2017 10-K also stated the following:

> ***Loss of key executives, limited experience in operating a public company and failure to attract qualified managers and sales persons could limit our growth and negatively impact our operations***
>
> We depend upon our management team to a substantial extent. In particular, we depend upon Christian C. Romandetti, our Chairman, President and Chief Executive Officer, for his skills, experience and knowledge of our Company and industry contacts. The loss of Mr. Romandetti or other members of our management team could have a material adverse effect on our business, results of operations or financial condition. [Emphasis in original.]

44. The above statement created the misleading impression that Romandetti was a valuable, indeed "key" member of management who was indispensable to the Company while failing to disclose his fraudulent conduct and market manipulation.

## 6. First Choice's Compliance Program

45. The Company represented in its 2013 10-K, 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K that its compliance program "reflects our commitment to complying with all laws, rules and regulations applicable to our business and that meets our ethical

obligations in conducting our business (the "Compliance Program').   We believe our Compliance Program provides a solid framework to meet this commitment and our obligations as a provider of health care services, including:

- a Compliance Committee consisting of our senior executives;

- our *Code of Ethics*, which is applicable to our employees, officers and directors;

- a disclosure program that includes a mechanism to enable individuals to disclose on a confidential or anonymous basis to our Chief Executive Officer, or any person who is not in the disclosing individual's chain of command, issues or questions believed by the individual to be a potential violation of criminal, civil, or administrative laws;

- an organizational structure designed to integrate our compliance objectives into our corporate offices and Medical Centers of Excellence; and

- education, monitoring and corrective action programs, including a disclosure policy designed to establish methods to promote the understanding of our Compliance Program and adherence to its requirements.

- The foundation of our Compliance Program is our *Code of Ethics* which is intended to be a comprehensive statement of the ethical and legal standards governing the daily activities of our employees, affiliated professionals, independent contractors, officers and directors. All our personnel are required to abide by, and are given thorough education regarding, our *Code of Ethics*. In addition, all employees are expected to report incidents that they believe in good faith may be in violation of our *Code of Ethics*.

**7.      First Choice's Code of Conduct and Ethics**

46.      During the Class Period, the Company had a Code of Conduct and Ethics ("Code of Ethics") which is posted on its corporate website, www.nyfchs.com ("Website") and was specifically referenced in the 2013 10-K, 2014 10-K, 2015 10-K, 2016 10-K, and 2017 10-K as described in the preceding paragraph.

47.     The Code of Ethics "sets out basic principles to guide the directors, officers, and employees of the Company."   The Code of Ethics represented that "[a]ll Company directors, officers, and employees should conduct themselves accordingly and seek to avoid even the appearance of improper behavior in any way relating to the Company.  In appropriate circumstances, this Code should also be provided to and followed by the Company's agents and representatives, including consultants."

48.     The intention of the Code of Ethics is "to deter wrongdoing and to promote the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, and understandable disclosure in reports and documents the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other communications made by the Company;

- compliance with applicable governmental laws, rules, and regulations;

- the prompt internal reporting of violations of this Code to the appropriate person or persons identified in this Code;

- accountability for adherence to this Code; and

- adherence to a high standard of business ethics."

49.     The Code of Conduct defines a "'conflict of interest'" as arising "when a director, officer, or employee takes actions or has interests that may make it difficult to perform his or her work on behalf of the Company in an objective and effective manner" or "when a **director, officer,** or employee, or a member of his or her family, **receives improper personal benefits as a result of his or her position with the Company.**"

(Emphasis added).  The Code of Conduct represented, "Service to the Company should never be subordinated to personal gain or advantage."

50.     As part of the Company's corporate disclosure policy, the Code of Conduct represented the following:

> All directors, officers, and employees should support the Company's goal to have full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Although most employees hold positions that are far removed from the Company's required filings with the SEC, each director, officer, and employee should promptly bring to the attention of the Chief Executive Officer, the Chief Financial Officer, the Company's Disclosure Committee, or the Audit Committee, as appropriate in the circumstances, any of the following:
>
> - Any material information to which such individual may become aware that affects the disclosures made by the Company in its public filings or would otherwise assist the Chief Executive Officer, the Chief Financial Officer, the Disclosure Committee, and the Audit Committee in fulfilling their responsibilities with respect to such public filings.
>
> - Any information the individual may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize, and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.
>
> - Any information the individual may have concerning any violation of this Code, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.
>
> - Any information the individual may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of this Code."

