**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

|  |  |
|---|---|
| MAZ PARTNERS LP, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FIRST CHOICE HEALTHCARE SOLUTIONS, INC. and CHRISTIAN ROMANDETTI, SR., <br><br> Defendants. | Case No. 6:19-cv-00619-PGB-LRH <br><br> **RESPONSE TO DISPOSITIVE MOTION** |

**LEAD PLAINTIFF MAZ PARTNERS LP'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS OF DEFENDANTS FIRST CHOICE HEALTHCARE SOLUTIONS, INC. AND CHRISTIAN ROMANDETTI, SR.**

## I.   INTRODUCTION

On November 14, 2018, the U.S. Department of Justice ("DOJ") filed a criminal indictment, and on November 15, 2018, the U.S. Securities & Exchange Commission ("SEC") commenced a civil action, against Christian Romandetti, Sr., the then-President, CEO, and Chairman of the Board of Directors ("Board") of First Choice Healthcare Solutions, Inc. ("FCHS," or the "Company," collectively with Romandetti, "Defendants"), for participating in, and benefitting from, an illegal "pump and dump scheme" involving FCHS stock. Romandetti was charged with securities fraud, wire fraud and money laundering, among other violations of law.  Not until after the government's charges were publicly announced, causing FCHS stock to lose nearly two-thirds of its value in a single day, did FCHS investors learn of Romandetti's market manipulation, notwithstanding years of FCHS's public statements touting Romandetti, the Company's ethics and compliance policies, and providing innocuous

reasons for the volatile nature of the market for FCHS stock.

In their motions to dismiss, Defendants ignore the shocking gravity of Romandetti's undisclosed market manipulation of FCHS's stock and argue that they had no duty to disclose, and investors did not need to know, that FCHS's stock was being manipulated by the Company's CEO.  Obviously, if the securities laws are to serve any useful purpose, this is not, and cannot be, the law.  Moreover, neither Defendant disputes that the Complaint adequately pleads Romandetti's scienter concerning the undisclosed material facts, which, as set forth below, is imputed to FCHS.  Defendants' motions to dismiss must be denied in full.

## II.   FACTUAL BACKGROUND

### A.   The Undisclosed Fraudulent Pump and Dump Scheme Orchestrated by Romandetti

From no later than September 2013 through June 2016, Romandetti, together with Elite Stock Research ("Elite"), Mark Burnett, Jeffrey Miller, Frank Sarro, and Anthony Vassallo (collectively, the "DOJ/SEC Defendants") were involved in an undisclosed multi-million dollar pump and dump scheme involving FCHS stock.  ¶¶56-67.[1]

The DOJ/SEC Defendants acquired large blocks of FCHS shares directly from FCHS and from individuals and entities associated with FCHS at below market prices and through loan, share exchange, stock purchase, debt conversion, and consulting agreements.  ¶¶4, 57, 63, 78.  Romandetti facilitated many of these share transfers, including through a shell company he used to transfer one million FCHS shares to Miller and Burnett.  ¶¶78-79.

---

[1] References to specific paragraphs of the Complaint For Violation Of The Federal Securities Laws And Demand For Jury Trial (Dkt. No. 1, the "Complaint") are cited to herein as "¶_." Unless otherwise indicated, all emphasis is added.

Thereafter, Burnett, Miller, Romandetti, Sarro and FCHS engaged Elite, a "boiler room" company operated and controlled by Vassallo, to artificially promote, or fraudulently "pump," the market price and trading volume of FCHS shares.  ¶¶4, 27, 58, 63.  Romandetti, Burnett, Miller, and Sarro paid Elite and Vassallo "in cash and large blocks of FCHS securities."  ¶¶63, 80.  Between September 2013 and December 2015, Romandetti and others, or entities controlled by them, "wired nearly $1 million to [Elite] as compensation for its role in promoting FCHS stock, including … $160,000 from Romandetti between March 2014 and December 2015."  ¶80.

Elite and its employees (on behalf of Romandetti and the other DOJ/SEC Defendants) also "engaged in manipulative trading patterns" to artificially drive up the price and trading volume of FCHS shares, including (1) wash trades (when an investor simultaneously sells and buys the same financial instruments to create misleading, artificial activity in the marketplace); (2) matched trades (a trade that is reflected by an equal and offsetting trade with a different counterparty); and (3) marking the close (attempts to influence the closing price of a security by executing purchase or sale orders at or near the close of normal trading hours).  ¶¶57-58, 66-67.  From September 2013 through March 21, 2014, the manipulative trading increased the price of FCHS stock from $0.90 to $3.40 per share.  ¶67.  The 7 million FCHS shares owned by Romandetti thereby almost quadrupled in value, increasing his net worth.  ¶77.  The manipulative trading continued from March 2014 through, at least, June 2016, and the price of FCHS common stock remained above $1.00 per share during that time.  ¶67.

Elite and Vassallo (again, on behalf of Romandetti and the other DOJ/SEC Defendants) also undertook a large scale and aggressive campaign (primarily through cold calling and a

newsletter) to market FCHS stock to retail investors – most of them elderly.  ¶¶56-58, 65.

Contemporaneously with, or shortly after, FCHS stock was "recommended" to victim investors, Romandetti and the other DOJ/SEC Defendants sold ("dumped") "substantial amounts of FCHS shares at the inflated prices that their fraudulent conduct had generated." ¶59.  The fraudulent pump and dump scheme generated more than $3.3 million of illegal profits for the DOJ/SEC Defendants from their sales (which they subsequently laundered through multiple entities), along with $560,000 in kickbacks for Romandetti.  ¶¶56, 59, 61, 79, 84-85.

During April 1, 2014 to November 14, 2018 (the "Class Period"), Defendants issued numerous materially misleading statements that failed to disclose the pump and dump scheme and Romandetti's involvement therein.  As a result, when the truth was revealed, FCHS stock immediately declined 65% in value, and Lead Plaintiff MAZ Partners LP ("MAZ") and the other public market investors suffered significant damages.

**B.**  **The Defendants' Misleading Omissions in Violation of the Securities Laws**

Romandetti orchestrated, and was intimately involved in, the fraudulent pump and dump scheme, and was in constant communication with his co-conspirators.  ¶¶78, 80-84.  For example, in June 2015, Romandetti received an email from Vassallo "regarding the identity of [Elite's] victims and the number of FCHS shares that victim investors had purchased for purposes of calculating [Elite's] compensation."  ¶81.  Romandetti visited Elite several times to discuss and coordinate the promotion of FCHS stock, and even "provided [Elite] employees with exaggerated information about FCHS that could be conveyed to victims solicited by [Elite] to induce them to purchase shares of the stock."  ¶82.  Romandetti "carefully coordinated the timing of [Elite's] promotional campaign and designed it to coincide with

manipulative trading activity by Burnett, Miller, Sarro, and Vassallo." ¶83.

Romandetti signed FCHS's annual reports on Form 10-K filed with the SEC, and the certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") (15 U.S.C. §7241) attached thereto. ¶¶9, 21, 25, 30, 35, 40, 74-75, 88. Romandetti certified that the 10-Ks did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made ... not misleading with respect to the period covered by this report" and that he had disclosed "*[a]ny fraud*, whether or not material, that *involves management* or *other employees who have a significant role in the Company's internal control over financial reporting*." ¶¶21, 25, 30, 35, 40. However, because Romandetti was intimately involved in the undisclosed pump and dump scheme, he, and FCHS, knew the aforementioned statements were materially misleading.

Defendants' statements in FCHS's 10-Ks filed during the Class Period regarding the historic "volatility" and "fluctuations" of FCHS's stock price were materially misleading as they attributed such volatility/fluctuations to a number of *possible hypothetical* factors, while omitting the *actual, then-existing* fact that the price of FCHS stock was fluctuating because it was being, or had been, manipulated by Romandetti and his co-conspirators. ¶¶7, 22, 26, 31-32, 36-37, 41-42.

