**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| MAZ PARTNERS LP, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FIRST CHOICE HEALTHCARE SOLUTIONS, INC. and CHRISTIAN ROMANDETTI, SR., <br><br> Defendants. | Case No. 6:19-cv-00619-PGB-LRH <br><br> **RESPONSE TO DISPOSITIVE MOTION** |

**LEAD PLAINTIFF MAZ PARTNERS LP'S OPPOSITION TO DEFENDANTS'**
**OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND**
**RECOMMENDATION TO DENY DEFENDANTS' MOTIONS TO DISMISS**

## I.      INTRODUCTION

On November 14, 2018, the U.S. Department of Justice ("DOJ") filed a criminal indictment, and on November 15, 2018, the U.S. Securities & Exchange Commission ("SEC") commenced a civil action, against Christian Romandetti, Sr., the then-President, CEO, and Chairman of the Board of Directors ("Board") of First Choice Healthcare Solutions, Inc. ("FCHS," with Romandetti, "Defendants"), for participating in, and benefitting from, an illegal "pump and dump scheme" involving FCHS stock.  Romandetti was charged with securities fraud, wire fraud, and money laundering, among other violations of law.  These announcements were the first time FCHS investors learned of Romandetti's market manipulation, notwithstanding years of Defendants' public statements providing, among other things, innocuous reasons for the volatile nature of the market for FCHS stock.  As a result, on November 15, 2018, the price per share of FCHS common stock fell nearly 65%.

Lead Plaintiff MAZ Partners LP ("MAZ") filed a Complaint[1] alleging Defendants violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Thereafter, Defendants moved to dismiss all of the claims against them. Dkt. Nos. 13, 28.

On October 16, 2019, Magistrate Judge ("M.J.") Hoffman issued a thoughtful and reasoned Report and Recommendation (Dkt. No. 37, "Report"), which correctly recommended that the Court deny Defendants' motions to dismiss. M.J. Hoffman considered each of Defendants' arguments in their motions to dismiss, and applied the allegations of the Complaint to controlling and instructive precedent.

Defendants now rehash and re-purpose the same arguments presented to M.J. Hoffman, yet they identify no error of law or fact that warrants disturbing the conclusions and recommendations in the Report. Consequently, the Report should be adopted and confirmed, and Defendants' Objections (Dkt. Nos. 39, 41) denied.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Undisclosed Fraudulent Pump and Dump Scheme Orchestrated by Romandetti

From no later than September 2013, Romandetti, together with Elite Stock Research ("Elite"), Mark Burnett, Jeffrey Miller, Frank Sarro, and Anthony Vassallo (collectively, "DOJ/SEC Defendants"), were involved in an undisclosed multi-million dollar pump and dump scheme involving FCHS stock. ¶¶56-67. The DOJ/SEC Defendants acquired large blocks of FCHS shares directly from FCHS and from individuals and entities associated with

---

[1] Complaint for Violation of the Federal Securities Laws and Demand for Jury Trial (Mar. 29, 2019, Dkt. No. 1, "Complaint"). References to specific paragraphs of the Complaint are cited to herein as "¶_." Unless otherwise indicated, all emphasis used herein is added.

2

FCHS at below market prices and through loan, share exchange, stock purchase, debt conversion, and consulting agreements.  ¶¶4, 57, 63, 78.  Romandetti facilitated many of these share transfers, including through a shell company he used to transfer one million FCHS shares to Miller and Burnett.  ¶¶78-79.

Thereafter, Romandetti, Burnett, Miller, Sarro, and FCHS engaged Elite, a "boiler room" company operated and controlled by Vassallo, to artificially promote, or fraudulently "pump," the market price and trading volume of FCHS shares.  ¶¶4, 27, 58, 63, 80.  Between September 2013 and December 2015, Romandetti and others, or entities controlled by them, "wired nearly $1 million to [Elite] as compensation for its role in promoting FCHS stock, including … $160,000 from Romandetti between March 2014 and December 2015."  ¶80.

Elite and its employees (on behalf of Romandetti, FCHS, and the other DOJ/SEC Defendants) "engaged in manipulative trading patterns" to artificially drive up the price and trading volume of FCHS shares.  ¶¶57-58, 66-67.  From September 2013 through March 21, 2014, the manipulative trading increased the price of FCHS common stock from $0.90 to $3.40 per share.  ¶67.  The manipulative trading continued from March 2014 through, at least, June 2016, and the price of FCHS stock remained above $1.00 per share during that time.  ¶67.

Elite and Vassallo (on behalf of Romandetti and the other DOJ/SEC Defendants) also undertook a large scale and aggressive campaign (primarily through cold calling and a newsletter) to market FCHS stock to retail investors – most of them elderly.  ¶¶56-58, 65.  Contemporaneously with, or shortly after, FCHS stock was "recommended" to victim investors, Romandetti and the other DOJ/SEC Defendants sold ("dumped") "substantial amounts of FCHS shares at the inflated prices that their fraudulent conduct had generated."

¶59.  The fraudulent pump and dump scheme generated more than $3.3 million of illegal profits for the DOJ/SEC Defendants from their sales (which they subsequently laundered through multiple entities), along with $560,000 in kickbacks for Romandetti.  ¶¶56, 59, 61, 79, 84-85.

Romandetti orchestrated, and was intimately involved in, the fraudulent pump and dump scheme, and was in constant communication with his co-conspirators.  ¶¶78, 80-84.  For example, in June 2015, Romandetti received an email from Vassallo "regarding the identity of [Elite's] victims and the number of FCHS shares that victim investors had purchased for purposes of calculating [Elite's] compensation."  ¶81.  Romandetti visited Elite several times to discuss and coordinate the promotion of FCHS stock, and even "provided [Elite] employees with exaggerated information about FCHS that could be conveyed to victims solicited by [Elite] to induce them to purchase shares of the stock."  ¶82.  Romandetti "carefully coordinated the timing of [Elite's] promotional campaign and designed it to coincide with manipulative trading activity by Burnett, Miller, Sarro, and Vassallo."  ¶83.

## B.   **Defendants' Motions to Dismiss**

Lead Plaintiff MAZ's Complaint alleges that during April 1, 2014 to November 14, 2018 ("Class Period"), Defendants issued numerous materially misleading statements that failed to disclose the pump and dump scheme and Romandetti's involvement therein.  As a result, when the truth was revealed by the DOJ (through its criminal indictment of Romandetti) and SEC (through its civil action against him), FCHS stock immediately declined 65% in value, and MAZ and the other public market investors suffered significant damages.

FCHS and Romandetti moved to dismiss MAZ's Complaint.  Dkt. Nos. 13, 28.  FCHS argued that MAZ did not properly allege (a) a materially misleading statement or omission, (b)

4

reliance, (c) that Romandetti's scienter was imputable to FCHS, and (d) an appropriate class definition. FCHS requested that the Court dismiss the Complaint with prejudice. *See* Dkt. No. 13. Romandetti adopted FCHS's arguments concerning (a) above, and also argued that the Complaint (i) was a shotgun pleading, and (ii) failed to allege justifiable reliance. *See* Dkt. No. 28. Neither Defendant challenged that MAZ properly alleged Romandetti's scienter. Report at 31-32. MAZ opposed the motions. Dkt. No. 36.

### C.  **M.J. Hoffman's Report and Defendants' Objections**

M.J. Hoffman's Report recommends that "the Court DENY Defendants' Motions to Dismiss." Report at 39. M.J. Hoffman correctly concluded that "for purposes of the motions to dismiss, MAZ has sufficiently pleaded that Defendants' alleged omission concerning the 'pump and dump' scheme was material" (Report at 18) and that

> the complaint contains adequate allegations demonstrating that [FCHS] had a duty to disclose the alleged market manipulation scheme based on its alleged materially misleading statements. The complaint adequately alleges that some of the statements made by [FCHS] could have been rendered misleading by its failure to disclose the stock manipulation scheme, namely the [Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") (15 U.S.C. §7241)] certifications and the risk disclosures in the SEC filings. [Report at 30-31.]