51.     The Code of Conduct, page 7, number 15, also requires the Company to promptly notify the "NYSE [New York Stock Exchange] after any executive officer becomes aware of any material non-compliance by the Company with any applicable corporate standard of the NYSE."

**8.      First Choice's Disclosure Policy**

52.     During the Class Period, the Company's Disclosure Policy, available on its Website, represented that the Company "is committed to providing timely, orderly, consistent and credible information, consistent legal and regulatory requirements, to enable orderly trading in our publicly held securities."  The purpose of the Disclosure Policy "is to develop and maintain realistic investor expectations by making all required disclosures on a broadly disseminated basis, without being unduly optimistic or pessimistic on prospects for future Company performance."

53.     During the Class Period, as part of the Disclosure Policy, the Company had a "Disclosure Policy Committee," chaired by defendant Romandetti, along with the Company's chief operations officer; CFO; legal counsel and investor relations counsel. According to FCHS, the purpose of the Disclosure Policy Committee "is to set insider-trading policies, oversee issues management and message consistency, assure compliance with applicable disclosure laws and regulations and coordinate ongoing disclosure practices" and monitor "unusual market price movements or activity and information generally circulating in the marketplace to determine if such movements or activity can be traced directly or indirectly to selectively disclosed non-public material information by the Company or anyone acting on its behalf."

54.     The Disclosure Policy represented that "Any information that could be expected to affect the Company's stock price, whether it is positive or negative, should be considered material" and the "execution of this disclosure policy will help to ensure compliance with the rules and regulations applicable to public companies and will help reduce volatility, improve market valuation, increase liquidity, strengthen the Company's credibility and enhance shareholder value."

55.     The statements in ¶¶21-54 were materially misleading as the statements failed to disclose that (i) Defendants retained Elite Stock Research to falsely promote the Company to investors in order to materially inflate the price of First Choice stock; (ii) the Company, through Romandetti, participated in a scheme to materially inflate the price of First Choice through an unlawful, paid promotional campaign, which enabled Romandetti to personally profit from the scheme; (iii) Defendants were in violation of the Company's internal compliance policies including its Compliance Program, the Code of Ethics and Disclosure Policy by participating in the pump and dump scheme; and (iv) a primary cause of fluctuations in First Choice's stock price was an unlawful campaign, in which defendant Romandetti directly participated, that caused the price of First Choice stock to be inflated, and at the same time, allowed others to dump their shares of First Choice stock for profit.

C.     **The Truth Emerges**

1.     **The DOJ Indictment**

56.     On November 14, 2018, the DOJ filed its criminal indictment against Romandetti and his co-conspirators.   On November 15, 2018, the DOJ issued a press release announcing the indictment and that it had charged Romandetti "and his associates

Frank Sarro, Jeffrey Miller, and Mark Burnett with conducting a pump and dump scheme in coordination with Elite Stock Research (ESR), a boiler room, to defraud investors in FCHS....  The charges include conspiracies to commit securities fraud, wire fraud and money laundering, and substantive securities fraud."  The DOJ's press release continued:

> As alleged in the indictment, between May 2013 and June 2016, the Defendants, together with others, engaged in a multi-million dollar scheme to defraud investors in FCHS, many of whom were elderly, by artificially controlling the price and volume of traded shares in the FCHS by artificially generating price movements and trading volume in the shares, and by including material misrepresentations and omissions in their communications with victim investors about FCHS stock.  The Defendants promoted the stocks primarily through cold-call campaigns and circulation of a newsletter.  The Defendants fraudulently concealed their control of FCHS shares by holding them in brokerage accounts in the names of other individuals or entities.  The Defendants then laundered over $3 million in proceeds of the foregoing stock manipulation scheme.

57.    As alleged in the DOJ's criminal indictment, in order to carry out the fraudulent stock manipulation scheme, employees of Elite Stock Research obtained shares from insiders at First Choice, specifically Romandetti, as well as Sarro, Miller and Burnett, "at below-market prices, through stock purchase and consulting agreements."