Defendants' statement in FCHS's 2014 10-K that FCHS had "engage[d] the services of [Elite]" in what was described as a 4-month cancelable consulting agreement (¶27)[2] was

---

[2] The 2014 10-K stated, under the heading, "*Elite Stock Research–Equity Compensation for Services*," that "[t]he Agreement provided for a monthly cash retainer, and 100,000 restricted shares of the Company's common stock that were issued in 2014 at a cost of $98,000." FCHS's Motion to Dismiss and Incorporated Memorandum of Law (Dkt. No. 13, "FCHS Mot."), Ex. B (Dkt. No. 13-2), p. 29.

materially misleading because Defendants failed to disclose that "Elite was a boiler room operation hired to engage in a pump and dump scheme" (¶6), and was paid via kickbacks from Romandetti and others (¶¶4, 63, 80, 85-86).

Defendants' material omissions also rendered misleading statements championing Romandetti as a "key executive" in each of FCHS's 10-Ks during the Class Period. These statements, which created the impression that Romandetti "in particular," was "key" to the success of FCHS, in a positive way,[3] were rendered materially misleading by Defendants' failure to disclose (i) Romandetti's fraudulent conduct and market manipulation, (ii) that Romandetti was exploiting his "skills, experience and knowledge of [the] Company and industry contacts" by his market manipulation scheme for personal gain, and that (iii) the "loss" of this "key executive" would be a positive for the Company, in light of his egregious misconduct. ¶¶24, 29, 34, 39, 44.

Defendants also made materially misleading omissions by affirmatively touting FCHS's Compliance Program and Codes of Conduct and Ethics (¶¶45-51) in each of its 10-Ks during the Class Period. These statements misleadingly reassured investors that (i) Defendants were on top of compliance issues – which also bound CEO Romandetti to adhere to a strict Code of Ethics – including regarding conflict of interest issues; (ii) the Compliance Program helped FCHS executives "meet[] our ethical obligations in conducting our business;" and (iii) there were detailed and ample procedures in place to report any wrongdoing. In fact,

---

[3] For example: "*Loss of key executives ... could limit our growth and negatively impact our operations*.... We depend upon our management team to a substantial extent. In particular, we depend upon [Defendant] Romandetti, our President and Chief Executive Officer, for his skills, experience and knowledge of our Company and industry contacts. The loss of Mr. Romandetti ... could have a material adverse effect on our business, results of operations or financial condition." ¶¶23, 28, 33, 38, 43.

Defendants retained Elite to falsely promote FCHS's stock; and the CEO (Romandetti), on behalf of FCHS and himself, was in egregious violation of FCHS's stated policies, including the Compliance Program, Code of Ethics, and Disclosure Policy by participating in the market manipulation scheme for his personal benefit.  ¶55.

## C.   The Truth is Revealed

On November 14, 2018, the DOJ filed a criminal indictment, and on November 15, 2018, the SEC commenced a civil action against Romandetti and the other DOJ/SEC Defendants in connection with their multi-million dollar pump and dump scheme.  ¶¶56, 61. On November 15, 2018, FCHS filed a Form 8-K with the SEC acknowledging that Romandetti had been arrested "on criminal charges of conspiracy to commit securities fraud, conspiracy to commit write fraud, securities fraud and conspiracy to commit money laundering."  ¶60.

On November 15, 2018, FCHS stock declined $0.66 per share, or nearly 65%, from its November 14, 2018 closing price of $1.01 per share, to close at $0.35 per share.  ¶68.

On November 16, 2018, FCHS filed a Form 8-K with the SEC disclosing that Romandetti had been placed on "indefinite administrative leave" by the Board.  ¶69.  On December 6, 2018, FCHS announced that Romandetti had resigned from the Board.  ¶70.  His employment was terminated on December 28, 2018.  FCHS Mot., Ex. C (Dkt. No. 13-3).

## III.  ARGUMENT – THE MOTIONS TO DISMISS SHOULD BE DENIED

## A.   Relevant Legal Standards

A complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Dismissal is appropriate only where a complaint, ***viewed in its totality***, fails to allege "enough facts to

7

state a claim to relief that is plausible on its face." *Id.* at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("a court should assume [well-pled facts'] veracity and then determine whether they plausibly give rise to an entitlement to relief.").

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act') and SEC Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) on which the plaintiff relied; (5) economic loss; and (6) loss causation. *See Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Plaintiff's allegations must satisfy Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).[4] On a motion to dismiss, the Court must accept all well-pled factual allegations as true and draw all reasonable inferences in plaintiffs' favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007); *Twombly*, 550 U.S. at 555-56.

The PSLRA also requires that a complaint allege, with particularity, facts giving rise to a strong inference that defendants acted with scienter. 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314; *see also Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1183 (S.D. Fla. 2005) (noting that in Eleventh Circuit scienter requirement is satisfied by showing defendants had "'an intent to deceive, manipulate or defraud' or ... 'acted with a severely reckless state of mind.'" (citation omitted)).

---

[4] For claims predicated on misleading statements or omissions, the PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1)(B); *FindWhat*, 658 F.3d at 1296.

8

**B. Defendants' Materially Misleading Omissions in Violation of the Securities Laws**

**1. Because Romandetti Benefitted from the Market Manipulation of FCHS Stock, Defendants Had a Duty to Disclose the Material Facts Concerning the Pump and Dump Scheme**

Defendants acknowledge that "a duty to disclose arises" when "a corporate insider trades on confidential information" (FCHS Mot., 9-10), but ignore that Romandetti orchestrated a pump and dump scheme and traded on insider information, triggering the duty to disclose. Romandetti, as Chairman, CEO, and the alter ego of the Company, had a fiduciary duty to FCHS shareholders. *See Chiarella v. United States*, 445 U.S. 222, 226-28 (1980) (corporate insiders have fiduciary duty to shareholders, which forms basis of "disclose or abstain" rule); *Dirks v. SEC*, 463 U.S. 646, 654 (1983) (same). The insider information was Romandetti's knowledge of the manipulation scheme he orchestrated, and the fact that it was this manipulation scheme, and not the Company's results or prospects, that generated market enthusiasm for FCHS and maintained and/or inflated its share price. *See In re Hienergy Techs., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 47044, at *27 (C.D. Cal. Oct. 24, 2005) (sustaining claim against corporation and CEO/President/Director for failure to disclose he may have colluded with others as part of undisclosed group to manipulate the company's stock).

Disclosure was also required because Romandetti personally profited from the scheme (at least $560,000 in kickbacks and participation in the insider trading by the DOJ/SEC Defendants). *E.g.*, ¶¶4, 6, 57-67, 78-87. *See Dirks*, 463 U.S. at 662 ("[T]he test is whether the insider personally will benefit, directly or indirectly" from the improper use of inside information); *SEC v. Yun*, 327 F.3d 1263, 1275 (11th Cir. 2003) (same). Such insider trading triggers a duty to disclose the material adverse information. *See United States v. O'Hagan*,

9

521 U.S. 642, 652 (1997) (reiterating duty of corporate insider to "disclose" the material adverse information or "abstain" from trading); *Chiarella*, 445 U.S. at 227.

Thus, the manipulative trading in FCHS stock, from which Romandetti benefited, triggered a duty to disclose the material pump and dump scheme, and the dishonest conduct of the Company's leader.

## 2.  <u>Defendants' Omissions Rendered Their Statements Materially Misleading</u>[5]

Rule 10b-5 "prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat*, 658 F.3d at 1305 (quoting Rule 10b-5); *see Matrixx*, 563 U.S. at 44 (same).  As the Eleventh Circuit has stated, "[b]y voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" *FindWhat*, 658 F.3d at 1305 (quotation omitted). "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *Id.* (quotation omitted).  "[A] defendant may not deal in half-truths." *Id.* (quotation and citation omitted); *see also Rabkin v. Lion Biotechs., Inc.*, 2018 U.S. Dist. LEXIS 25326, at *27 (N.D. Cal. Feb. 15, 2018) (rejecting similar argument that "plaintiff's 'omission theory' fails because an alleged lack of completeness is not actionable," on similar facts).

---

[5] Both Romandetti (who signed the 10-Ks) and FCHS (the company who issued them) made the statements and omissions at issue here. *See, e.g.*, *SEC v. Lottonet Operating Corp.*, 2017 U.S. Dist. LEXIS 51390, at *33 (S.D. Fla. Mar. 31, 2017), *recommendation adopted*, 2017 U.S. Dist. LEXIS 53840 (S.D. Fla. Apr. 6, 2017) (signatory and company liable for misleading statements in SEC filings).