MAZ alleges that Defendants gave risk disclosures concerning reasons for FCHS stock price volatility in each of FCHS's Form 10-Ks filed during the Class Period, but failed to disclose the ongoing, fraudulent, stock manipulation scheme, and Romandetti also certified that, among other things, he had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting," when he omitted that he had not. ¶¶21-22, 25-26, 30-32, 35-37, 40-42, 55, 74-75.

M.J. Hoffman correctly concluded that MAZ had alleged Romandetti acted with

5

scienter (which neither Defendant challenged) and that "MAZ has properly alleged that imputation of Romandetti's conduct to [FCHS] is proper." Report at 31, 34. Among other things, MAZ alleges that Romandetti was the CEO and Chairman of FCHS, signed the Form 10-Ks on FCHS's behalf, and FCHS benefited from the fraud because its stock price increased. ¶¶19, 21, 25, 30, 35, 40, 67, 74, 88; *see also* Dkt. Nos. 13-1 at 51, 13-2 at 53.

M.J. Hoffman correctly concluded that determinations of reliance were not appropriate on a motion to dismiss, and recommended "that the Court defer its determination regarding reliance" (Report at 34-35), but in any event, concluded that MAZ's reliance allegations "are sufficient" and "because this case centers on Defendants' omissions, it appears that MAZ may be able to rely on the 'presumption of reliance' as stated in *Affiliated Ute Citizens of Utah [v. United States]*, 406 U.S. 128 [(1972)]" (Report at 36).

M.J. Hoffman also recommended "that the Court deny the portion of [FCHS's] motion to dismiss seeking to strike the class allegations without prejudice to [FCHS] raising its arguments in opposition to any motion for class certification," and that the Court decline to dismiss the Section 20(a) claim because MAZ properly alleged a primary violation of Section 10(b). Report at 36-38. *Neither* Defendant challenges these two recommendations.

On October 30, 2019, FCHS filed its Objections to the Report (Dkt. No. 39, "FCHS Objections" or "FCHS Obj."). On November 7, 2019, Romandetti filed his Objections to the Report (Dkt. No. 41, "Romandetti Objections" or "R. Obj.," with FCHS Obj., "Objections").

## III.  ARGUMENT – THE COURT SHOULD ADOPT M.J. HOFFMAN'S REPORT AND OVERRULE DEFENDANTS' OBJECTIONS

### A.  The Court Should Deny the Motions to Dismiss

FCHS (joined by Romandetti) argues that M.J. Hoffman erred by "wholly deny[ing]

the motion to dismiss," and instead, should have recommended dismissal with leave to amend or striking certain allegations.  FCHS Obj. at 7-9.  This objection should be overruled, and the Report affirmed and adopted.

FCHS ignores the fact that its motion to dismiss the Complaint requested that the Court "dismiss[] all claims in the Complaint against [FCHS] with prejudice."  Dkt. No. 13 at 25.  Because M.J. Hoffman found that MAZ adequately alleged violations of Sections 10(b) and 20(a), she properly recommended that this Court deny FCHS's motion and its requested relief.[2]

In any event, in support of the unprecedented relief it seeks, FCHS presents a chart listing 29 paragraphs of the Complaint that FCHS contends are "no longer at issue in this Action" after M.J. Hoffman's Report found certain alleged misrepresentations not actionable.  FCHS Obj. at 7.  However, this chart fails to recognize the difference between allegations of *facts* as they relate to *scienter* and allegations of *misleading statements*.

For example, M.J. Hoffman found that "the allegations of the [C]omplaint do not demonstrate that the [C]orporate [P]olicy [S]tatements are actionable misrepresentations,"[3] and recommended that they "cannot form the basis of a securities fraud claim in this case."

---

[2] FCHS's citations (FCHS Obj. at 7) do not support the type of relief it requests here. *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 698 n.104 (11th Cir. 2010), is a citation to Judge Tjoflat's dissent (not, as FCHS asserts, concurrence) from that part of the panel's decision remanding a motion for sanctions to the district court. *See id.* at 639-40. *Cramer v. State of Florida* concerned a "rambling shotgun pleading that is so disorganized and ambiguous that it is almost impossible to discern precisely what it is that these appellants are claiming." 117 F.3d 1258, 1261 (11th Cir. 1997).  M.J. Hoffman properly rejected Romandetti's shotgun pleading argument.  Report at 14 n. 7.  FCHS did not object to that finding, and its argument comparing the Complaint to a shotgun pleading should be rejected.

[3] FCHS's Compliance Program, Code of Conduct and Ethics, and Disclosure Policy are referred to herein as the "Corporate Policies."  The Complaint's allegations quoting text of the Code of Conduct and Ethics and Disclosure Policy (¶¶46-54), and what Defendants said about FCHS's Compliance Program in its Form 10-Ks (¶45) are referred to herein as the "Corporate Policy Statements."

7

Report at 27-28. From this finding, FCHS incorrectly argues that ¶¶8, 45-55, and 72-73 are "no longer at issue." However, only a part of ¶55 alleges the Corporate Policy Statements are actionable misrepresentations. ¶55 also alleges that Defendants' risk disclosures and SOX certifications were materially misleading, which M.J. Hoffman found actionable. As such, striking the paragraph is not appropriate. Furthermore, MAZ alleges in ¶¶45-54 the facts of the existence of the Corporate Policies, and the text of the Corporate Policy Statements, which are relevant to Romandetti's and, in turn FCHS's, scienter. That is because MAZ alleges, in ¶¶8 and 72-73, that Romandetti's knowledge of the Corporate Policies and their requirements is relevant to his scienter, as he willfully violated them. Therefore, the factual allegations contained in ¶¶8, 45-54, and 72-73 are clearly still "at issue" in the litigation.

FCHS further incorrectly argues that because M.J. Hoffman concluded that "MAZ has not sufficiently alleged that [FCHS's] disclosures regarding [Elite] were misleading" (Report at 29), ¶¶27, 55 (partial), and 64-65 are "no longer at issue." But, again, only a part of ¶55 alleges the statement about Elite was misleading. ¶27 describes what FCHS's 2014 10-K states about hiring Elite, and ¶¶64-65 merely recite the facts of what was stated about Elite and the pump and dump scheme in the SEC Complaint. The facts that Defendants hired Elite and that Elite was a boiler room operation are relevant to prove the undisclosed pump and dump scheme and Romandetti's scienter, and are clearly still "at issue" in this case, even if the statements about Elite, by themselves, do not rise to actionable misrepresentations.

FCHS also incorrectly argues that ¶¶10, 23-24, 28-29, 33-34, 38-39, and 43-44 are "no longer at issue" in light of M.J. Hoffman's finding that "MAZ has not sufficiently alleged that [Defendants' disclosure that Romandetti was a key employee] was misleading or that it was

8

rendered misleading by [FCHS's] omission of Romandetti's purported unlawful conduct." Report at 20. Whether or not M.J. Hoffman's ruling on this issue was correct, the fact that FCHS highlighted Romandetti was a key employee is relevant to its own scienter. In other words, these statements support imputing Romandetti's scienter to FCHS because they note he was FCHS's CEO and a key employee, and as such, the paragraphs referencing FCHS's admissions of Romandetti's importance to FCHS are still "at issue" in this case.