58.    The DOJ further alleged that once employees of Elite Stock Research obtained shares of First Choice, Romandetti, along with Sarro, Miller and Burnett

> engaged in manipulative trading patterns, including wash trades and matched trades to drive up the price of the shares, while aggressively and repeatedly calling and emailing victim investors - many of whom were senior citizens - to purchase shares in FCHS.  When victim investors indicated a willingness to purchase a recommended stock, the Defendants and their co-conspirators at the Boiler Room called the victim investors repeatedly, pressuring them to follow through with their purchases and directing them to log into their trading accounts while still on the telephone to place purchase orders for FCHS stock.  In some cases, the Boiler Room also charged the victim investors for 'subscriptions' to receive stock recommendations.

59.     The DOJ also alleged that Romandetti, Sarro, Miller and Burnett "did not disclose to the victim investors that, contemporaneously with or shortly after their recommendations to the victim investors of the stock of FCHS, [they] and their co-conspirators sold their own shares of FCHS stock." DOJ Indictment, ¶18.  Unfortunately, for the victim investors, they "were left with the false and misleading impression that the stock of FCHS was a sound investment." *Id.* Ultimately, Romandetti and the three others, "profited from the manipulative trading in FCHS shares when they and their co-conspirators sold substantial amounts of the shares at the inflated prices that their fraudulent conduct had generated." *Id.*

60.     On November 15, 2018, while the market for First Choice common stock was open, First Choice filed a Form 8-K with the SEC, acknowledging the November 15, 2018 arrest of Romandetti, "on criminal charges of conspiracy to commit securities fraud, conspiracy to commit wire fraud, securities fraud and conspiracy to commit money laundering."

## 2.     The SEC Complaint

61.     On November 15, 2018, the SEC filed the SEC Complaint and issued a press release announcing its charges "for defrauding elderly and unsophisticated investors."  The SEC alleged that Romandetti, Elite Stock Research, Mark Burnett, Jeffrey Miller, Anthony Vassallo and Frank Sarro, manipulated First Choice's "shares generating more than $3.3 million of illegal profits and more than $560,000 in kickbacks for Romandetti."  The SEC's press release continued:

> The SEC's complaint alleges that Romandetti and the other Defendants duped more than 100 victims in a scheme that inflated First Choice's stock

price from less than $1 per share to $3.40 per share. According to the complaint, from at least September 2013 until about June 2016, the Defendants used multiple accounts in an attempt to disguise their trading, engaged in manipulative trading practices, and hired Elite Stock Research, a boiler room run by Defendant Anthony Vassallo, to promote First Choice to vulnerable investors, some of who invested retirement savings.

*** 

In a related action in July 2017, the SEC originally charged boiler room Elite Stock Research, as well as another Long Island boiler room and 13 individuals, with bilking victims out of more than $10 million through high-pressure sales tactics and lies about penny stocks. Seven of those individuals have pleaded guilty to parallel criminal charges brought by the U.S. Attorney's Office for the Eastern District of New York.  The SEC's litigation against the 13 individuals is continuing.

Today's SEC action, filed in federal district court in Central Islip, New York, charges Romandetti, Vassallo, Mark Burnett, Jeffrey Miller, Frank Sarro and Elite Stock Research with fraud and Burnett, Miller, Sarro, and Vassallo with market manipulation. The SEC is seeking permanent injunctions, return of allegedly ill-gotten gains with interest, civil penalties, penny stock bars, and officer-and-director bars against Romandetti and Burnett.

62.     The SEC Complaint alleged that from at least September 2013 through June 2016, Romandetti, Burnett, Miller Sarro, Anthony Vassallo and Elite Stock Research "orchestrated and implemented a fraudulent scheme,... to manipulate the market price and trading volume of [First Choice] securities that earned them over $3.3 million in trading profits while causing at least $2.5 million in losses to more than 100 unsuspecting retail investors." SEC Complaint, ¶1.

63.     According to the SEC, the fraud began when Burnett, Miller, Sarro and Vassallo, acquired large blocks of First Choice shares, with the help of Romandetti.  Next, Burnett, Miller, Romandetti and Sarro "engaged Elite Stock Research, a 'boiler room' operated and controlled by Vassallo, to promote artificially, or fraudulently 'pump,' the

market price and trading volume of FCHS shares." Burnett, Miller, Romandetti and Sarro "paid Vassallo and Elite Stock Research in cash and large blocks of FCHS securities for their services." SEC Complaint, ¶2.