In considering whether an omission has made a statement misleading, "the 'appropriate inquiry' is 'into the meaning of the statement to the reasonable investor and its relationship to the truth.'" *FindWhat*, 658 F.3d at 1305 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968)). "A statement is misleading if in the light of the facts existing at the time of the [statement] ... [a] reasonable investor, in the exercise of due care, would have been misled by it." *FindWhat*, 658 F.3d at 1305 (citation and quotation omitted).

The omitted facts here were extremely material, as they concerned Romandetti's scheme for the manipulation of FCHS stock, evidenced  by a nearly 65% stock price decline immediately upon their disclosure.  Further, during the Class Period, FCHS *conceded* that such omissions are *material* by stating in its Disclosure Policy (as described below at n.11) that "[a]ny information that could be expected to affect the Company's stock price, whether it is positive or negative, should be considered material."  ¶54.

Additionally, "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c), that misconduct creates an independent duty to disclose. Failure to do so thus gives rise to a violation of Rule 10b-5(b)." *In re Initial Pub. Offering ["IPO"] Sec. Litig.*, 241 F. Supp. 2d 281, 381 (S.D.N.Y. 2003).  "[T]he duty to disclose falls on all parties aware of the manipulation, or who take advantage of it." *Id.*  Thus, where plaintiffs allege market manipulation (allegations supported here by a DOJ Indictment):

> "[Defendants] possessed the affirmative duty ... to disclose this fact" to Plaintiffs.  And because, in addition to that duty, the content of the alleged misrepresentation was material [], Plaintiffs have stated a Rule 10b-5(b) claim for material misstatements upon which relief may be granted.

*Id.* at 382-83 (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972)); *see Hienergy*, 2005 U.S. Dist. LEXIS 47044, at \*11, 24 (sustaining §10(b) claim where allegations

11

that CEO and others formed an undisclosed group for the purpose of manipulating company's stock "mainly center on allegations of material omissions"); *Mausner v. Marketbyte LLC*, 2013 U.S. Dist. LEXIS 199521, at \*22 (S.D. Cal. Jan. 4, 2013) ("A defendant's 'failure to disclose that market prices are being manipulated constitutes a material omission of fact in the offer of securities.'") (citations omitted).

### a)   Material Omissions Regarding the Volatility of FCHS's Stock Price

Defendants' discussion of stock price volatility/fluctuations in their public filings, stating it *may* occur due to a number of wholly innocuous and *hypothetical* factors, while omitting to disclose that it was already occurring due to a market manipulation scheme orchestrated by the CEO, was highly misleading, and is actionable. *See FindWhat*, 658 F.3d at 1305; *In re IPO*, 241 F. Supp. 2d at 381-83. "After [FCHS] chose to disclose a lengthy list of reasons why its stock price might fluctuate, it needed to include in that list the alleged scheme that [it] was manipulating the stock price with the help of [Romandetti and his conspirators]." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1181 (D. Or. 2015);[6] *see also Rabkin*, 2018 U.S. Dist. LEXIS 25326, at \*28 (company "disclosed reasons why its stock might fluctuate, but failed to disclose that [it, through its CEO, and others] was engaged in a promotion scheme intended to manipulate the price of its common stock."); *Ansell v. Laikin*, 2011 U.S. Dist. LEXIS 85695, at \*9 (C.D. Cal. Aug. 1, 2011) ("Defendant represented ... that past and future stock price fluctuations were due to factors beyond the Company's control, but did not disclose that Defendant had been manipulating the stock price

---

[6] As in *Galena*, the Complaint here alleges Defendants' involvement in the market manipulation scheme, including a "pump and dump" scheme.

with the help of the stock promoter").[7]

Defendants contend they disclosed that the price "fluctuations" or "volatility" were due (or could be due) to "potential extreme price and volume fluctuations," or securities analyst estimates or reports (FCHS Mot., 13-14).  However, this tells investors nothing about a key reason for the fluctuations – manipulation of FCHS's stock price – which (as the DOJ Indictment confirms) had already affected the volatility and fluctuations of FCHS stock.[8]  The materiality thereof was amplified because the market manipulation was orchestrated by FCHS's own leader, Romandetti, making the continuation of the manipulation likely (and its thwarting, unlikely).

### b)   <u>Material Omissions Concerning the Retention of Elite by FCHS</u>

Defendants' disclosure that FCHS hired Elite, but failure to disclose that "Elite was a

---

[7] Defendants' cases (FCHS Mot., 13-14) present facts vastly different from those at issue here. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 569, 576-77 (S.D.N.Y. 2013) (disclosure of "imminence and amount" of potential lawsuit not required because court found there had been substantial information "'readily accessible in the public domain'" about the preparations of just such a lawsuit, and the amount of the potential claim); *Rok v. Identiv, Inc.*, 2017 U.S. Dist. LEXIS 1019 (N.D. Cal. Jan. 4, 2017) (disclosures concerning lack of internal controls due to lack of sufficient accounting staff encompassed the danger that an executive might slip personal expenses by the short-handed internal accounting staff).  These cases – indeed, *all* of Defendants' cases – present facts vastly different from failing to disclose a stock manipulation scheme by the CEO and trying to pass off as "sufficient disclosures" statements that a stock might fluctuate due to mundane reasons having nothing to do with the CEO's fraud.

[8] Defendants' contention that they disclosed that class actions "have often been brought against companies that experience volatility" in their stock price (*id.*) is irrelevant.  Plaintiff alleges the failure to disclose wrongdoing already perpetrated by Romandetti, which caused statements made by Romandetti and FCHS to be materially misleading.  *See, e.g., Galena*, 117 F. Supp. 3d at 1181.  Plaintiff does not allege failure to disclose a lawsuit, or the risk of one.  FCHS's suggestion that they disclosed their internal controls "*could*" prove insufficient which "*could*" hurt FCHS's stock price (Mot., 14), warns of a different, possible risk, than the concrete, specific fact, that had already come to pass.  *See* §III.B.3.c)-d), below.  Defendants' remaining contentions (FCHS Mot., 14.) similarly cite meaningless statements disclosing nothing about the then-existing shocking facts, and ignore the above-cited, well-established precedent that once a defendant chooses to address a subject, it must do so accurately and completely, and not withhold key adverse facts rendering the statements made misleading.

boiler room operation hired to engage in pump and dump scheme" (¶6) and was paid via kickbacks from Romandetti and others, was a materially misleading omission. Touting the hiring of Elite as a consultant to do a positive thing for FCHS, while omitting that Elite was actually hired to commit a crime, and was not otherwise qualified to act as a consultant (¶¶4-6, 27, 55-67), made the statement of its hiring (and manner of its "compensation") materially misleading. *See SEC v. Corporate Relations Grp., Inc.*, 2003 U.S. Dist. LEXIS 24925, at \*25 (M.D. Fla. Mar. 28, 2003) (reasonable investor would consider paid nature of stock promotion "relevant to the 'total' mix of information"); *SEC v. Huttoe*, 1998 U.S. Dist. LEXIS 23211, at \*19-22 (D.D.C. Sept. 14, 1998) (same; disclosure regarding "consulting" arrangement insufficient to disclose paid promotion scheme); *see also Galena*, 117 F. Supp. 3d at 1181.[9]

### c)   <u>Material Omissions Regarding Romandetti as a Key Executive</u>

Portraying Romandetti as "key" to FCHS's success was particularly misleading in light of the nature of the omitted facts – that he orchestrated the market manipulation of the stock of the very company of which he was CEO (and thereby making his departure inevitable) – directly undercutting the integrity and credibility of FCHS as a company and as an investment. Accordingly, these statements are actionable. *See Miller v. Apropos Tech., Inc.*, 2003 U.S. Dist. LEXIS 5074, at \*15-19 (N.D. Ill. Mar. 31, 2003) (similar statements regarding key employees in SEC filings found actionable); *Voit v. Wonderware Corp.*, 977 F. Supp. 363,

---

[9] *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257 (11th Cir. 2016), is not to the contrary. Plaintiffs there alleged that defendants failed to disclose they paid promotional firms to write flattering articles about the company; but there was no allegation the articles were false, and the court found defendants' conduct was *not* "manipulation." Here, Defendants failed to disclose an illegal market manipulation scheme, including classic "boiler-room" and "pump-and-dump" operations, orchestrated by FCHS's own CEO, who profited therefrom. Such facts are supported by the DOJ Indictment and the SEC Complaint, and go to the very heart of shareholder trust in the Company and its leader.