FCHS's arguments to have the Complaint dismissed with leave to amend or strike allegations in light of, at most, a handful of paragraphs no longer at issue, fail. FCHS has not made a motion to strike, and therefore requests relief not before the Court. In any event, as this Court has recognized, "striking material is a drastic remedy to be resorted to only when required for the purposes of justice. As such, motions to strike are generally disfavored and should only be granted as a remedy for material that has no possible relation to the controversy and may cause prejudice to one of the parties." *Evanston Ins. Co. v. Republic Props.*, No. 6:16-cv-1649, 2017 U.S. Dist. LEXIS 198619, at \*10 (M.D. Fla. Dec. 4, 2017) (Byron, J.) (quotations and citations omitted). FCHS does not contend it has been "prejudiced."

Also, there is no risk of confusion, as the paragraphs alleging misleading statements no longer at issue are easily identifiable. The contents of the documents quoted in the Complaint are undisputed. It will be no burden for FCHS to answer, where applicable, that the paragraph (or a sentence therein) is no longer at issue as a result of the Report, and to the extent a response is required, admit or deny the allegation. FCHS's speculation about discovery disputes also does not support its argument. The Court's meet and confer rule (L.R. 3-1(g)) is more than adequate to resolve discovery disputes or crystalize and focus disputes that are not resolved.

9

Further, dismissing a 112-paragraph complaint with leave to re-plead because, at most, a handful of paragraphs (or parts thereof) are no longer at issue, or so that relevant allegations can be moved to a scienter section instead of their current location, is not an efficient use of the parties' or the Court's resources.  It is a transparent attempt by FCHS to obtain the right to file a second motion to dismiss on any new complaint, continuing the PSLRA statutorily imposed discovery stay, and further delaying a resolution on the merits of this action.[4]

## B.  **MAZ Properly Alleges Misleading Statements**

### 1.  **The Pump and Dump Scheme Was Material**

M.J. Hoffman correctly concluded that "for purposes of the motions to dismiss, MAZ has sufficiently pleaded that Defendants' alleged omission concerning the 'pump and dump' scheme was material."[5]  Report at 18; *see also id.* ("the undersigned cannot state, as a matter of law at this early stage of the litigation, that Defendants' omissions regarding the alleged stock manipulation scheme would be so plainly unimportant to a reasonable investor that reasonable minds could not differ."); *id.* at 30 ("the [C]omplaint contains adequate allegations demonstrating that [FCHS] had a duty to disclose the alleged market manipulation scheme

---

[4] M.J. Hoffman concluded the Complaint was not a shotgun pleading.  Report at 14 n.7.  Romandetti objects (R. Obj. at 2-5), and contends that, in light of the recommendations that three categories of statements are not actionable, the Report has caused the Complaint to become a shotgun pleading.  This objection is meritless because the Complaint does not fit into any of the four categories of shotgun pleadings identified by the Eleventh Circuit.  *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015).  In addition, as correctly recognized by M.J. Hoffman, "[t]here are only two counts in the [C]omplaint, and importantly, all of the factual allegations are relevant to both, particularly because Count II [Section 20(a)] relates to derivative liability and cannot be established without a violation under Count I [Section 10(b) and Rule 10b-5]."  Report at 14 n.7.

[5] Both Romandetti (who signed the 10-Ks) and FCHS (the company who issued them) made the misleading statements at issue here.  *See SEC v. Lottonet Operating Corp.*, No. 17-21033, 2017 U.S. Dist. LEXIS 51390, at *33 (S.D. Fla. Mar. 31, 2017), *recommendation adopted*, 2017 U.S. Dist. LEXIS 53840 (S.D. Fla. Apr. 6, 2017) (signatory and company liable for misleading statements in SEC filings).

based on its alleged materially misleading statements.")  Indeed, Defendants do not contest the materiality of the pump and dump scheme.

### 2.     The SOX Certifications Were Misleading

M.J. Hoffman correctly "recommend[ed] that the Court find that MAZ has sufficiently alleged that the SOX certifications were rendered materially misleading based on the omission regarding the stock manipulation scheme, which could form an actionable basis for a securities fraud claim."  Report at 23.  In FCHS's SOX certifications, Romandetti certified that the 10-Ks did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made ... not misleading with respect to the period covered by this report" and that he had disclosed "*[a]ny fraud*, whether or not material, that *involves management* or *other employees who have a significant role in the Company's internal control over financial reporting*."  ¶¶21, 25, 30, 35, 40.  However, because Romandetti was intimately involved in the undisclosed pump and dump scheme, he, and FCHS, knew the aforementioned statements were materially misleading.  ¶¶74-75, 78-87.

Notably, FCHS and Romandetti do not dispute that the SOX certifications were materially misleading.  Nevertheless, FCHS (joined by Romandetti) incorrectly argues that M.J. Hoffman "ignored on point Eleventh Circuit precedent [*Garfield v. NDS Health Corp.*, 466 F.3d 1255 (11th Cir. 2006)]…'that SOX certifications are limited to an issuer's periodic reports containing financial statements.'"  FCHS Obj. at 9-10.  As MAZ argued in opposition to the motions to dismiss (Dkt. No. 36 at 20 n.14), *Garfield* addressed the issue of whether the signing of SOX certifications showed Defendants' scienter, *not* whether a misrepresentation in a SOX certification had to relate to a company's financial statements in order to be

11

actionable. 466 F.3d at 1266 ("we hold that a [SOX] certification is only probative of *scienter* if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.") This is not an issue here because Romandetti's scienter is undisputed. *See* Report at 31. *Garfield* in no way limits liability in SOX certifications to statements or omissions only respecting financial figures.

Additionally, FCHS's argument concerning SOX certifications in its motion to dismiss was only 16 lines long (less than one page), and relied on only two out of Circuit decisions other than *Garfield*. M.J. Hoffman correctly found both distinguishable:

> [FCHS] further argues that alleged misstatements in a SOX certification cannot form the basis of a securities fraud claim as a matter of law… The decision [FCHS] relies upon for this bold proposition – *In re Silicon Storage Tech., Inc., Sec. Litig.*, No. C-05-0295PJH, 2007 WL 760535, at *17 (N.D. Cal. Mar. 9, 2007) – is readily distinguishable and not persuasive. The court in that case was addressing whether a "statement in a [SOX] certification that financial statements comply with GAAP [Generally Accepted Accounting Principles] is independently actionable." *Id.* Here, the allegations do not relate to failure to adhere to GAAP, which "standing alone, are insufficient to create an inference of fraud." *See In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) (and cases cited therein). [FCHS] also cites cases where the court has concluded that SOX certifications were not actionable when the allegations do not challenge the content of the certifications themselves. *See In re KBR, Inc. Sec. Litig.*, CV H-17-1375, 2018 WL 4208681, at *8 (S.D. Tex. Aug. 31, 2018). Here, however, MAZ is challenging two specific statements in the SOX certifications—a certification that the SEC filings did not omit material information and a certification that any fraud, material or not, had been disclosed. [Report at 22 and 22 n.10.]

FCHS does not dispute M.J. Hoffman's conclusion that *Silicon Storage* and *KBR* are distinguishable. Rather, as part of an argument more than four times as long as in the original motion to dismiss, FCHS cites, without any detailed discussion, additional decisions, all of which pre-date FCHS's motion to dismiss. FCHS Obj. at 10-11. As this Court has recognized, "[i]t of course defies logic to claim that the Magistrate Judge erred by failing to consider legal

12

authority which was never offered for h[er] consideration, and the undersigned will decline to entertain new arguments which should have been raised to the Magistrate Judge." *Fla. Action Comm., Inc. v. Seminole Cnty.*, No. 6:15-cv-1525, 2016 U.S. Dist. LEXIS 143735, at *9 n.3 (M.D. Fla. Oct. 18, 2016) (Byron, J.) (citing *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) ("[A] district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge.")); *see also Starks v. United States*, No. 09-22352-CIV, 2010 U.S. Dist. LEXIS 110806, at *7-9 (S.D. Fla. Oct. 19, 2010) ("Arguments that are not raised before a magistrate judge cannot be raised for the first time as an objection to a report and recommendation.").