64.     Elite Stock Research represented itself on its website as a company that provides investors with "top quality trade recommendations and … research that you can trust." SEC Complaint, ¶31. In reality, "Elite Stock Research operated as a boiler room, employing numerous individuals and using approximately 19 different telephone lines to artificially increase the price of certain microcap securities, including FCHS, via manipulative trading and strong-arm, promotional campaigns." *Id.*

65.     Elite Stock Research and Vassallo "implemented a large-scale promotional campaign touting FCHS, targeting retail investors ─ specifically the elderly and unsophisticated ─ and aggressively soliciting them to purchase FCHS stock while failing to disclose that Elite Stock Research was at the same time, engaging in manipulative trades designed to artificially increase the trading volume and market price of FCHS shares." SEC Complaint, ¶4.

66.     According to the SEC, Elite Stock Research, Vassallo, Burnett, Miller, and Sarro "engaged in manipulative trading of their FCHS shares, including 'marking the close' and executing 'matched' and 'wash' trades designed to artificially raise the market price and trading volume of FCHS and give the false appearance of active trading and a rising price for the security." SEC Complaint, ¶3.

67.     Through their manipulative trading, Romandetti, Burnett, Miller, Sarro, Vassallo and Elite Stock Research "artificially and significantly increased FCHS's share

price." SEC Complaint, ¶57. For example, from September 19, 2013 through March 21, 2014, "the price of FCHS increased from $0.90 to $3.40 per share." *Id.* According to the SEC, "[m]anipulative trading in FCHS continued from March 2014 through at least June 2016, during which time the share price remained near or above $1.00. In total, between September 19, 2013 and June 2016, Burnett, Miller, Sarro, Vassallo, or entities controlled by them, executed approximately 4,300 trades in FCHS." *Id.*

### 3. First Choice Common Stock Declines Significantly

68. On this news, First Choice common stock declined $0.66 per share or nearly 65% from its November 14, 2018 closing price of $1.01 per share, to close at $0.35 per share on November 15, 2018.

69. On November 16, 2018, the Company filed a Form 8-K with the SEC, disclosing that Romandetti was placed "on indefinite administrative leave" by the Company's Board.

70. On December 6, 2018, the Company filed a Form 8-K with the SEC, disclosing the resignation of Romandetti from the Company's Board.

### D. Scienter Allegations

71. As the Company's most senior executive, Romandetti was an active, culpable, and primary participant in the fraud as evidenced by his knowing issuance and control over the Company's materially misleading statements. Further, Romandetti was the senior officer of First Choice during the Class Period and had final approval over the public statements issued in the name of the Company.

72.     Throughout the Class Period, Romandetti had personal knowledge of, and approved, the Company's Compliance Program, Code of Conduct and Disclosure Policy, and their applicability to him as the CEO, President and Chairman of the Company's Board.  Indeed, the Code of Conduct applies to "[a]ll Company directors, officers, and employees."  Further, as the CEO, Romandetti chaired the Company's Disclosure Policy Committee.

73.     Romandetti had personal knowledge that the Company's Compliance Program, the Code of Ethics, and Disclosure Policy were seriously flawed as he served as the Chairman of the Company's Disclosure Policy Committee, CEO, President and Chairman of the Board, and therefore, he was able to circumvent these procedures.  As the Chairman of the Disclosure Policy Committee, Romandetti was charged and responsible for, among other things, to monitor "unusual market price movements or activity and information generally circulating in the marketplace to determine if such movements or activity can be traced directly or indirectly to selectively disclosed non-public material information by the Company or anyone acting on its behalf."

74.     Romandetti was the most senior officer of First Choice.  In connection with each Annual Report First Choice filed with the SEC during the Class Period, Romandetti signed certifications pursuant to SOX.  Specifically, Romandetti signed certifications under Section 302 of the SOX during the Class Period in the respective Form 10-Ks representing that the Company's Form 10-Ks did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the

period covered by this report."  The SOX certifications also stated that Romandetti had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting" when he did not.  As set forth herein, these SOX certifications were materially misleading and Romandetti knew that he, himself, had committed fraud, and that the fluctuations of the price of First Choice common stock were materially affected, not by any of the possible factors listed in the Company's SEC filings, but rather by an illicit pump and dump scheme in which he was a primary participant.