370-71 (E.D. Pa. 1997) (same); *see also Ansell*, 2011 U.S. Dist. LEXIS 85695, at \*9 ("by failing to mention his scheme but listing several other risks ... Defendant misled investors into believing that the [document] had disclosed all known risks of investing in the Company.").

Defendants' argument that there is no duty to disclose uncharged criminal conduct, or the risk thereof (FCHS Mot., 10, 12-13), misapprehends the issue. Defendants have a duty to disclose then-existing, material facts, the omission of which mislead investors. *Supra*. Defendants did not need "criminal charges" to know that Romandetti's market manipulation of FCHS's stock was highly material, adverse information, that should have been disclosed in light of the public statements Defendants had voluntarily made. *See Galena*, 117 F. Supp. 3d at 1189 (sustaining §10(b) claims despite lack of criminal charges where "[t]here is a substantial likelihood that a reasonable investor would have found the fact that Galena's Prospectus and SEC filings did not disclose that the Company and its officers were engaging in fraud or market manipulation to have significantly altered the 'total mix' of information."); *Rabkin*, 2018 U.S. Dist. LEXIS 25326 (liability on similar facts despite no criminal charges); *Ansell*, 2011 U.S. Dist. LEXIS 85695 (same).[10]

---

[10] Defendants' citation to *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 52 F. Supp. 3d 961 (N.D. Cal. 2014), is unavailing. That case concerned allegations of the CEO's personal misconduct (sexual advances to an independent consultant), some of which an internal investigation did not find were supported; and the board disclosed the investigation and the CEO resigned days thereafter. This is a far cry from a CEO's manipulation of his company's own stock for his personal financial gain (giving rise to a duty to disclose) – disclosed only when he was indicted and arrested. Equally inapplicable are their other citations. *See In re UBS AG Sec. Litig.*, 2012 U.S. Dist. LEXIS 141449, at \*97-105 (S.D.N.Y. Sept. 28, 2012) (articles in public domain already disclosed government investigation into tax evasion by lower-level employee in "minor business unit" with small percentage of revenue); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375-77 (S.D.N.Y. 2004) (allegations of mere mismanagement, not manipulative or deceptive conduct implicating §10(b)).

### d) **Material Omissions Regarding FCHS's Compliance Program and Code of Ethics**

Defendants misleadingly touted their Compliance Program and Codes of Conduct and Ethics during the Class Period.  FCHS represented in its 10-Ks that its Compliance Program "reflects our commitment to complying with all laws, rules and regulations applicable to our business" and "*meets our ethical obligations in conducting our business*."  ¶45.  FCHS highlighted that "*[t]he foundation of our Compliance Program is our Code of Ethics"* which is "applicable to our employees, officer and directors" and *"a comprehensive statement of the ethical and legal standards governing the daily activities of our employees, ... officers and directors*. All our personnel are *required to abide by, and are given thorough education regarding, our Code of Ethics*." *Id.*

The 10-Ks emphasized FCHS had (i) a "Compliance Committee consisting of senior executives" (including Romandetti), (ii) "education, monitoring and corrective action programs" to ensure compliance, including a "disclosure program" and "disclosure policy" establishing "methods to promote the understanding of our Compliance Program and adherence to its requirements," and (iii) "a mechanism to enable individuals to disclose on a confidential or anonymous basis to our [CEO]. . . issues or questions believed by the individual to be a potential violation of ... laws," as "all employees are expected to report incidents that they believe in good faith may be in violation of our Code of Ethics." *Id.*

The FCHS 10-Ks (*e.g.*, Dkt. No. 13-2 (FCHS 2014 10-K) at 42) stated that FCHS "has adopted a Code of Ethics for adherence by its [CEO] and [CFO] to ensure honest and ethical conduct; full, fair and proper disclosure of financial information in the Company's periodic reports filed pursuant to the [Exchange Act]; and compliance with applicable laws, rules, and

16

regulations," and directed investors to FCHS's website for a full copy.[11]

FCHS's stated purpose of the Code of Ethics was to "deter wrongdoing and to promote," *inter alia*, "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest," "full, fair, accurate, timely, and understandable disclosure" in its SEC filings and other communications," "compliance with applicable ... laws," and "prompt internal reporting of violations of this Code."   ¶48.   FCHS's Code of Conduct defined a "conflict of interest" as, *inter alia*, "when a *director, officer*, or employee ...  receives *improper personal benefits* as a result of his or her position with the Company."   ¶49.   The Code of Conduct further states that "[a]ll directors, officer and employees" are to report to the CEO, CFO, Disclosure Committee or Audit Committee, as appropriate, *inter alia*, "any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls," "any violation of this Code, including ... conflicts of interest" of such persons, or a "violation of securities or other laws ... applicable to the Company ... by the Company or any agent thereof...."   ¶50.

Thus, these policies – created and disclosed to reassure investors that FCHS and

---

[11] In its Disclosure Policy, set forth on its website, FCHS stated it "is committed to providing timely, orderly, consistent and credible information, consistent [with] legal and regulatory requirements, *to enable orderly trading in our publicly held securities*" (¶52), and that "execution of this disclosure policy will help *ensure compliance* ... and will help reduce *volatility*, [and] *strengthen the Company's credibility*."   ¶54.   As part of that Policy, FCHS had a "Disclosure Policy Committee," chaired by Romandetti, the purpose of which was "*to set insider-trading policies*, ... assure compliance with applicable disclosure laws ... and coordinate ongoing disclosure practices" and monitor "unusual market price movements or activity and information generally circulating in the marketplace to determine if such movements or activity can be traced directly or indirectly to selectively disclosed non-public material information by the Company or anyone acting on its behalf." ¶53.   That FCHS sought to reassure investors that its CEO was on top of Compliance issues through, *e.g.*, chairing such a committee, and was subject to various ethics requirements, made all the more misleading the failure to disclose that, in reality, he was manipulating FCHS's stock price and benefitting therefrom.

Romandetti were, respectively, an ethical, law abiding company and citizen, when the true, omitted facts proved otherwise – were a sham in practice and were not followed.

The Eleventh Circuit has found similar statements actionable. *See FindWhat*, 658 F.3d at 1298-99 ("To avoid being misleading, the Defendants' statements triggered a duty to disclose the grave defects that existed within the 'enforce[ment]' system they voluntarily touted" (citing *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007))). As in *FindWhat*, Defendants' statements create the impression that FCHS maintains an active and ample system for preventing the type of egregious behavior committed by the CEO and his co-conspirators (one hired by FCHS) to manipulate its own stock. *Id.* at 1298 ("Accepting the Plaintiffs' allegations as true, these statements are misleading because they could mislead a reasonable investor into believing that the Defendants had systems in place that would detect and remove [persons engaged in fraudulent] practices, when in truth and in fact they did not.").[12] Thus, Plaintiff "plausibly allege[s] facts indicating that a reasonable investor would assume that" FCHS's compliance and corporate governance procedures were "adequate." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243-44 (S.D.N.Y. 2012) (holding statement actionable that company conducted

---

[12] *See also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251-52 (2d Cir. 2014) (affirming denial of summary judgment as trier of fact could find omissions regarding ongoing compliance violations may have "render[ed] misleading the comforting statements ... about compliance measures"); *In re Signet Jewelers Sec. Litig.*, 2019 U.S. Dist. LEXIS 97959, at *9-11, *20 (S.D.N.Y. June 11, 2019) (holding actionable statements in Code of Conduct and Code of Ethics on corporate website referenced in SEC filings that company was "committed to a workplace that is free from sexual ... or other unlawful harassment" where plaintiffs alleged company had pervasive culture of sexual harassment); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 661 (S.D.N.Y. 2017).