In any event, the newly raised decisions are readily distinguishable. For example, in *In re Equifax Inc. Securities Litigation*, the only in-Circuit decision cited by FCHS, the statement alleged to be false and misleading was that "Equifax maintained a system of internal controls that would provide 'reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.'" 357 F. Supp. 3d 1189, 1230 (N.D. Ga. 2019). This is materially different than the statements alleged to be misleading in FCHS's SOX certifications. Further, the *Equifax* complaint alleged inadequate controls to detect and respond to data breaches. The court concluded that a "reasonable investor would not take assurances of internal controls to detect improprieties in accounting and bookkeeping to guarantee that there were systems in place to deal with cybersecurity breaches." *Id.* at 1230-31. This stands in stark contrast to the situation in this case, where MAZ alleges that Romandetti orchestrated and did not disclose the pump and dump scheme, which clearly was a "fraud…that involves management

13

[Romandetti]…who have a significant role in the Company's internal control over financial reporting." ¶¶21, 25, 30, 35, 40, 74-75.[6]

FCHS's attempts to distinguish the cases relied upon by M.J. Hoffman in finding that FCHS's SOX certifications signed by Romandetti are actionable are misguided. None of those decisions mandate that the underlying fraud must impact a company's financial condition to make misleading statements in SOX certifications actionable. On the contrary, *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.* states that liability for misleading statements in SOX certifications ***is not*** limited to false financial statements:

> Sarbanes-Oxley, however, is not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices. Any interpretation restricting its scope to these purposes would be artificially narrow and inconsistent with the remedial purpose of the statute. As evidenced by the precipitous decline of Horizon's stock price upon public disclosure of the DOJ investigation, the rate-fixing scheme orchestrated by Serra, Gill, Glova and individuals from one of

---

[6] The other out-of-Circuit cases relied on by FCHS are similarly distinguishable because the plaintiffs alleged internal control deficiencies or failed to plead specific facts in the operative complaint evidencing falsity of the SOX certifications themselves. *See Anderson v. StoneMor Partners, L.P.*, 296 F. Supp. 3d 693, 702 (E.D. Pa. 2017) (Plaintiffs alleged false SOX certifications "without explanation" did "not even allege with particularity that Defendants knew at the time of certifying that the statements were false," and did not allege any price movement (*i.e.* loss causation)), *aff'd sub nom. Fan v. StoneMor Partners LP*, 927 F.3d 710, 715 n.3 (3d Cir. 2019) (decided after FCHS filed its motion to dismiss, but the ruling concerning SOX certifications was not appealed); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370-71 (E.D.N.Y. 2013) (plaintiff alleged that "Gentiva's disclosure controls and procedures and internal controls over financial reporting were not effective;" court held "SOX certifications cannot constitute a misstatement or omissions for purposes of 10b- 5 liability ***under the circumstances of this case***. The Plaintiff has not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [it] lacked adequate internal controls." (citation and quotation omitted)); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 757 (S.D.N.Y. 2017) ("Plaintiffs' claims that the certifications were misleading founder because there are no concrete factual allegations in the SAC that made those statements false or misleading. Indeed, the SAC is devoid of any allegations indicative of undisclosed control deficiencies affecting Braskem's financial reporting."); *Lorusso v. Boulder Brands, Inc.*, No. 15-cv-00679, 2017 U.S. Dist. LEXIS 45640, at *43 (D. Colo. Mar. 1, 2017) ("Plaintiff has failed to plead particularized facts demonstrating the falsity of any SOX certifications."); *In re Molycorp, Inc. Sec. Litig*, No. 12-cv-00292, 2015 U.S. Dist. LEXIS 42070, at *57 (D. Colo. Mar. 31, 2015) ("Complaint does not plead facts showing how the facts attested to in the certifications are false under the PSLRA's heightened pleading requirements.").

Horizon's competitors was every bit as destructive to investor capital as inaccurate statements on a balance sheet.

686 F. Supp. 2d 404, 419 (D. Del. 2009); *see also id.* at 420 ("[Officers] must certify that they personally have no knowledge of such misleading statements or omissions."). Similarly, in *Limantrou v. Cray Inc.*, the "[p]laintiffs d[id] not allege that any specific SEC filings actually reported incorrect results as a result of these 'material weaknesses' but only that this SOX 404 disclosure establishes that the weaknesses existed, rendering the earlier SOX 302 certifications false or misleading." 432 F. Supp. 2d 1129, 1159 (W.D. Wash. 2006); *see also Rabkin v. Lion Biotechnologies, Inc.*, No. 17-cv-02086, 2018 U.S. Dist. LEXIS 25326, at *29-30 (N.D. Cal. Feb. 15, 2018) (virtually identical SOX certifications to those executed by Romandetti held actionable where they failed to disclose stock promotion/manipulation scheme engaged in by CEO). M.J. Hoffman therefore correctly concluded that:

> courts have held that where the complaint asserts facts indicating that, at the time of the [SOX] certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their [SOX] certification erroneous, a false or misleading certification may form the basis of a § 10(b) and Rule 10b–5 claim. [Report at 22 (internal quotation marks and citation omitted).]

FCHS also argues that *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017) was "wrongfully decided and contrary to this Circuit's decisional law." FCHS Obj. at 12 n.5. As discussed above (pp. 11-12), FCHS's interpretation of this Circuit's decision in *Garfield* is incorrect. Further, even accepting FCHS's argument that "the Court must parse the various SOX statements themselves and analyze whether Plaintiff sufficiently pled that the individual statements are actionable under the PSLRA" (*id.*), it is clear M.J. Hoffman did: "Here, however, MAZ is challenging two specific statements in the SOX

15

certifications—a certification that the SEC filings did not omit material information and a certification that any fraud, material or not, had been disclosed." Report at 22 n.10. Both statements were indisputably false or misleading, and FCHS's SOX certifications are therefore actionable.

**3.  Defendants' Risk Disclosures Concerning Stock Volatility Were Misleading**

M.J. Hoffman correctly concluded that Defendants' risk disclosures in FCHS's 10-Ks filed during the Class Period regarding the historic "volatility" and "fluctuations" of FCHS's stock price were materially misleading due to Defendants' failure to disclose the pump and dump scheme. Report at 24, 29. The Form 10-Ks attributed such volatility/fluctuations to a number of *possible hypothetical* factors, while omitting the ***actual, then-existing*** fact that the price of FCHS stock was fluctuating because it was being, or had been, manipulated by Romandetti and his co-conspirators. ¶¶7, 22, 26, 31-32, 36-37, 41-42.

**a)  Defendants Had an Obligation to Disclose the Pump and Dump Scheme**

M.J. Hoffman "recommend[ed] that the Court follow *In re Galena Biopharma, Inc. Securities Litigation*[, 117 F. Supp. 3d 1145 (D. Or. 2015)] and find that MAZ had sufficiently alleged in the complaint that the risk factors were misleading." Report at 24. In *Galena*, the Court held that "[a]fter Galena chose to disclose a lengthy list of reasons why its stock price might fluctuate, it needed to include in that list the alleged scheme that Galena was manipulating the stock price with the help of [outside consultants]." 117 F. Supp. 3d at 1181.

FCHS's Objections (joined by Romandetti) to this recommendation are wrong. FCHS argues that "companies do not have a duty to disclose uncharged, adjudicated wrongdoing." FCHS Obj. at 13 (citations and quotations omitted). As MAZ argued to M.J. Hoffman (Dkt.