75.     The SOX certifications signed by Romandetti were materially misleading because, at the time they were executed, Romandetti was aware of, or recklessly disregarded, the severe fluctuations in the Company's stock price caused by the pump-and-dump scheme to manipulate and artificially inflate the price of FCHS stock, which he helped orchestrate.  Romandetti was in a position to know that the Company's stock was being manipulated as he was the Company's Chairman, President and CEO, and the one that created the pump and dump scheme along with his criminal co-Defendants – Messrs. Sarro, Miller and Burnett.  The SOX certifications are strong indicia of scienter because the fraud at issue directly implicates the accuracy of the Company's representations to the public, the cause of its market volume, bears on the integrity of the then-head of the Company, and artificially inflated First Choice's common stock.

76.     During the Class Period, Romandetti had both the motive and opportunity to commit fraud.  As alleged herein, Romandetti acted with scienter in that, because he actively participated in, and benefitted from, the pump and dump scheme, personally

making over $500,000 from it, as well as having his personal holdings of FCHS stock artificially inflated; knew or recklessly disregarded that the public statements he made, and the documents he issued and disseminated in the name of the Company, were materially misleading; knew or acted with deliberate recklessness in disregard that such statements and documents would be issued and disseminated to the investing public; and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as a primary violator of the federal securities laws.  In so doing, First Choice and Romandetti committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of First Choice common stock during the Class Period.

77.     Romandetti was motivated to maintain First Choice's stock price inflated as high as possible in order for him and his co-conspirators to personally profit from the inflation.  Romandetti received at least $560,000 in kickbacks for his role in the pump and dump scheme.  Moreover, the value of his own substantial holdings of FCHS stock (nearly 7 million shares or 21% of the Company's outstanding shares) were artificially inflated due to his actions, increasing his net worth.

78.     Romandetti, as First Choice's CEO, was an active participant in the pump and dump scheme as he "facilitated many of the share transfers" after Burnett, Miller, Sarro and Vassallo acquired shares both directly from First Choice and from individuals and entities associated with First Choice "pursuant to loan, share exchange, or debt conversion agreements."   SEC Complaint, ¶¶36-37.   As a critical participant in the scheme, Romandetti assisted in the creation of MedTech Diagnostics LLC ("MedTech"), a shell

entity used as a vehicle "to transfer shares to Burnett and Miller.  Burnett and Miller used MedTech to acquire one million shares of FCHS by selling their interest in MedTech to FCHS in exchange for the shares."  *Id*. ¶37.

79.    Besides creating MedTech, Romandetti created other holding companies including C&K, LLC, MTCR, LLC and MTKR LLC (the "Romandetti Entities"). "Romandetti had access and control" of bank accounts and brokerage accounts of the Romandetti Entities.  DOJ Indictment, ¶3.

80.    As part of the pump and dump scheme, starting in September 2013, Romandetti and others "engaged Elite Stock Research and Vassallo to inflate artificially the price and trading volume of FCHS stock" and "paid Vassallo and Elite Stock Research in cash and large blocks of FCHS securities for their services." *Id*. ¶¶2, 41.  Between September 2013 and December 2015, Romandetti and others, or entities controlled by them, "wired nearly $1 million to Elite Stock Research as compensation for its role in promoting FCHS stock, including… $160,000 from Romandetti between March 2014 and December 2015." *Id*. ¶42.

81.    Romandetti was in constant communication and contact with his co-conspirators involved in the pump and dump scheme.  For example, on June 5, 2015, Vassallo e-mailed Romandetti and attached "screen shots from the online brokerage account of Victim A,[1] to show that Elite Stock Research exercised control over Victim A's brokerage account and caused Victim A to purchase FCHS shares." *Id*. ¶44.  Also, on June

---

[1] The DOJ Indictment against Romandetti kept confidential the identities of certain victims and witnesses using letters for victims and numbers for witnesses.