18

"'extensive' 'training and safety programs'").[13]

### e)  Material Omissions Regarding Defendants' SOX Certifications

Liability of signatories for statements or omissions made in 10-K filings or SOX certifications are evaluated on their own merits. Defendants' own authority acknowledges this. *See In re KBR, Inc. Sec. Litig.*, 2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) (cited at FCHS Mot., 12; statements in SOX certifications "are not actionable where the allegations do not challenge the content of the certifications themselves.")).

Defendants misapprehend the point of Plaintiff's claims concerning SOX certifications. Plaintiff does not allege liability for the mere certification, but for the fact that the certifications, themselves, misleadingly claimed (i) that the 10-Ks did not "omit to state a material fact necessary to make the statements made ... not misleading," when Romandetti knew otherwise; and (ii) that he disclosed "[a]ny fraud ... that involves management or other employees who have a significant role in [FCHS's] internal control over financial reporting," notwithstanding that he knew he did not. ¶¶74-75. *See Rabkin*, 2018 U.S. Dist. LEXIS 25326, at *29-30 (virtually identical SOX certifications held actionable where they failed to disclose stock promotion/manipulation scheme engaged in by CEO); *see also Galena*, 117 F. Supp. 3d

---

[13] FCHS's cases (Mot., 17-18) are inapposite, and the propositions for which they are cited do not apply to these facts. Unlike *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009), Plaintiff here does not seek disclosure of "all violations" of a code of ethics, but violations that were egregious, and went to the heart of the integrity of the Company, its leader, and its stock price. *See also Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 717-18 (S.D.N.Y. 2018) ("mere adoption of a code of ethics" itself "not rendered misleading by a breach thereof," where claims amounted to mere mismanagement; unlike here, where code was more specific and touted in FCHS's filings, and undisclosed wrongdoing resulted in criminal charges); *Hewlett-Packard*, 52 F. Supp. 3d 961 (general business standards policy not actionably misleading for failure to disclose CEO's sexual advances to consultant; *but see* contrary result in *Signet, supra*). FCHS's remaining cases (Mot., 17-18) are inapposite as they merely state that "reasonable investors do not base their investing decisions on corporate 'puffery.'" Here, Defendants' statements were not mere vague platitudes**.**

at 1181-82 (liability where plaintiffs alleged that SEC filing "asserts that it does not omit a material fact and that the signatories have disclosed to Galena's auditors any fraud that involves management or other employees"); *Horizon Lines*, 686 F. Supp. 2d at 417-20 (cited FCHS Mot., 17, "where 'the complaint asserts facts indicating that, at the time of the certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their [SOX] certification erroneous,' a false or misleading certification may form the basis of a ... Rule 10b-5 claim.").[14]

### 3. Material Omissions Concerning the Volatility of FCHS Stock Are Not Subject to the PSLRA Safe Harbor or Bespeaks Caution Doctrine

FCHS claims the risk disclosures concerning the volatility of FCHS's common stock (¶¶22, 26, 31-32, 36-37, and 41-42) are protected by the PSLRA safe harbor or the bespeaks causation doctrine. FCHS Mot., 12.[15] Defendants are wrong.

### a) The Safe Harbor Is Inapplicable as FCHS Stock was a Penny Stock

The Eleventh Circuit has explained that "a defendant may avoid liability [under the PSLRA's safe harbor, 15 U.S.C. §78u-5] by showing: (1) the forward-looking statement was issued with meaningful cautionary language; (2) the statement was simply immaterial; or (3) that the plaintiff fails to prove that the statement was made with actual knowledge that it was false." *City Pension Fund for Firefighters & Police Officers in the City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1399 (S.D. Fla. 2011) (citing *Edward J. Goodman*

---

[14] FCHS's reliance on *Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006), is misplaced, as that court addressed the issue of whether the signing of SOX certifications showed Defendants' *scienter*, not an issue here since Romandetti's scienter is uncontested by Defendants. *Garfield* in no way limits liability in SOX certifications to statements or omissions only respecting financial figures.

[15] FCHS does not contend that the risk disclosures alleged to be misleading concerning FCHS's key employees (¶¶23, 28, 33, 38, 43) are forward looking.

*Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010)).[16]

However, the PSLRA safe harbor is inapplicable because it specifically states that it "***shall not apply to a forward-looking statement*** that is made with respect to the business or operations of the issuer, ***if the issuer…issues penny stock***." 15 U.S.C. §78u-5(b)(1)(C); *see also SEC v. Strategic Global Invs., Inc.*, 262 F. Supp. 3d 1007, 1021 (S.D. Cal. 2017) ("Congress expressly excluded all issuers of penny stocks from the protections afforded by the Safe Harbor provisions."). FCHS ***admitted*** in each of its 10-Ks filed during the Class Period ***that its common stock was "subject to the SEC's 'penny stock' rules."*** *See, e.g.,* FCHS Mot. Ex. A (2017 10-K) at 24 and Ex. B (2014 10-K) at 25 (Dkt. Nos. 13-1 and 13-2). As such, FCHS ***is foreclosed from arguing for safe harbor protection***. "[A]ny litigation protections offered by the Safe Harbor provisions are inapplicable here." *Strategic Global*, 262 F. Supp. 3d at 1021.

### b) The Bespeaks Caution Doctrine is Unavailing as Plaintiff Does Not Allege False Statements in Offering Documents

The bespeaks caution doctrine has not been applied by the Eleventh Circuit beyond statements in offering documents. *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 850 (11th Cir. 2004) ("'bespeaks caution' cases [] deal with forecasts or projections ***in offering documents***."); *see also Saltzberg v. TM Sterling/Austin Assocs.*, 45 F.3d 399, 400 (11th Cir. 1995) ("When ***an offering document's projections*** are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law."); *Merchant*

---

[16] As shown above at §III.B.2.a)-e), the omission of Romandetti's manipulation was material, and as shown at §§II.A.-B and III.C.1, C.3, the omission was made with Romandetti's actual knowledge.

*Capital*, 483 F.3d at 767 (same, quoting *Saltzberg*).[17]   Plaintiff does not allege misleading statements in offering documents, but rather in 10-Ks, and hence the bespeaks caution doctrine is inapplicable.

Moreover, the bespeaks caution doctrine raises issues inappropriate for determination on a motion to dismiss.  *See In re Ins. Mgmt. Solutions Grp. Sec. Litig.*, 2001 U.S. Dist. LEXIS 9962, at *33 (M.D. Fla. July 11, 2001)  ("To the extent the bespeaks caution doctrine may apply to the statements made in connection with the IPO, the Court refrains from ruling at the motion to dismiss stage on this issue, requiring the development of a factual basis.").

### c)   <u>The Volatility Risk Disclosure Is Not Forward Looking</u>

Even if the safe harbor or bespeaks caution doctrine[18] were applicable, statements of present or historical fact are not protected. *See FindWhat*, 658 F.3d at 1299.  Moreover, an "otherwise actionable omission concerning past or present problems, [] cannot be sanitized by forward-looking statements about similar problems." *In re Towne Servs. Sec. Litig.*, 184 F. Supp. 2d 1308, 1320 (N.D. Ga. 2001) (footnote omitted).   *Towne Services* expressly distinguished the Eleventh Circuit holding in *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999), relied on by FCHS, as addressing "the typical 'forward-looking' scenario, *i.e.*, predictions that do not come true." *Towne Servs.*, 184 F. Supp. 2d at 1321 n.10. As in *Towne Services*, Plaintiff here

---

[17] In *Saltzberg*, the Eleventh Circuit "accepted and applied the 'bespeaks caution' doctrine as explained in *In re Donald J. Trump Casino Sec. Litig*., 7 F.3d 357 (3rd Cir. 1993)."  45 F.3d at 400.  *Trump Casino* also stated that the bespeaks caution doctrine related to "***cautionary language in [an ] offering document.***"

[18] As the safe harbor is the "statutory equivalent" of the bespeaks caution doctrine, *Merchant Capital*, 483 F.3d at 767 n.18, Plaintiff's arguments against the safe harbor are equally applicable to the bespeaks caution doctrine.

do[es] not contend that the statements [] are false or misleading because of later events, but rather, that they are false or misleading because of events that had already occurred at the time of the [omission]. A claim of this type is not barred by the safe harbor for 'forward-looking' statements or the 'bespeaks caution' doctrine. [*Id.* at 1320-21.]