16

No. 36 at 11-12), Defendants had an independent duty to disclose the fraudulent scheme. "Where a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c), that misconduct creates an independent duty to disclose. Failure to do so thus gives rise to a violation of Rule 10b-5(b)." *In re Initial Pub. Offering ["IPO"] Sec. Litig.*, 241 F. Supp. 2d 281, 381 (S.D.N.Y. 2003). "[T]he duty to disclose falls on all parties aware of the manipulation, or who take advantage of it." *Id.* at 382. Thus, where plaintiffs allege market manipulation (allegations supported here by the DOJ Indictment):

> "[Defendants] possessed the affirmative duty ... to disclose this fact" to Plaintiffs. And because, in addition to that duty, the content of the alleged misrepresentation was material [], Plaintiffs have stated a Rule 10b-5(b) claim for material misstatements upon which relief may be granted.

*Id.* at 382-83 (quoting *Affiliated Ute*, 406 U.S. at 153); *see In re Hienergy Techs., Inc. Sec. Litig.*, No. SA CV 04-1226, 2005 U.S. Dist. LEXIS 47044, at *11, 24 (C.D. Cal. Oct. 24, 2005) (allegations that CEO and others formed an undisclosed group for the purpose of manipulating company's stock "mainly center on allegations of material omissions"); *Mausner v. Marketbyte LLC*, No. 3:12-CV-2461, 2013 U.S. Dist. LEXIS 199521, at *22 (S.D. Cal. Jan. 4, 2013) ("A defendant's 'failure to disclose that market prices are being manipulated constitutes a material omission of fact in the offer of securities.'" (citations omitted)).

Disclosure was also required because Romandetti personally profited from the scheme, receiving at least $560,000 in kickbacks from the insider trading by the DOJ/SEC Defendants. ¶¶4, 6, 57-67, 78-87. *See Dirks v. SEC*, 463 U.S. 646, 662 (1983) ("[T]he test is whether the insider personally will benefit, directly or indirectly" from the improper use of inside information); *SEC v. Yun*, 327 F.3d 1263, 1275 (11th Cir. 2003) (same). Such insider trading triggers a duty to disclose the material adverse information. *See United States v. O'Hagan*,

521 U.S. 642, 652 (1997) (reiterating duty of corporate insider to "disclose" the material adverse information or "abstain" from trading).[7]

As Romandetti orchestrated a pump and dump scheme and benefited from trading on insider information, Defendants' duty to disclose was triggered. M.J. Hoffman relied on similar decisions when finding that Defendants' failure to disclose the fraudulent manipulation scheme was material. Report at 18.

In addition, Rule 10b-5 "prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting Rule 10b-5); *see also* Report at 29-30. Defendants put the cause of FCHS's volatility at issue by publishing misleading risk disclosures. Once the risk disclosure was issued, Defendants had an obligation to make it complete and accurate.

FCHS also objects to M.J. Hoffman's reliance on *Galena*. FCHS's argument rests on its flawed interpretation of *In re Galectin Therapeutics, Inc. Securities Litigation*, 843 F.3d 1257 (11th Cir. 2016). While FCHS is correct that the Eleventh Circuit stated in *Galectin* that *Galena* was "non-precedential," the Eleventh Circuit also highlighted that *Galena* had

---

[7] Further, Romandetti, as Chairman, CEO, and the alter ego of FCHS, indisputably had a fiduciary duty to FCHS shareholders. *See Chiarella v. United States*, 445 U.S. 222, 226-28 (1980) (corporate insiders have fiduciary duty to shareholders, which forms basis of "disclose or abstain" rule); *Dirks*, 463 U.S. at 654 (same). The insider information was Romandetti's knowledge of the manipulation scheme he orchestrated, and the fact that it was this manipulation scheme, and not FCHS's results or prospects, that generated market enthusiasm for FCHS and maintained and/or inflated its share price. *See Hienergy*, 2005 U.S. Dist. LEXIS 47044, at *27 (sustaining claim against corporation and CEO/President/Director for failure to disclose he may have colluded with others as part of undisclosed group to manipulate the company's stock).

"materially different facts from the [*Galectin*] case." *Id.* at 1274 n.7.[8]  Further, FCHS ignores

the clear allegations of the Complaint when attempting to distinguish the case at bar from

*Galena* and compare it to *Galectin*:

> The Complaint does not allege that Romandetti ever dumped his [FCHS] shares nor does it explain how Romandetti played a hands-on role in the actual promotion of the [FCHS] stock.  Instead, it merely alleges that non-parties Elite and Anthony Vassalo "implemented a large-scale promotional campaign" and "engaged in manipulative trades" so that the non-parties could "dump their [FCHS] stock at the inflated prices." []¶ 5, 6. Romandetti, for his part, was only alleged to have provided the schemers with their shares and received kickbacks. []¶¶6, 57.  Because the Complaint does not allege that Romandetti dumped his shares **or** actively controlled [FCHS's] promotion, the *Galena* decision is inapposite.  [FCHS] was under no obligation to disclose the uncharged market-manipulation scheme as a basis for volatility.  [FCHS Obj. at 14.]

However, the Complaint expressly alleges that "***Romandetti***, Sarro, Miller and Burnett did not

disclose to the victim investors that, ***contemporaneously with or shortly after their***

***recommendations to the victim investors of the stock of FCHS, [they] and their***

***coconspirators <u>sold</u> their own shares of FCHS stock***," and that Romandetti received at least

$560,000 in kickbacks from the over $3.3 million in illegal profits that the pump and dump

scheme made (from dumped shares).   ¶¶59, 61-62, 77, 84-85.   MAZ also alleges how

Romandetti played a hands on role in orchestrating and overseeing the pump and dump

scheme.   Romandetti was in constant communication with his co-conspirators.   ¶¶78, 80-84;

*see also* p. 4 above.   Romandetti visited Elite several times to discuss and coordinate the

---

[8] In "*Galena*, the company's executive officers edited, approved, and controlled the content of the articles before payment and publication… The articles were described as 'misleading' and were written under different aliases without disclosing that the companies controlled the content and paid for the articles… some articles falsely disclaimed that they were not paid promotions." *Galectin*, 843 F.3d at 1274 n.7.  The *Galectin* plaintiffs alleged that defendants failed to disclose they paid promotional firms to write flattering articles about the company; but there was no allegation the articles were false, and the court found defendants' conduct was not "manipulation." *Id.* at 1272-74.

19

promotion of FCHS stock, "provided [Elite] employees with exaggerated information about FCHS that could be conveyed to victims solicited by [Elite] to induce them to purchase shares of the stock," and "carefully coordinated the timing of [Elite's] promotional campaign and designed it to coincide with [the] manipulative trading activity." ¶¶82-83. Applying FCHS's argument, because MAZ alleges "that Romandetti dumped his shares [and] actively controlled [FCHS's] promotion," *Galena* is instructive and FCHS had an "obligation to disclose the uncharged market-manipulation scheme as a basis for volatility." FCHS Obj. at 14.