22, 2015, Vassallo corresponded with Miller and Romandetti, "regarding the identity of Elite Stock Research's victims and the number of FCHS shares that victim investors had purchased for purposes of calculating Elite Stock Research's compensation." *Id.*

82.     Romandetti "visited Elite Stock Research on several occasions to discuss and coordinate the promotion of FCHS with Vassallo and Elite Stock Research employees, including Employee 1 and 2." *Id.* ¶45.  Indeed, "Romandetti provided Elite Stock Research employees with exaggerated information about FCHS that could be conveyed to victims solicited by Elite Stock Research to induce them to purchase shares of the stock." *Id.*

83.     Romandetti, along with Burnett, Miller, Vassallo and Sarro "carefully coordinated the timing of Elite Stock Research's promotional campaign and designed it to coincide with manipulative trading activity by Burnett, Miller, Sarro, and Vassallo." *Id.* ¶47.

84.     Between September 19, 2013 and June 2016, "Burnett, Miller, Sarro, Vassallo, and Elite Stock Research artificially inflated the volume and price of FCHS securities, such that they reaped approximately $3.3 million in trading profits." *Id.* ¶58. These illegal trading profits were transferred to at least twelve different bank accounts. *Id.* ¶59.  For example, during this period, "Sarro recognized approximately $2.3 million, Vassallo recognized approximately $485,000, Miller recognized approximately $340,000, and Burnett recognized approximately $193,000 in trading profits." *Id.* ¶58.

85.     Between December 2013 and March 2016, "Sarro transferred a significant portion of his trading profits back to Miller and Romandetti." *Id.* ¶59.  Next, Romandetti compensated Elite Stock Research for its promotion of First Choice stock by using "a

portion of these illegally obtained profits." *Id*. Sarro and entities he controlled transferred approximately $140,000 to Miller and approximately $565,000 to an entity controlled by Romandetti. *Id*. On October 20, 2014, "Sarro wired $65,000 from his bank account to Miller. The following day, Miller wired the entire $65,000 to Romandetti, who then immediately wired $25,000 to Elite Stock Research." *Id*. ¶60.

86.     According to the SEC Complaint, "on or about August 17, 2015, Sarro deposited 235,000 FCHS shares into his brokerage account" after acquiring the shares in July 2015 for "$1.00 per share from Individual A, a physician at one of FCHS's medical facilities." *Id*. ¶61. In fact, "Romandetti facilitated the transfer from Individual A to Sarro by assisting in setting up the brokerage account on behalf of Individual A, and by paying $100,000 of the $235,000 purchase price." *Id*. From August 12, 2015 through September 30, 2015, "Sarro dumped all of the 235,000 shares and received profits exceeding $300,000. Sarro then wired $160,000 of these trading profits to Romandetti, who transferred $20,000 of the proceeds to Elite Stock Research." *Id*. ¶59.

87.     According to the DOJ, on or about October 6, 2015, a $20,000 wire transfer was made from an entity's bank account that Sarro had access and control "into a Romandetti Entities bank account. On the same day, a $20,000 wire transfer was made from a Romandetti Entities bank account into an FCHS bank account controlled by Romandetti. Again on the same day, a $35,786.18 payment was made to American Express from the FCHS bank account controlled by Romandetti." DOJ Indictment, ¶23(m).

88.     As alleged herein, Romandetti acted with the requisite scienter attributable to First Choice, when as the Chairman, President and CEO for the Company, he knew

about or recklessly disregarded the unauthorized inflation of the price of First Choice common stock through the pump and dump scheme, evidencing knowledge of the pump and dump scheme with various entities including entities that Romandetti controlled. Romandetti also signed several SOX certifications attesting to the absence or full disclosure of any known frauds at that time, yet failed to disclose the fraudulent pump and dump scheme, or his involvement therein, that artificially inflated the price of First Choice common stock.

89.     The scienter of First Choice's most senior officer and director (*i.e.*, Romandetti) is imputed to First Choice.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired First Choice common stock during the Class Period (the "Class"), and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

91.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, First Choice common stock was actively traded on the OTC.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members

of the Class may be identified from records maintained by First Choice or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

92.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

93.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

94.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)      whether statements made by Defendants to the investing public during the Class Period misrepresented facts by omitting material information about manipulative trading in the Company's stock, the integrity of management of First Choice, as well as the strength (or lack thereof) of the Company's internal controls and Compliance Program;

c)      whether Romandetti caused First Choice to issue misleading statements due to material omissions during the Class Period;

d)      whether Defendants acted knowingly or recklessly in issuing misleading statements to the investing public;

e)      whether Romandetti participated in, and benefitted from, the pump and dump scheme detailed above;

f)      whether the prices of First Choice common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

95.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Against Defendants for Violations of
Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

98.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the misleading statements specified above, which they knew or deliberately disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a)      employed devices, schemes and artifices to defraud;

b)      omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of First Choice common stock during the Class Period.