Here, the challenged statements are not forward-looking as they omitted present and historical facts, namely that Romandetti was, and had been, manipulating the price of FCHS stock.

### d) The Cautionary Language Was Not Meaningful

For a forward-looking statement to receive safe harbor protection, the accompanying "cautionary statement" must be "meaningful." 15 U.S.C. §78u-5(c)(1)(A)(i). FCHS is protected by neither the PSLRA safe harbor nor the bespeaks caution doctrine as its omissions and disclosures were not accompanied by meaningful cautionary language. Only "when an investor has been warned of risks of a significance similar to that actually realized" is he or she "sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris*, 182 F.3d at 807; *see also Saltzberg*, 45 F.3d at 400 (for bespeaks caution to apply, warnings must be "explicit, repetitive and linked to the projections about which plaintiffs complain."). The risk disclosure here did not warn of "risks of a significance similar to that actually realized." It only listed risks that could involve any common stock (such as negative analyst reports or not meeting financial projections). The risk disclosure *listed nothing similar to the fact that Romandetti, with the help of a paid consultant of FCHS and others, was actively manipulating the price of FCHS stock*. As such, it was not meaningful. *See FindWhat*, 658 F.3d 1299.

Further, when a risk has already occurred and corporate officers have become aware of it, the inclusion of cautionary language that omits mention of the realized risk will not cure the

23

non-disclosure. As the Eleventh Circuit has held, when

> a promoter makes optimistic statements about the prospects of the business but fails to include past performance information that would be useful to a reasonable investor in assessing those statements…general cautionary language does not render omission of [those] specific adverse historical facts immaterial. [*Merchant Capital*, 483 F.3d at 768.[19]]

"'[T]o warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'" *FindWhat*, 658 F.3d at 1299 (quoting *Merchant Capital*, 483 F.3d at 769 and *Rubinstein*, 20 F.3d at 171). At the time the risk disclosures were made, Romandetti was actively manipulating FCHS's common stock. As such, the event had already occurred, and failure to disclose it is not immunized by purported forward looking statements.

## C. The Complaint Pleads a Strong Inference of Scienter as to Defendants

### 1. The Complaint Pleads a Strong Inference of Scienter as to Romandetti

Neither Romandetti nor FCHS challenges (and thus concede) that the Complaint alleges a strong inference of scienter as to Romandetti. Nor can they so challenge. The Complaint alleges that Romandetti was intimately involved with, and helped direct, the pump and dump scheme, evidencing his knowledge of it and his failure to disclose it in the Company's SEC filings and other public statements. As the most senior officer of FCHS, and a member of the Disclosure Committee and Compliance Committee, Romandetti had personal knowledge of, and approved, FCHS's Compliance Program, Code of Conduct, and Disclosure Policy, and was aware of the need to disclose the material fact of the pump and dump scheme

---

[19] *See also Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("[T]he inclusion of general cautionary language regarding a prediction [does] not excuse the alleged failure to reveal known material, adverse facts.").

24

and his involvement in it.  *See* §III.B.2.d), above.  Thus, the Complaint alleges that Romandetti made his materially misleading omissions with actual knowledge.

### 2. Romandetti's Scienter Is Imputed to FCHS

As to FCHS, Plaintiff has pled sufficient facts to impute the (unchallenged) scienter of Romandetti, to FCHS, under the well-established principles of corporate scienter.  *See, e.g.*, *ZPR Inv. Mgmt. v. SEC*, 861 F.3d 1239, 1252 (11th Cir. 2017) ("The scienter of a corporation is established by showing that the corporation's officers or directors acted with scienter."); *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010) ("Corporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them."); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (imputing officers' scienter to company); *see also SEC v. Spartan Sec. Grp., Ltd.*, 2019 U.S. Dist. LEXIS 94135, at *14-15 (M.D. Fla. June 5, 2019) (individual defendants' severe recklessness pled, "[c]onsequently" scienter imputed to their company).

### 3. The Adverse Interest Exception Does Not Immunize FCHS

FCHS acknowledges "the general rule is that the scienter of a corporation's executives can be imputed to the corporation" FCHS Mot., 22.  Yet, FCHS half-heartedly invokes the so-called "adverse interest" exception, which it admits "may be difficult to apply ... on a motion to dismiss."  *Id.*, 22-23.  FCHS cites no case from this Circuit applying this exception, and there is no compelling reason for this Court to apply it.  In any event, those few courts outside of this Circuit that have addressed this exception have held that "'this most narrow of exceptions' is reserved for cases of 'outright theft or looting or embezzlement ... where the fraud is committed *against* a corporation rather than on its behalf.'"  *In re Bernard L. Madoff*

25

*Inv. Sec. LLC*, 721 F.3d 54, 64 (2d Cir. 2013) (citation omitted, emphasis in original).  Thus,

"'where a corporation benefits to *any* extent from the fraudulent acts of its agents, the agents

cannot be said to have 'totally abandoned' the interests of the corporation.'" *In re Petrobras*

*Sec. Litig.*, 116 F. Supp. 3d 368, 382 (S.D.N.Y. 2015) (quoting *Kirschner v. Grant Thornton*

*LLP*, 2009 U.S. Dist. LEXIS 32581, at \*22 (S.D.N.Y. Apr. 14, 2009) (emphasis in original).[20]

Here, not only did Romandetti not steal from FCHS or otherwise act adversely to it,

but Romandetti's actions, including hiring Elite with the knowledge of the Company and all

of its officers and directors, artificially promoted FCHS stock, in order to make it rise in value

(*e.g.,* ¶¶4-6, 27, 55-56, 58, 66-67, 80, 82) – which did occur – and which inured to FCHS's

benefit.  Thus, he did not act "adversely" to FCHS. *See Kirschner*, 2009 U.S. Dist. LEXIS

32581, at \*31-32 (exception inapplicable "however reprehensible the conduct of the insiders"

in profiting from scheme, as it did not directly harm company, only share purchasers);

*Hienergy*, 2005 U.S. Dist. LEXIS 47044, at \*23-24 (rejecting adverse inference exception

defense on motion to dismiss).[21]

---

[20] *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 982 (N.D. Cal. 2013), does not help FCHS.  There, the court recognized that ordinarily "applying the adverse interest exception on a motion to dismiss is inappropriate;" but concluded that it applied because the executive *stole from* the corporation, which "paid [his] improper expenses."  *Id.*  Thus, his interest was clearly "adverse" to his company, which was the "victim" of his behavior.  *Id.  See also Fries*, 285 F. Supp. 3d at 711-13 (FCHS Mot., 23) (where CEO started a different company and crux of allegations was that he "neglected his responsibilities as the CEO of Northern Oil, and instead, appropriated Northern Oil resources to further his control of Dakota Plains.").

[21] Further, FCHS benefitted from Romandetti's misconduct because "the failure to correct the corporation's public statements allowed the company 'to survive – to attract investors and customers and raise funds for corporate purposes.'" *In re Lihua Int'l Sec. Litig.*, 2016 U.S. Dist. LEXIS 44252, at \*50 (S.D.N.Y. Mar. 31, 2016) (citation omitted); *see also In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1361-62 (S.D. Fla. 2005) (scienter imputed where CEO engaged in pump-and-dump scheme in company stock, while company benefited by appearing healthy and successful).

In any event, the exception (even if recognized, and applicable) does not prevent imputation of scienter to FCHS here because of Romandetti's "substantial control over [FCHS's] affairs." *Sunbeam*, 89 F. Supp. 2d at 1340 ("the knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation."); *Costa Brava P'ship III LP v. ChinaCast Educ. Corp.*, 809 F.3d 471, 477, 479 (9th Cir. 2015) (noting also that "adverse interest" exception does not apply when innocent third parties (such as shareholders here) are harmed).

Thus, all the knowledge/scienter Romandetti had is imputed to FCHS. *ZPR*, 861 F.3d at 1252.  This includes Romandetti's (uncontested) knowledge that Elite was a "boiler room" operation (¶¶56-67, 71-88), which renders FCHS's contentions regarding the pleading of its own knowledge regarding Elite (FCHS Mot., 18-19) beside the point.  *See id.* at 1252.