### b) **The Bespeaks Caution Doctrine Is Not Applicable**

FCHS argues that M.J. Hoffman "misinterpreted the [bespeaks caution] doctrine in finding that [FCHS's] cautionary statements were not 'sufficiently specific' in that they did not 'forewarn about market manipulation schemes.'" *Id.* at 15. Initially, the Court need not reach FCHS's argument. As argued to M.J. Hoffman, the bespeaks caution doctrine "has not been applied in this Circuit beyond statements in offering documents." Report at 25.[9] MAZ does not allege misleading statements in FCHS's offering documents. M.J. Hoffman also concluded that "to the extent that MAZ alleges Defendants' knowledge of/involvement in the alleged stock manipulation scheme, it appears that the bespeaks caution doctrine may not apply." *Id.* at 26 (citing *FindWhat*, 658 F.3d at 1299 ("[T]he inclusion of general cautionary language regarding a prediction [does] not excuse the alleged failure to reveal known material, adverse facts.")). At the time the risk disclosures were made, Romandetti was actively

---

[9] *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 850 (11th Cir. 2004) ("'bespeaks caution' cases [] deal with forecasts or projections in offering documents."); *Saltzberg v. TM Sterling/Austin Assocs.*, 45 F.3d 399, 400 (11th Cir. 1995) ("accept[ed] and appl[ied] the 'bespeaks caution' doctrine as explained in *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3rd Cir. 1993)," which also stated that the bespeaks caution doctrine related to "cautionary language in [an ] offering document.").

manipulating FCHS's common stock.  As such, he was aware of known, material, adverse facts, and failure to disclose the fraudulent scheme is not immunized by purported forward looking statements.  FCHS does not object to this finding, which represents an independent basis to affirm the recommendation that the bespeaks caution doctrine does not apply.[10]

In any event, FCHS's argument to invoke bespeaks caution fails.  FCHS argues that its risk disclosures were "accompanied by meaningful cautionary statements," that "investors were warned that the stock price may fluctuate based on factors unconnected to [FCHS's] performance," and that it warned investors "that its stock price may experience 'wide fluctuations,' including "potential extreme price and volume fluctuations," and that "the volatility may be unrelated to 'operating performance.'"  FCHS Obj. at 15.  As M.J. Hoffman recognized, these risk disclosures are not meaningful.  Report at 25-26.  Only "when an investor has been warned of risks of a significance similar to that actually realized" is he or she "sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999); *see also Saltzberg*, 45 F.3d at 400 (for bespeaks caution to apply, warnings must be "explicit, repetitive and linked to the projections about which plaintiffs complain.").  The risk disclosure here did not warn of "risks of a significance similar to that actually realized."  It only listed risks that could involve any common stock (such as negative analyst reports or not meeting financial projections).  The risk disclosure listed nothing similar

---

[10] In addition, the bespeaks caution doctrine raises issues inappropriate for determination on a motion to dismiss. *See In re Ins. Mgmt. Solutions Grp. Sec. Litig.*, No. 8:00-cv-2013, 2001 U.S. Dist. LEXIS 9962, at *33 (M.D. Fla. July 11, 2001) ("To the extent the bespeaks caution doctrine may apply to the statements made in connection with the IPO, the Court refrains from ruling at the motion to dismiss stage on this issue, requiring the development of a factual basis.").

to the fact that Romandetti, with the help of a paid consultant of FCHS, was actively manipulating the price of FCHS stock. Therefore, M.J. Hoffman correctly concluded that "even assuming the [bespeaks caution] doctrine is applicable, the risk disclosures regarding the volatility of [FCHS's] stock were not sufficiently specific to speak to MAZ's concern because the risk disclosures did not include a forewarning about market manipulation schemes." Report at 25.

## C.  MAZ Properly Alleges Reliance[11]

M.J. Hoffman was correct to conclude that reliance is a fact-intensive inquiry not appropriate for a decision on a motion to dismiss, "'but one more appropriate for the fact-finder after discovery has developed a sufficient evidentiary record,'" and properly recommended that that "the Court defer its determination regarding reliance." Report at 34-35 (quoting *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 449 (S.D.N.Y. 2010)). The Court should adopt M.J. Hoffman's recommendation to defer determination of reliance questions until MAZ's motion for class certification.[12] However, if the Court decides to address FCHS's individual arguments concerning reliance, they should all be rejected.

*First,* FCHS argues that MAZ's reliance allegations are "conclusory" and are "insufficient." However, MAZ specifically, and sufficiently, alleges reliance in the Complaint:

- "Plaintiff purchased 250,859 shares of [FCHS] common stock at artificially inflated prices in reliance on Defendants' misleading statements due to omissions of material facts during the Class Period." ¶17;

---

[11] Romandetti joins FCHS's reliance arguments and also raises substantially similar objections concerning justifiable reliance (R. Obj. at 2, 5-6), which fail for the same reasons detailed below.

[12] By not objecting to the recommendation that the Court deny FCHS's challenges to the class definition without prejudice to FCHS's ability to raise them in opposition to class certification (Report at 36-38), FCHS acknowledges that it is appropriate to defer determination of issues to a later stage.

- "Plaintiff and the other members of the Class relied on the statements described above during the Class Period in purchasing [FCHS] common stock at prices that were artificially inflated as a result of the misleading statements by Defendants." ¶102; and

- "Had Plaintiff and the other members of the Class been aware that the market price of [FCHS] common stock had been artificially inflated by Defendants' omissions of the material adverse information that Defendants did not disclose, they would not have purchased [FCHS] common stock at the artificially inflated prices that they did, or at all." ¶103.

Plaintiff's allegations of reliance are not conclusory.[13]   Rather, MAZ has "show[n] that [it] was aware of [FCHS's] statement[s] and engaged in a relevant transaction – *e.g.* purchasing common stock – based on that specific misrepresentation[s]." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (cited FCHS Obj. at 19).   MAZ "lists the alleged misrepresentations, states [it] was ignorant of their falsity and believed them to be true, and notes several times that plaintiff relied on those misrepresentations when entering into the agreement…[T]his [is] sufficient to allege reasonable reliance." *Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, No. 2:18-cv-00356, 2019 U.S. Dist. LEXIS 161566, at *28 (M.D. Fla. Sept. 23, 2019).[14]   Thus, M.J. Hoffman properly concluded that "[t]hese allegations are sufficient" to allege reliance.   Report at 36 and 36 n.19 (citing *Castellano v. Young & Rubicam,*

---

[13] FCHS again introduces decisions available to it at the time of its motion to dismiss, but not cited in that motion.   FCHS Obj. at 19-20 (citing *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 306 (S.D.N.Y. 2009); *Reding v. Goldman Sachs & Co.*, 382 F. Supp. 2d 1112, 1125 (E.D. Mo. 2005); *Lopez v. Rica Foods, Inc.*, No. 06-20710-CIV, 2006 WL 8432716, at *10 (S.D. Fla. Aug. 4, 2006)).   FCHS cites each of these decisions to argue that MAZ's allegations are conclusory or a plaintiff must identify the specific statements relied upon.   These cases should not be considered. *See Seminole Cnty.*, 2016 U.S. Dist. LEXIS 143735, at *9 n.3.   But even if they are, FCHS's arguments are incorrect as MAZ's allegations are not conclusory and the Complaint specifically identifies the statements alleged to be misleading.

[14] FCHS's attempt to distinguish *Skypoint*, because in that case the plaintiff alleged specific communications were made by the defendant to the plaintiff (FCHS Obj. at 20 n.10), is misplaced. MAZ, as in *Skypoint*, alleges the specific statements relied on that were misleading.