100.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of First Choice were materially misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  Defendants, by virtue of their actual knowledge of the true facts of First Choice, their control over, and/or receipt and/or modification of the Company's allegedly

materially misleading statements, and/or their associations with the Company, which made them privy to information concerning the conspiracy to engage in the pump and dump scheme to artificially inflate the Company's stock price, participated in the fraudulent scheme alleged herein.

101.   Romandetti, who was the senior officer and director of the Company, had actual knowledge of the material omissions set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with extreme reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements made by him and the Company or other First Choice personnel to members of the investing public, including Plaintiff and the Class.

102.   As a result of the foregoing, the market price of First Choice common stock was artificially inflated during the Class Period.  Unaware of the falsity of the statements by Defendants, Plaintiff and the other members of the Class relied on the statements described above during the Class Period in purchasing First Choice common stock at prices that were artificially inflated as a result of the misleading statements by Defendants.

103.   Had Plaintiff and the other members of the Class been aware that the market price of First Choice common stock had been artificially inflated by Defendants' omissions of the material adverse information that Defendants did not disclose, they would not have purchased First Choice common stock at the artificially inflated prices that they did, or at all.

104.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

105.   By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages, which they suffered in connection with their purchase of First Choice common stock during the Class Period.

## COUNT II

### (Against Romandetti for Violations of Section 20(a) of the Exchange Act)

106.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

107.   Defendant Romandetti acted as a controlling person of First Choice within the meaning of Section 20(a) of the Exchange Act as alleged herein by virtue of his high-level position, agency, ownership and contractual rights, and participation in and/or awareness of First Choice's operations and/or intimate knowledge of the misleading statements.

108.   During the Class Period, Romandetti participated in the operation and management of First Choice, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of his senior position and the fact that he was a creator of, and participated in, the pump and dump scheme described above, he knew the adverse non-public information causing the Company's misleading statements described above.

109.   As an officer and director of a publicly owned company, Romandetti had a duty to disseminate accurate and truthful information with respect to the trading of First Choice stock, the integrity of the Company's management (namely himself), and the lack

of controls of the Company and the ineffectiveness of its stated policies recited herein, and to correct promptly any public statements issued by First Choice, which had become materially misleading.

110.   Because of his position of control and authority as the Company's senior officer, Romandetti was able to, and did, control the contents of the various reports, press releases and public filings, which First Choice disseminated in the marketplace during the Class Period concerning the Company's operations.   Throughout the Class Period, Romandetti exercised his power and authority to cause First Choice to engage in the wrongful acts complained of herein. Romandetti therefore, is a "controlling person" of First Choice within the meaning of Section 20(a) of the Exchange Act.   In this capacity, Romandetti participated in the unlawful conduct alleged, which artificially inflated the market price of First Choice common stock.

111.   Romandetti, therefore, acted as a controlling person of First Choice.   By reason of his senior management position and/or being a director of First Choice, Romandetti had the power to direct the actions of, and exercised the same to cause, First Choice to engage in the unlawful acts and conduct complained of herein.   Romandetti exercised control over the general operations of First Choice and possessed the power to control the specific activities that comprise the primary violations about which Plaintiff and the other members of the Class complain.

112.   By reason of the above conduct, Romandetti is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by First Choice.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper, including disgorgement of the, at least, $560,000 in kickbacks received by Romandetti for his role in the pump and dump scheme.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 29th day of March, 2019.

By:    /s/ *Joshua W. Ruthizer*   
Joshua W. Ruthizer
***Trial Counsel***
Florida Bar Identification Number 92528
Chet B. Waldman
*Pro Hac Vice* application to be filed
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Tel: 212-759-4600
Fax: 212-486-2093
jruthizer@wolfpopper.com
cwaldman@wolfpopper.com

***Attorneys for Plaintiff***