Citing *Fries*, 285 F. Supp. 3d at 722, FCHS suggests that Romandetti's termination after the DOJ indicted him raises a sufficient inference under *Tellabs* to overcome the imputation of scienter.  However, in *Fries*, where the CEO was terminated after receiving a Wells Notice from the SEC, the Court cited a host of reasons negating scienter (*id.* at 720-22) before, lastly, adding that he was terminated.  Thus, in that case, the fact of termination alone was in no way determinative.  Here, FCHS effectively had no choice but to terminate Romandetti after his indictment and arrest, for public relations and practical purposes.  *See Galena*, 117 F. Supp. 3d at 1167, 1173 (fact that CEO was terminated for cause or resigned was evidence *supporting* inference of scienter, and imputing that scienter to corporation).

**D.  <u>Defendants' Arguments Concerning Reliance Are Without Merit</u>**

Plaintiff expected that FCHS and its CEO were disclosing all material facts known to

27

them about the Company and trading in its stock.  Plaintiff's justifiable reliance was misplaced.

Nonetheless, Defendants argue that Plaintiff has not sufficiently pled the element of reliance.

Defendants are wrong for the following reasons.

*First*, the Complaint alleges reliance.  ¶17 ("Plaintiff purchased 250,859 shares of

[FCHS] common stock at artificially inflated prices in reliance on Defendants' misleading

statements due to omissions of material facts during the Class Period."); ¶102 ("Plaintiff and

the other members of the Class relied on the statements described above during the Class

Period in purchasing [FCHS] common stock at prices that were artificially inflated as a result

of the misleading statements by Defendants."); ¶103.  In sum, Plaintiff relied on the omission

of the fact of Romandetti's market manipulation of FCHS stock from Defendants' statements,

which rendered them misleading.  *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 246-47

("'Who would knowingly roll the dice in a crooked crap game?'") (citation omitted).

*Second*, whether reliance on a class-wide basis is sufficiently indicated is an issue to be

resolved at the class certification (or later) stage, not on a motion to dismiss.[22]  *See Anwar v.*

*Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 449 (S.D.N.Y. 2010) (reliance "ordinarily is

a fact-intensive issue not proper for determination as a matter of law at the pleading stage");

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-84 (2014) (discussing fact-

bound considerations in establishing class-wide reliance in §10(b) cases).  Here, the Complaint

alleges that "[FCHS] common stock was actively traded on the OTC" (¶91).  Courts have held

that stocks trading on the OTC market traded in an efficient market, such that the "fraud-on-

---

[22] That Defendants recognize this issue is more properly addressed at a later stage, *i.e.*, class certification, is indicated by their statement that Plaintiff "*ultimately*" would need to show the class relied on the market's efficiency.  FCHS Mot., 19-20.

the-market" presumption of reliance applied. *See In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 430 (S.D. Fla. 1991) ("[c]ontrary to Defendants contention, ... the majority of courts considering the issue have held that the fact that securities traded on an OTC market, rather than on a national stock exchange, will not necessarily defeat a finding of market efficiency").[23]

*Third*, the key indicator of an efficient market is "an immediate negative impact on the stock price" following an "unexpected disclosure." *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1257 (11th Cir. 2014). Here, in particular, FCHS stock reacted decidedly and immediately upon disclosure of Romandetti's market manipulation scheme, dropping nearly 65% in one trading day. ¶¶11, 68. This is "'the hallmark of an efficient capital market'" – prompt digestion of information, reflected in the stock price. *Regions*, 762 F.3d at 1257 (citation omitted); *see also Cammer v. Bloom*, 711 F. Supp. 1267, 1287 (D.N.J. 1989) (noting this factor is "the essence of an efficient market and

---

[23] Defendants' cases (FCHS Mot., 20-21), most of which were decided on a class certification motion, are unpersuasive, and turned on vastly different facts. *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213 (C.D. Cal. 2015), is distinguishable on multiple grounds including: it involved trading of unregistered shares of stock where sales of one shareholder constituted 22.6% - 50% of total weekly sales at issue; the court found plaintiff *knew the true facts* and thus could not have reasonably relied, and was prevented by the terms and acknowledgments of a stipulation from asserting reliance; critically, plaintiff's claim was based on alleged direct, private misrepresentations from defendant to plaintiff, not on *public* statements or omissions to the market; and the court concluded that Scrips stock price movements did not correlate with public news of corporate events, negating an inference of an efficient market. *Id.* at 1224, 1226, 1238, 1248-58.

Also inapposite are *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) (claim failed because "Plaintiffs were not ignorant of the manipulation of the price of RMDX stock that they now claim to be victims of, and so cannot establish that they relied on [a] market free of manipulation"); *Epstein v. American Reserve Corp.*, 1988 WL 40500 (N.D. Ill. Apr. 21, 1988) (denial of *class certification* for lack of adequate representative; plaintiff's purchases made after alleged fraud became known); and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001) (on *class certification*, court noted that determination of reliance presents questions of law and fact, rejecting per se rule regarding OTC stocks as the relevant inquiry remains the market for that stock, not where it trades).

29

the foundation for the fraud on the market theory.").  In *Regions*, 762 F.3d at 1257, the court

affirmed the granting of class certification, stressing that the inquiry is fact-specific, regardless

of where the stock trades, stating:

> Stocks that trade on a smaller scale, or that are not widely followed, might trade on an efficient market. It is up to the District Courts to consider the nature of the market on a case-by-case basis to decide whether the totality of the circumstances supports a finding of market efficiency.... [P]laintiffs ... did identify one unexpected disclosure around the class period – a corrective disclosure on January 20, 2009, which had an immediate negative impact on the stock price. On this record, the District Court did not abuse its discretion when it refused to require the plaintiffs to identify more instances of unexpected disclosures and a resulting price impact.... 'While the particular market for stock trades might be relevant, it is not dispositive of whether the current price reflects all available information, which, of course, is the hallmark of an efficient capital market.' [Citation omitted]. Thus, although trading on a national exchange may be relevant to the inquiry, District Courts should remain focused on the market for the particular stock before them, as *FindWhat* suggests.

*Id.*, *class certification granted on partial remand*, 2014 U.S. Dist. LEXIS 162403, at *19-20

(N.D. Ala. Nov. 19, 2014) (finding significant stock drop upon unexpected disclosure provided

evidence of efficient market); *see also FindWhat*, 658 F.3d at 1310, 1313, 1317 (noting that an

"informationally efficient market rapidly and efficiently translates public information into the

security's price;" efficient market shown where "immediately" after company revealed truth,

"the inflation in [its] stock price dissipated.").[24]

At a minimum, however, sufficient questions of fact concerning the efficiency of the

---

[24] Defendants cite *Fezzani v. Bear Stearns & Co.*, 777 F.3d 566, 572 (2d Cir. 2015), to suggest that the Second Circuit has questioned the theory of reliance on the integrity of the market in market manipulation cases.  However, *Fezzani supports* Plaintiff's theory of reliance.  *Fezzani* reasoned that, "in a manipulation claim, a showing of reliance may be based on market activity intended to mislead investors by sending a false pricing signal to the market, upon which victims of the manipulation rely." *Id.* at 571-72.  Here, the Complaint, and the DOJ/SEC, allege that Defendants created precisely the type of "false pricing signal" that the *Fezzani* panel reasoned would be sufficient to show reliance.

market for FCHS stock exist to make resolution of this issue inappropriate on a motion to dismiss, prior to any further discovery. *See Anwar*, 728 F. Supp. 2d at 449.

*Fourth*, in any event, as set forth throughout the Complaint, Plaintiff's allegations focus on the ***omission*** of material facts – Romandetti's market manipulation scheme in FCHS stock – rendering Defendants' statements misleading. As such, the *Affiliated Ute* presumption of reliance applies here. In *Affiliated Ute*, the U.S. Supreme Court held that:

> in cases involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. Th[e] obligation to disclose and th[e] withholding of a material fact establish the requisite element of [reliance].

406 U.S. at 153-54 (internal citations omitted). Essentially, the Supreme Court held what is obvious – you cannot rely on something that should have been, but was never, disclosed. *See also Lipton v. Documation, Inc.*, 734 F.2d 740, 743 (11th Cir. 1984) ("In nondisclosure cases, therefore, a plaintiff may prove reliance through a rebuttable presumption that he relied on the undisclosed information, subject to the defendant proving that the plaintiff's decision would have been unaffected even if the omitted information had been disclosed.").