23

*Inc.*, 257 F.3d 171, 186-87 (2d Cir. 2001) (citation omitted) ("[P]laintiffs may allege transaction and loss causation by averring both that they would not have entered the transaction but for the misrepresentations and that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction;" "transaction causation is generally understood as reliance.")).[15]

*Second*, assuming, contrary to M.J. Hoffman's finding, that Plaintiff did not adequately plead direct reliance, FCHS argues that "numerous courts have held as a matter of law that the OTC [over-the-counter] market is not efficient," and that, therefore, Plaintiff cannot rely on a fraud on the market presumption of reliance.  FCHS Obj. at 19.  However, as recognized by M.J. Hoffman, there is "conflicting authority on whether the OTC market is considered an efficient market."  Report at 35 n.18 (citing *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 430 (S.D. Fla. 1991) ("[c]ontrary to Defendants contention, ... the majority of courts considering the issue have held that the fact that securities traded on an OTC market, rather than on a national stock exchange, will not necessarily defeat a finding of market efficiency")); *see also Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015) ("most courts have held that where a stock is traded—in an over-the-counter market, like [defendant's] stock was,

---

[15] FCHS's attempts to distinguish *Castellano* (FCHS Obj. at 21) fail.  The fact that *Castellano* concerned a motion for summary judgment only supports M.J. Hoffman's conclusion that reliance is not appropriate for a determination at the motion to dismiss stage.  FCHS tries to distinguish *Stephenson v. Deutsche Bank AG* because it stated that in the Eighth Circuit "reliance is not an element of a Rule 10b-5 claim, but is rather a means of establishing transaction causation," 282 F. Supp. 2d 1032, 1058 (D. Minn. 2003), and in the Eleventh Circuit, reliance is an element of a 10b-5 claim (FCHS Obj. at 21).  However, this is simply a distinction without a difference.  "Transaction causation is no more than another way of describing reliance."  *Ledford v. Peeples*, 657 F.3d 1222, 1248 n.78 (11th Cir. 2011) (citation and internal quotation marks omitted).  Further, that *Castellano* and *Stephenson* were decided before *Twombly* and *Iqbal* is irrelevant, as they both were decided after the PSLRA was enacted, and as both concerned fraud claims, Federal Rule of Civil Procedure 9(b) was implicated.

versus on a national exchange—is not dispositive as to whether the market for that stock is efficient.").[16]  As such, M.J. Hoffman correctly concluded that "the question of whether the OTC market is efficient should not be decided on a motion to dismiss."  Report at 35 n.18 (citing *In re IPO,* 241 F. Supp. 2d at 377 ("[W]hether the fraud on the market theory applies is not a pure question of law.  Rather, that determination turns on whether the relevant market has the traits of an 'efficient market' as described in *Basic*.  Thus, the question of whether securities were traded in an efficient market should not be decided on a motion to dismiss.").  The Court should affirm this finding of M.J. Hoffman and make a determination on the efficiency of the market, if necessary, upon a full factual record after discovery.

*Third,* FCHS incorrectly argues that MAZ "does not even attempt to plead that [FCHS] shares were traded efficiently" and consequently, Plaintiff cannot benefit from the fraud on the market presumption of reliance.  As MAZ argued to M.J. Hoffman (Dkt. No. 36 at 28-30), the Complaint alleges that "[FCHS] common stock was actively traded on the OTC."  ¶91.[17] Further, the key indicator of an efficient market is "an immediate negative impact on the stock

---

[16] As MAZ argued to M.J. Hoffman (Dkt. No. 36 at 29 n.23), the decisions FCHS relies upon are unpersuasive, and turned on vastly different facts.  *ScripsAmerica, Inc. v. Ironridge Global LLC* is distinguishable on multiple grounds including: it involved trading of unregistered shares of stock where sales of one shareholder constituted 22.6% - 50% of total weekly sales at issue; the court found plaintiff *knew the true facts* and thus could not have reasonably relied, and was prevented by the terms and acknowledgments of a stipulation from asserting reliance; critically, plaintiff's claim was based on alleged direct, private misrepresentations from defendant to plaintiff, not on *public* statements or omissions to the market; and the court concluded that Scrips stock price movements did not correlate with public news of corporate events, negating an inference of an efficient market.  119 F. Supp. 3d 1213, 1224, 1226, 1238, 1248-58 (C.D. Cal. 2015).  Also inapposite is *Alki Partners, L.P. v. Vatas Holding GmbH*, where the claim failed because "Plaintiffs were not ignorant of the manipulation of the price of RMDX stock that they now claim to be victims of, and so cannot establish that they relied on [a] market free of manipulation."  769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011).

[17] Documents submitted by FCHS in support of its motion to dismiss evidence that there were between 18.4 million and 32.2 million shares of FCHS stock outstanding during the Class Period.  *See* Dkt. Nos. 13-1 at 2, 13-2 at 2.

price" following an "unexpected disclosure." *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1257 (11th Cir. 2014) (affirming the grant of class certification, stressing that the inquiry is fact-specific, regardless of where the stock trades). Prompt digestion of information reflected in the stock price is "'the hallmark of an efficient capital market.'" *Id.* (citation omitted). MAZ alleges that FCHS stock reacted decidedly and immediately upon disclosure of Romandetti's market manipulation scheme, dropping nearly 65% in one trading day. ¶¶11, 68. Therefore, MAZ alleged "a sufficient factual basis for any contention that" FCHS common stock "traded in a well-developed and efficient market." *Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1022 (N.D. Cal. 2011).[18]

*Fourth*, FCHS objects to M.J. Hoffman's conclusion that "because this case centers on Defendants' omissions, it appears that MAZ may be able to rely on 'the presumption of reliance' as stated by the U.S. Supreme Court in *Affiliated Ute*." Report at 36. In doing so, FCHS incorrectly argues that this case is a "mixed" case of allegations of omissions and statements made misleading by those very omissions, and that under *Cavalier Carpets, Inc. v.*

---

[18] FCHS cites *Plichta* and three other out-of-Circuit cases (FCHS Obj. at 18 n.9) in support of its argument that MAZ does not allege facts to support that FCHS common stock traded efficiently. As stated above (pp. 25-26), that argument is incorrect. Further, none of these decisions were cited by FCHS in its motion to dismiss, and the Court should therefore not consider them in support of FCHS's argument. *Seminole Cnty.*, 2016 U.S. Dist. LEXIS 143735, at *9 n.3. In any event, as MAZ has alleged facts demonstrating that FCHS common stock was actively traded and that the price of its shares experienced an immediate negative decline upon the disclosure of corrective information, these cases are distinguishable. *See Plichta*, 790 F. Supp. 2d at 1022 (the ruling on reliance concerned debentures, and plaintiff excluded the debentures from the definition of the securities that were alleged to trade efficiently); *Hull v. Glob. Digital Sols., Inc.,* No. CV 16-5153, 2017 WL 6493148, at *17 (D.N.J. Dec. 19, 2017) (plaintiff only alleged that the stock "traded on the OTC market with moderate to heavy volume during the relevant period"); *Detroit St. Partners, Inc. v. Lustig*, No. 17-CV-2992, 2019 WL 3337094 (D. Colo. July 25, 2019) (plaintiffs "only allege that they 'relied on the integrity of the IPO Share allocation market.'"); *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 873 (S.D. Tex. 2016) (no detailed discussion of the plaintiff's reliance or efficiency allegations).