Courts have reasoned that the *Affiliated Ute* presumption is also applicable in cases involving market manipulation, because any failure to fully disclose market manipulation is "intrinsically misleading" and "(presuming the illegality is also material) is always violative" of Rule 10b-5. *In re IPO*, 241 F. Supp. 2d at 382; *In re UBS Auction Rate Sec. Litig.*, 2010 U.S. Dist. LEXIS 59024, at *77, 81-86 (S.D.N.Y. June 10, 2010) (applying *Affiliated Ute* presumption in market manipulation case); *Hienergy*, 2005 U.S. Dist. LEXIS 47044, at *11, 24. "Where a defendant has engaged in conduct that amounts to 'market manipulation' ... that

31

misconduct creates an independent duty to disclose." *In re IPO*, 241 F. Supp. 2d at 381-82. Thus, the *Affiliated Ute* presumption of reliance applies.

### E.   <u>The Class Definition is Proper</u>

Plaintiff brought this action on behalf of "all those who purchased or otherwise acquired [FCHS] common stock during the Class Period (the "Class"), and were damaged thereby."  ¶90.  Defendants argue the "class allegations should be stricken" because the class definition creates a "fail-safe" class, as it covers those who purchased during the Class Period "and were damaged thereby." FCHS Mot., 24-25.  This argument is without merit.

*First*, this is another issue not properly resolvable on this motion to dismiss.  *See Sullivan v. GEICO*, 2018 U.S. Dist. LEXIS 219631, at *24-28 (M.D. Fla. Apr. 6, 2018) ("Motions to strike are considered 'drastic' and disfavored by courts;" citing decisions of Eleventh Circuit denying motions to strike).[25]

*Second*, the class definition here is typical of class definitions in securities cases, and virtually identical classes have been routinely certified by courts.  *See, e.g., In re Internap Network Servs. Cor. Sec. Litig.*, 2012 U.S. Dist. LEXIS 197368, at *29 (N.D. Ga. Aug. 22, 2012) (certifying class of "all persons or entities that purchased the common stock of Internap during the [class period], and were damaged thereby.").[26]

---

[25] *MRI Associates of St. Pete, Inc. v. State Farm Mutual Automobile Insurance Co.*, 755 F. Supp. 2d 1205 (M.D. Fla. 2010), and *Shenandoah Chiropractic, P.A. v. National Specialty Insurance Co.*, 526 F. Supp. 2d 1283 (S.D. Fla. 2007) (FCHS Mot., 24), involving medical billing statutes requiring serial determinations of "reasonable" amounts of a myriad of medical services, are inapposite.

[26] *See also In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 285 (N.D. Ala. 2009) ("[a]ll persons who ... purchased ... stock [of the company] and were damaged thereby"); *Burges v. BancorpSouth, Inc.*, 2017 U.S. Dist. LEXIS 97953, at *4–5 (M.D. Tenn. June 26, 2017); *In re Virtus Inv. Partners, Inc.*, 2017 U.S. Dist. LEXIS 73554, at *18 (S.D.N.Y. May 17, 2017); *In re Groupon, Inc. Sec. Litig.*, 2014 U.S. Dist. LEXIS 137382, at *9 (N.D. Ill. Sept. 23, 2014).

*Third*, even if, contrary to the numerous courts that have certified similar classes, this Court were inclined to conclude that the Class definition was improper, this can be easily remedied by redefining the Class, either at the class certification stage, or by amendment. *See Iverson v. Advanced Disposal Servs.*, 2019 U.S. Dist. LEXIS 104015, at *7-8 n.3 (M.D. Fla. June 7, 2019) (noting authority to modify class definition if needed, but rejecting fail-safe class argument, as "[class] definition may prove to strongly correlate with success or failure on the merits, the qualifying standards to join the class are based on factual criteria, not legal ones.").[27]

## F.   **Defendant Romandetti's Arguments Are Without Merit**

In his motion to dismiss (Dkt. No. 28, "R. Mot."), Romandetti raises three primary arguments, all of which lack merit. *First*, Romandetti improperly argues the Complaint must be dismissed because it is impermissible "shotgun pleading."  To begin, Count II (control person liability) simply realleges the preceding factual allegations, which is permissible. *See, e.g., SEC v. Spartan Sec. Grp., Ltd.*, 2019 U.S. Dist. LEXIS 94135, at *7-8 (M.D. Fla. June 5, 2019) (realleging prior paragraphs not considered "shotgun pleading" where facts were appropriate to claims, such as those "based on a continuous fraudulent scheme") (citing cases). Further, Romandetti acknowledges that Count II (control person liability) "cannot exist in the absence of a primary violation" (R. Mot., 4-5, 9), thus it *requires* the pleading of a primary violation (Count I).  Therefore, Plaintiff must establish the previously pled facts showing a

---

[27] *See also In re Libor-Based Fin. Instruments Antitrust Litig.*, 2016 U.S. Dist. LEXIS 63745, at *75-77 (S.D.N.Y. May 12, 2016) (denying motion to strike fail-safe class, "reformation of the class definition ... is the appropriate response," and defendant "identified no case holding that the appropriate relief is to strike the class allegations entirely"); *In re AutoZone Wage & Hour Emp't Practices Litig.*, 289 F.R.D. 526, 545-46 (N.D. Cal. 2012) (court has "broad discretion ... to [re]define the class to avoid the fail-safe problem.").

§10(b) violation, in order to establish a §20(a) violation (Count II).  Accordingly, Romandetti's argument makes no sense in the context of the only two counts here.[28]

*Second*, Romandetti argues the Complaint fails to plead reliance, which argument is unavailing as shown above.  *See* §III.D.  Romandetti's contention that failure to identify a specific statement Plaintiff relied on "impairs the Court's ability to discern whether class certification is appropriate" (R. Mot., 8) only underscores that class certification is the appropriate time to address this argument; and his related suggestion that individual reliance issues might predominate again ignores that the key omitted facts (his manipulation scheme) are common, and, of course, material.

*Third*, Romandetti contests §20(a) liability only insofar as he contends Plaintiff fails to allege a primary violation.  Because, as shown above, Plaintiff has adequately pled a primary §10(b) violation, the control person claim should be sustained as well.

## IV.  CONCLUSION

For the reasons stated above, Defendants' Motions to Dismiss (Dkt. Nos. 13, 28) should be denied.  In the alternative, Plaintiff MAZ should be given leave to replead.  Indeed, in FCHS's brief opposing a stay of the motion to dismiss briefing, pending appointment of a lead plaintiff, FCHS cited as one of the grounds for accelerated briefing that "a ruling on the Motion to Dismiss would also provide clarity for any future complaints." Dkt No. 25, p.10 n.3.  Finally, even if amendment is required, no costs are warranted in this meritorious case.

---

[28] This is not a case where, *e.g.*, a plaintiff alleges ten counts, encompassing securities, antitrust, statutory consumer, and common law, where incorporation of all preceding allegations might legitimately cause confusion.

34

## LOCAL RULE 3.1(j) REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 3.1(j), Plaintiff MAZ requests oral argument on the motions and estimates the time required for both sides to make their presentation to be one hour.

Dated: June 28, 2019                    Respectfully submitted,


**By:** */s/ Joshua W. Ruthizer*
Joshua W. Ruthizer
Fla. Bar No. 92528
Chet B. Waldman
Granted Special Admission to Practice
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Tel:  212-759-4600
Fax: 212-486-2093
cwaldman@wolfpopper.com
jruthizer@wolfpopper.com

*Attorneys for Lead Plaintiff MAZ Partners LP*
*and Lead Counsel for the Proposed Class*

Ronald J. Cohen
Fla. Bar No. 235504
RICE PUGATCH ROBINSON STORFER &
COHEN, PLLC
101 NE 3rd Ave., Suite 1800
Fort Lauderdale, Florida 33301
Tel:  954-462-8000
Fax: 954-462-4300
rcohen@rprslaw.com

*Local Counsel for MAZ Partners LP and the*
*Proposed Class*