*Caylor*, 746 F.2d 749 (11th Cir. 1984), the *Affiliated Ute* presumption is not available to MAZ.[19]  Contrary to that argument, however, MAZ primarily alleges a failure to disclose an ongoing, undisclosed, fraudulent pump and dump scheme.  FCHS admits this, stating in its Objections that "[MAZ] does not allege that [FCHS's] risk disclosures included any material misstatements, but instead claim that the disclosures were misleading for failing to include the uncharged stock manipulation scheme as a basis for potential volatility in [FCHS's] stock." FCHS Obj. at 13.  Defendants had an independent duty to disclose the fraudulent scheme (*i.e.* a material omission).  *See* pp. 16-18 above.  As an independent duty to disclose an ongoing fraud existed, this is a case "involving primarily a failure to disclose," and the *Affiliated Ute* presumption is available.  *See, e.g., Cavalier*, 746 F.2d at 756.  Further, as MAZ argued in opposition to the motions to dismiss (Dkt. No. 36 at 31-32), courts have reasoned that the *Affiliated Ute* presumption is applicable in cases involving market manipulation, because any failure to fully disclose market manipulation is "intrinsically misleading" and "(presuming the illegality is also material) is always violative" of Rule 10b-5.  *In re IPO*, 241 F. Supp. 2d at 382; *In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967, 2010 U.S. Dist. LEXIS 59024, at *77, 81-86 (S.D.N.Y. June 10, 2010) (applying *Affiliated Ute* presumption in market manipulation case); *Hienergy*, 2005 U.S. Dist. LEXIS 47044, at *11, 24.  Further, failure to

---

[19] The other citations that FCHS relies upon in support of its *Affiliated Ute* argument are distinguishable. In *Smith v. Ayres*, the Fifth Circuit expressly stated that the presumption of reliance had been rebutted by the plaintiff's own allegations in the complaint – he voted against the allegedly fraudulently induced share issuance.  845 F.2d 1360, 1363-64 (5th Cir. 1988).  *In re Sahlen & Assocs., Inc. Sec. Litig.*, ironically supports the conclusion that MAZ properly alleged reliance under the fraud on the market presumption: "a plaintiff seeking to invoke the fraud on the market theory must allege either that the stock they purchased or sold was actively traded on a well-developed, efficient market or **facts which give rise to such an inference**."  773 F. Supp. 342, 356 (S.D. Fla. 1991).  As detailed at pp. 25-26, above, MAZ's allegations give rise to such an inference.

allege an ongoing fraud has been found to "primarily" constitute an omissions case. *See Katz v. MRT Holdings, LLC,* No. 07-64138-CIV, 2008 U.S. Dist. LEXIS 114421, at *13-14 (S.D. Fla. Oct. 24, 2018) ("Although Plaintiffs also allege misrepresentations, the heart of the claim is that Defendants failed to inform investors that any and all returns depended on the contribution of monies from new investors, that is the Defendants' Ponzi scheme.  Courts have found the *Affiliated Ute* exception applicable where plaintiffs allege a fraudulent Ponzi scheme." (citations omitted)).[20]

### D.  **MAZ Properly Alleges that Romandetti's Scienter Can be Imputed to FCHS**

*First*, M.J. Hoffman correctly concluded that "neither Romandetti nor [FCHS] argue that MAZ has failed to sufficiently allege that Romandetti acted with the requisite scienter." Report at 31.  Nor could they, as Romandetti orchestrated and was intimately involved in the scheme, and also received $560,000 in kickbacks.  ¶¶76-87.  *Second*, M.J. Hoffman was correct to recommend that "the Court find at this stage of the case that MAZ has properly alleged that imputation of Romandetti's conduct to [FCHS] is proper."  Report at 34.  "The scienter of a corporation is established by showing that the corporation's officers or directors acted with scienter."  *ZPR Inv. Mgmt. v. SEC*, 861 F.3d 1239, 1252 (11th Cir. 2017).  Consequently, FCHS's scienter is properly alleged through the uncontested scienter of Romandetti: the then-CEO and Chairman of FCHS.

FCHS argues that, on a motion to dismiss, the Court "should refuse to impute the

---

[20] Further, *Cavalier* was a post-trial appeal challenging two jury instructions, and concerned whether the burden at trial to prove reliance shifted to Defendants when both misrepresentations and omissions were alleged, again supporting M.J. Hoffman's conclusion that a decision concerning reliance and the applicability of *Affiliated Ute* should not be decided on a motion to dismiss.

scienter of an allegedly bad-acting CEO to [FCHS]." FCHS Obj. at 22.  FCHS relies on *Fries v. N. Oil & Gas, Inc.* 285 F. Supp. 3d 706 (S.D.N.Y. 2018), and argues that scienter should not be imputed because MAZ does not allege anyone other than Romandetti knew about the scheme, and FCHS fired Romandetti after the scheme came to light.[21]   M.J. Hoffman considered, and rightly dismissed, this argument.

> In *Fries*, the court concluded that the inference of scienter was not "as compelling as any opposing inference of nonfraudulent intent."  *Fries* did not involve an organized market manipulation scheme perpetrated by the CEO as alleged in this case, and therefore it is factually inapposite as to this point. [Report at 33 n.16.]

FCHS also incorrectly argues that the "Complaint fails to allege (and the Report does not specify) any particular benefit purportedly received by [FCHS] from the underlying scheme." FCHS Obj. at 22.  M.J. Hoffman specifically stated that "[h]ere, it is difficult to argue that Romandetti's interests were totally averse to that of [FCHS], because although Romandetti personally benefitted from the stock manipulation scheme, *[FCHS] likewise would have benefitted from the rise in the value of its stock.*" Report at 33 (internal quotation marks omitted); *see also* ¶67 ("from September 19, 2013 through March 21, 2014, the price of FCHS [stock] increased from $0.90 to $3.40 per share.").  As recognized by M.J. Hoffman, "'[t]here are certainly plenty of 10(b) cases where the CEO's attempts to inflate his company's stock price are imputed to the corporation.'" Report at 33 (quoting *In re Spear & Jackson Sec.*

---

[21] In *Fries*, where the CEO was terminated after receiving a Wells Notice from the SEC, the Court cited a host of reasons negating scienter (285 F. Supp. 3d at 720-22) before, lastly, adding that he was terminated.  Thus, the fact of termination alone was in no way determinative.  Here, FCHS effectively had no choice but to terminate Romandetti after his indictment and arrest, for public relations and practical purposes. *See Galena*, 117 F. Supp. 3d at 1167, 1173 (fact that CEO was terminated for cause or resigned was evidence supporting inference of scienter, and imputing that scienter to corporation).

*Litig.*, 399 F. Supp. 2d 1350, 1361 (S.D. Fla. 2005)).

## IV.    **CONCLUSION**

For the reasons stated above, the Defendants' Objections to the Report should be overruled, and the Court should adopt the Report and its recommendations.  In the alternative, should the Court accept any of Defendants' arguments, Plaintiff MAZ should be given leave to replead.[22]   Indeed, in FCHS's brief opposing a stay of the motion to dismiss briefing, pending appointment of a lead plaintiff, FCHS cited as one of the grounds for accelerated briefing that "a ruling on the Motion to Dismiss would also provide clarity for any future complaints."  Dkt. No. 25 at 10 n.3.

Dated: November 21, 2019                   Respectfully submitted,

                                           By**:** */s/ Joshua W. Ruthizer*
                                           Joshua W. Ruthizer
                                           Fla. Bar No. 92528
Ronald J. Cohen                            Chet B. Waldman
Fla. Bar No. 235504                        Granted Special Admission to Practice
RICE PUGATCH ROBINSON                      WOLF POPPER LLP
STORFER & COHEN, PLLC                      845 Third Avenue
101 NE 3rd Ave., Suite 1800                New York, NY 10022
Fort Lauderdale, Florida 33301             Tel:  212-759-4600
Tel:  954-462-8000                         Fax: 212-486-2093
Fax: 954-462-4300                          jruthizer@wolfpopper.com
rcohen@rprslaw.com                         cwaldman@wolfpopper.com

*Local Counsel for MAZ Partners LP*        *Attorneys for Lead Plaintiff MAZ Partners LP*
*and the Proposed Class*                   *and Lead Counsel for the Proposed Class*

---

[22] FCHS boldly asserts that if the Court accepts its other arguments and the Complaint is dismissed, MAZ "should not be given leave to replead to clarify its claims and allegations."  FCHS Obj. at 9 n.3. This argument is contrary to FCHS's own cited authority.  *See Thompson*, 610 F.3d at 630 (the district court dismissed with prejudice only "[a]fter twice allowing the plaintiffs to amend their complaint…"). Unlike in *Thompson*, MAZ has filed only the one initial complaint, and has not even amended once.