**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| MAZ PARTNERS LP, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>FIRST CHOICE HEALTHCARE SOLUTIONS, INC. and CHRISTIAN ROMANDETTI, SR.,<br><br>        Defendants. | **Case No. 6:19-cv-00619-PGB-LRH** |

**DECLARATION OF CHET B. WALDMAN, ESQ. IN SUPPORT OF LEAD PLAINTIFF MAZ PARTNERS LP'S MOTIONS FOR (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND FINAL CERTIFICATION OF SETTLEMENT CLASS; AND (2) AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT.......................................................................... 2

II.  BACKGROUND OF THE ACTION ................................................................ 8

    A.   The Undisclosed Stock Manipulation Scheme.................................... 8

    B.   The Alleged Materially Misleading Statements ................................ 11

    C.   Relevant Procedural History ............................................................ 15

        1.   Commencement of the Action, the Motions to Stay, and Appointment of Lead Plaintiff ................................................. 15

        2.   The Motions to Dismiss and Judge Hoffman's Report and Recommendation that the Motions to Dismiss be Denied .....19

        3.   Defendants' Objections to Judge Hoffman's Report and Recommendation that the Motions to Dismiss be Denied, and the Court's Order Adopting and Confirming the Report and Recommendation ................................................................. 25

        4.   The Discovery Phase of Litigation Commences...................... 29

    D.   Mediation Before Simone K. Lelchuk, Esq. and Settlement in Principle .......................................................................................... 29

    E.   FCHS Files for Bankruptcy Protection.............................................31

    F.   Negotiation of Settlement Documents...............................................31

    G.   Approval of the Settlement by the Bankruptcy Court and Preliminary Approval of the Settlement by this Court........................................ 32

III. THE TERMS OF THE SETTLEMENT ........................................................ 34

IV.  THE RISKS OF CONTINUED LITIGATION ............................................. 36

V.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE ISSUANCE OF NOTICE..............37

VI.  ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT....................41

VII.   THE FEE AND EXPENSE APPLICATION ................................................. 44

   A.   Lead Plaintiff's Request for an Award of Attorneys' Fees ................ 44

      1.   Wolf Popper's Effort, Time and Costs and Expenses ............. 46

      2.   The Time, Labor, Difficulty and Skill Involved Support the Requested Fee Award ............................................................. 49

      3.   The Result Achieved and the Reasonableness of the Fee Request Support the Requested Fee Award .......................... 50

      4.   The Risks and Economies of the Litigation Support the Requested Fee Award ............................................................. 52

      5.   The Reaction of the Settlement Class to the Fee and Expense Applications ........................................................... 54

      6.   Awards in Similar Actions and a Lodestar Cross-Check Support the Requested Fee Award........................................ 54

   B.   The Request for Reimbursement of Litigation Expenses ................. 56

   C.   Lead Plaintiff's Reimbursement Requests ...................................... 58

VIII. CONCLUSION....................................................................................... 59

ii

## LIST OF EXHIBITS

**Exhibit No.**   **Description**

1   Declaration of Eric J. Miller Regarding (a) Mailing of Postcard Notice of Proposed Class Action Settlement; (b) Publication of Summary Notice; and (c) Report on Requests for Exclusions Received

1.A   Postcard Notice of Proposed Class Action Settlement

1.B   Summary Notice of Proposed Class Action Settlement

1.C   Notice of Proposed Class Action Settlement

1.D   Proof of Claim and Release Form

2   Declaration of Ronald Cohen in Support of Lead Plaintiff's Motion for Attorneys' Fees and Litigation Expenses

2.A   Lorium PLLC Firm Resume

3   Wolf Popper LLP Firm Resume

I, CHET B. WALDMAN, ESQ., declare and state as follows:

1.      I am an attorney licensed to practice law in the State of New York and a member of the law firm of Wolf Popper LLP, court appointed Lead Counsel for Lead Plaintiff MAZ Partners LP ("MAZ" or "Lead Plaintiff").  I was granted special admission to practice in this Court to appear *pro hac vice* on behalf of Lead Plaintiff.  ECF No. 27 (Order).

2.      I have personal knowledge of the matters set forth herein based on my active participation in, and supervision of, the Action,[1] and if I were called upon as a witness, I could and would testify competently thereto.

3.      I respectfully submit this Declaration in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, and Final Certification of Settlement Class ("Final Approval Motion").

4.      I also respectfully submit this Declaration in support of Lead Plaintiff's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Motion for Attorneys' Fees"), which requests the Court award (a) Plaintiffs' Counsel attorneys' fees in the amount of 25% of the Gross Settlement Fund and reimbursement of Plaintiffs' Counsel's litigation costs and expenses of $29,895.11, and (b) Lead Plaintiff, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), its reasonable costs and expenses

---

[1] Unless otherwise indicated herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated October 8, 2020 (ECF No. 64-1, the "Stipulation"); all citations and internal quotation marks are omitted; and all emphasis is added.

(including lost wages) directly relating to the representation of the Settlement Class ("Plaintiff PSLRA Award").

## I.   PRELIMINARY STATEMENT

5.   On March 1, 2021, the Court issued an Order Preliminarily Approving Class Action Settlement, Preliminarily Certifying Settlement Class, and Directing Notice to Settlement Class (ECF No. 67, "Preliminary Approval Order"). The Court preliminarily approved the Settlement of $1 million on behalf of a "Settlement Class" of:

> all persons or entities who purchased or otherwise acquired First Choice Healthcare Solutions, Inc. ("FCHS" or "First Choice") common stock during the period between April 1, 2014, and November 14, 2018 ["Class Period")], both dates inclusive, and who did not sell all such securities prior to November 14, 2018, including Lead Plaintiff, and excluding: (i) Defendants; the officers, directors, and employees of First Choice during the Class Period (the "Excluded D&Os"); members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, agents, affiliates, successors or assigns; and any entity in which Defendants, the Excluded D&Os, or their immediate families have or had a controlling interest; and (ii) Steward Health Care System LLC and its affiliates, successors, and assigns. Also excluded from the Settlement Class are any persons or entities who or which timely and validly request exclusion from the Settlement Class pursuant to the requirements in this Order and the Notice. [ECF No. 67 (Preliminary Approval Order), ¶ 3; ECF No. 64-1 (Stipulation) § A.38.]

6.   Since then, A.B. Data, Ltd., the Court-approved Claims Administrator, has provided notice to potential Settlement Class Members by mail in accordance with the Preliminary Approval Order and Stipulation. Summary Notice was also published over *PR Newswire*.

7.   This Declaration does not seek to detail each and every event that occurred in the course of the litigation. Rather, it highlights certain key events

leading to the Settlement, and the basis upon which Lead Plaintiff and Lead Counsel recommend its approval.

8.     The Settlement is an excellent result for the Settlement Class.  As described herein, the $1 million Settlement Amount represents approximately 20% of the estimated damages for the Settlement Class's claims, an extraordinary result considering that the average securities class action settlement represents less than 10% of estimated damages.  *See* ¶ 136, below.  Also, the $1 million Settlement Amount represents approximately 38% of the Company's entire market capitalization of $2.64 million on June 12, 2020, the last trading day prior to FCHS's filing its Chapter 11 voluntary bankruptcy petition in the United States Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court") on June 15, 2020.  *See In re: First Choice Healthcare Sols.*, No. 6:20-bk-3344-KSJ ("Bankruptcy Proceeding").

9.     Moreover, if the litigation had continued, Lead Plaintiff and the Settlement Class Members would have faced numerous risks that could have precluded securing any recovery at all.  A class had not yet been certified, and although Lead Counsel is confident that it would have achieved class certification, Defendants argued strenuously during the course of litigation that the fraud on the market theory did not apply (meaning that a presumption of reliance would not apply, raising individual issues of reliance that would predominate over common issues) and that class certification was, therefore, inappropriate.  *See* ECF Nos. 13 (FCHS Motion to Dismiss) at 19-22 and 39 (FCHS Objections) at 16-21.  Even if

3

Lead Plaintiff did succeed in obtaining class certification, many hurdles would remain, including Defendants' likely summary judgment motion, a trial, and appeals.

10.     In addition, at the time a settlement in principal was reached, FCHS was in a precarious financial position, with the threat of bankruptcy potentially delaying or eliminating Settlement Class Members' ability to collect any future judgment from FCHS.  This risk was borne out when the Bankruptcy Proceeding was initiated.

11.     Lead Plaintiff is confident in the merits of the case, but the Settlement secures a substantial recovery now, without having to risk an unfavorable outcome later.  The Settlement avoids the expense and delay of continued litigation, a key consideration here given the relatively small size of the damages and FCHS's Bankruptcy Proceeding.

12.     In light of the above risks and the other risks inherent in continued litigation, Lead Counsel respectfully submits that the Settlement represents an outstanding recovery for the Settlement Class that is supported by each of the facts applied by courts in the Eleventh Circuit in approving class action settlements, including the factors set forth in Federal Rule of Civil Procedure 23(e), as well as the additional factors set forth in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  *See, e.g., Shiyang Huang v. Equifax Inc. (In re Equifax Customer Data Sec. Breach Litig.),* No. 20-10249, 2021 U.S. App. LEXIS 16599, at *44 (11th Cir. June 3, 2021).

13. The Settlement is the result of Lead Plaintiff's and Lead Counsel's substantial litigation efforts, including (1) conducting an investigation of relevant facts and potential claims that could be asserted against the Defendants; (2) filing an initial complaint (which survived Defendants' motions to dismiss); (3) successfully opposing Defendants' motions to dismiss, which resulted in a Report and Recommendation from Magistrate Judge Leslie Hoffman concluding that the motions to dismiss be denied; (4) opposing Defendants' objections to Judge Hoffman's Report and Recommendation, which resulted in an Order from the Court adopting and affirming the Report and Recommendation; (5) preparing for, and participating in, a formal full day mediation before Ms. Simone K. Lelchuk, an independent and experienced mediator, which followed the preparation of extensive mediation statements submitted by the Parties; (6) negotiating and drafting appropriate documentation of the Settlement, including the Stipulation and notice documents; and (7) after an agreement in principle was reached, but before the Settlement was finalized, significant negotiations with Defendants to revise the Settlement and other related documents to take into account FCHS's Bankruptcy filing.

14. Lead Plaintiff supervised Lead Counsel, participated in all aspects of the litigation, remained informed throughout the settlement negotiations, and ultimately approved the Settlement.

15. In addition to seeking the Court's final approval of the Settlement, Lead Plaintiff seeks approval of the proposed plan of allocation for the Net

Settlement Fund[2] (the "Plan of Allocation") as fair and reasonable. To prepare the Plan of Allocation, Lead Plaintiff engaged Michael A. Marek of Financial Markets Analysis, LLC, a highly experienced economics and market efficiency expert with extensive experience in preparing similar plans. Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to Settlement Class Members who timely submit a valid Proof of Claim and Release Form ("Claim Form"), based on their Recognized Loss amount as calculated pursuant to the Plan of Allocation.

16.     Lead Plaintiff also requests an award of attorneys' fees for Plaintiff's Counsel's efforts, which resulted in a substantial recovery for the Settlement Class in the face of significant risks, and for reimbursement of Plaintiff's Counsel's litigation expenses. Specifically, Lead Plaintiff is applying for an attorneys' fee award of 25% of the Gross Settlement Fund (i.e., 25% of the Settlement Amount, plus interest earned thereon), and for reimbursement of litigation expenses in the amount of $29,895.11, to be paid from the Gross Settlement Fund. Plaintiff's Counsel's requested fee is well within the range of fees routinely approved by courts in this Circuit in comparable securities class actions with settlement funds

---

[2] The Net Settlement Fund is the Gross Settlement Fund less (a) Attorneys' Fees and Expenses awarded to Plaintiff's Counsel; (b) any Plaintiff PSLRA Award awarded by the Court; and (c) Notice and Administration Expenses, made up of the costs and expenses of notice to Settlement Class Members and the appropriate persons or entities under the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 ("CAFA"), and costs and expenses of claim administration, including Taxes and Tax Expenses. The Net Settlement Fund shall be used to pay approved claims of the Settlement Class Members in accordance with a Plan of Allocation to be approved by the Court. ECF No. 64-1 (Stipulation) ¶¶ C.2-3, C5.

of similar sizes and is amply supported by each of the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), as followed by the Eleventh Circuit *in Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), as well as the additional factors often applied by Courts in this District and Circuit. *See, e.g., Equifax*, 2021 U.S. App. LEXIS 16599, at *44. The reasonableness of Plaintiff's Counsel's requested 25% fee is also confirmed by a lodestar cross-check, which yields a *negative* multiplier of 0.27 — meaning that the value of Plaintiffs' Counsel's time is substantially higher than the amount of the fee requested, which courts have recognized fully supports the reasonableness of the fee. *See In re Health Ins. Innovations Sec. Litig.*, No. 8:17-cv-2186-TPB-SPF, 2021 U.S. Dist. LEXIS 61051, at *40 (M.D. Fla. Mar. 23, 2021) (quoting *In re Netbank, Inc. Secs. Litig.*, No. 1:07-cv-2298-TCB, 2011 U.S. Dist. LEXIS 162835, at *13 (N.D. GA Nov. 9, 2011)) ("fact that counsel recovered a fraction of their lodestar "further confirms that the awarded fee is wholly proper""")); *In re Citrix Data Breach Litig.*, No. 19-61350-CIV-ALTMAN/Hunt, 2021 U.S. Dist. LEXIS 112272, at *10 (S.D. Fla. June 11, 2021) ("a fee award that results in a negative lodestar multiplier of 0.78—is both fair and reasonable").

17. Lead Plaintiff also requests that the Court, pursuant to 15 U.S.C. § 78u-4(a)(4), award Lead Plaintiff a Plaintiff PSLRA Award from the Gross Settlement Fund. While the Eleventh Circuit's recent decision in *Johnson v. NPAS Solutions*, 975 F.3d 1244, 1258-59 (11th Cir. 2020) held that two Supreme Court decisions from the 1880s prohibit granting incentive awards to class

7

representatives, it noted an exception to that prohibition where Congress, via a statute, expressly permits an award to a plaintiff.  The PSLRA, which was enacted in 1995 and applies to this Action, specifically allows for "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).

18.     This Declaration describes (a) the efforts undertaken by Plaintiffs' Counsel to prosecute the Action; (b) the events leading up to the Settlement with Defendants, and the risks that Lead Plaintiff and Lead Counsel considered in determining that the Settlement provides an outstanding recovery for the Settlement Class; (c) the notice of the Settlement provided to Settlement Class Members; (d) the proposed Plan of Allocation for the Settlement; and (e) Lead Plaintiff's application for Attorneys' Fees and Expenses.

## II.     BACKGROUND OF THE ACTION

### A.  The Undisclosed Stock Manipulation Scheme

19.     On November 14, 2018, the U.S. Department of Justice ("DOJ") filed a criminal indictment, and on November 15, 2018, the U.S. Securities & Exchange Commission ("SEC") commenced a civil action, against Christian Romandetti, Sr., the then-President, CEO, and Chairman of the Board of Directors of FCHS, for allegedly participating in, and benefitting from, an illegal stock manipulation

8

scheme relating to trading in FCHS stock.  ¶¶ 6, 56-67.[3] Romandetti was charged with securities fraud, wire fraud, and money laundering, among other violations of law.  *Id.*

20.  These announcements were the first time FCHS investors learned of Romandetti's alleged market manipulation, after years of public statements providing innocuous reasons for the volatile nature of the market for FCHS stock.  ¶¶ 4, 7, 22, 26, 31-32, 36-37, 41-42.  As a result of these disclosures, on November 15, 2018, the price of FCHS common stock fell $0.66 per share, or nearly 65%, to close at $0.35 per share.  ¶¶ 11, 68-69.

21.  The Complaint alleges that from no later than September 2013 through June 2016, Romandetti, together with Elite Stock Research ("Elite"), Mark Burnett, Jeffrey Miller, Frank Sarro, and Anthony Vassallo (collectively, the "DOJ/SEC Defendants") were involved in an undisclosed multi-million dollar pump and dump scheme involving FCHS stock.  ¶¶ 56-67.

22.  The DOJ/SEC Defendants acquired large blocks of FCHS shares directly from FCHS and from individuals and entities associated with FCHS at below market prices and through loan, share exchange, stock purchase, debt conversion, and consulting agreements.  ¶¶ 4, 57, 63, 78.  Romandetti facilitated many of these share transfers, including through a shell company he used to transfer one million FCHS shares to Miller and Burnett.  ¶¶ 78-79.

---

[3] Unless otherwise noted, citations to "¶_" refer to the paragraphs of Lead Plaintiff's Complaint (ECF No. 1).

9

23.     Thereafter, Romandetti, Burnett, Miller, Sarro, and FCHS engaged Elite, a "boiler room" company operated and controlled by Vassallo, to artificially promote, or fraudulently "pump," the market price and trading volume of FCHS shares.  ¶¶ 4, 27, 58, 63, 80.  Between September 2013 and December 2015, Romandetti and others, or entities controlled by them, "wired nearly $1 million to [Elite] as compensation for its role in promoting FCHS stock, including … $160,000 from Romandetti between March 2014 and December 2015." ¶ 80.

24.     Elite and its employees (on behalf of Romandetti, FCHS, and the other DOJ/SEC Defendants) "engaged in manipulative trading patterns" to artificially drive up the price and trading volume of FCHS shares.  ¶¶ 57-58, 66-67.  From September 2013 through March 21, 2014, the manipulative trading increased the price of FCHS common stock from $0.90 to $3.40 per share.  ¶ 67.  The manipulative trading continued from March 2014 through, at least, June 2016, and the price of FCHS stock remained above $1.00 per share during that time.  ¶ 67.

25.     Elite and Vassallo (on behalf of Romandetti and the other DOJ/SEC Defendants) also undertook a large scale and aggressive campaign (primarily through cold calling and a newsletter) to market FCHS stock to retail investors – most of them elderly.  ¶¶ 56-58, 65.  Contemporaneously with, or shortly after, FCHS stock was "recommended" to victim investors, Romandetti and the other DOJ/SEC Defendants sold ("dumped") "substantial amounts of FCHS shares at the inflated prices that their fraudulent conduct had generated."  ¶ 59.  The fraudulent pump and dump scheme generated more than $3.3 million of illegal

10

profits for the DOJ/SEC Defendants from their sales (which they subsequently laundered through multiple entities), along with $560,000 in kickbacks for Romandetti.  ¶¶ 56, 59, 61, 79, 84-85.

26.    Romandetti orchestrated, and was intimately involved in, the fraudulent pump and dump scheme, and was in constant communication with his co-conspirators.  ¶¶ 78, 80-84.  For example, in June 2015, Romandetti received an email from Vassallo "regarding the identity of [Elite's] victims and the number of FCHS shares that victim investors had purchased for purposes of calculating [Elite's] compensation."  ¶ 81.  Romandetti visited Elite several times to discuss and coordinate the promotion of FCHS stock, and even "provided [Elite] employees with exaggerated information about FCHS that could be conveyed to victims solicited by [Elite] to induce them to purchase shares of the stock."  ¶ 82. Romandetti "carefully coordinated the timing of [Elite's] promotional campaign and designed it to coincide with manipulative trading activity by Burnett, Miller, Sarro, and Vassallo."  ¶ 83.

## B. The Alleged Materially Misleading Statements

27.    Lead Plaintiff alleges that during the Class Period, Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78t) and SEC Rule 10b-5 (17 CFR § 240.10b-5) promulgated thereunder by issuing numerous materially misleading statements that failed to disclose the stock manipulation scheme and Romandetti's involvement therein.  ¶¶ 21-22, 25-26, 30-32, 35-37, 40-42.  As a result, when the truth was revealed, FCHS stock

plummeted in value, and MAZ and the other investors suffered significant damages.  ¶ 68.

28.     Romandetti signed FCHS's annual reports on Form 10-K filed with the SEC, and the certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") (15 U.S.C. §7241) attached thereto.  ¶¶ 9, 21, 25, 30, 35, 40, 74-75, 88.

29.     In the SOX certifications, Romandetti certified that the 10- Ks did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made … not misleading with respect to the period covered by this report" and that he had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."  ¶¶ 21, 25, 30, 35, 40.  Lead Plaintiff alleged that because Romandetti was intimately involved in the undisclosed pump and dump scheme, he, and, through him, FCHS, knew the aforementioned statements were materially misleading.  ¶¶ 71-88.

30.     Lead Plaintiff alleged that Defendants' statements in FCHS's 10-Ks filed during the Class Period regarding the historic "volatility" and "fluctuations" of FCHS's stock price were materially misleading as they attributed such volatility/fluctuations to a number of possible hypothetical factors, while omitting the actual, then-existing fact that the price of FCHS stock was fluctuating because it was being, or had been, manipulated by Romandetti and his co-conspirators.  ¶¶ 7, 22, 26, 31-32, 36-37, 41-42.

31.     Lead Plaintiff alleged that Defendants' statements championing Romandetti as a "key executive" in each of FCHS's 10-Ks during the Class Period were materially misleading because these statements, which created the impression that Romandetti "in particular," was "key" to the success of FCHS, in a positive way, were rendered materially misleading by Defendants' failure to disclose (a) Romandetti's fraudulent conduct and market manipulation, (b) that Romandetti was exploiting his "skills, experience and knowledge of [the] Company and industry contacts" by his market manipulation scheme for personal gain, and (c) that the "loss" of this "key executive" would be a positive for the Company, in light of his egregious misconduct. ¶¶ 24, 29, 34, 39, 44.

32.     Lead Plaintiff alleged that Defendants' statement in FCHS's 2014 10-K that FCHS had "engage[d] the services of [Elite]" in what was described as a 4-month cancelable consulting agreement (¶ 27) was materially misleading because Defendants failed to disclose that "Elite was a boiler room operation hired to engage in a pump and dump scheme" (¶ 6), and was paid via kickbacks from Romandetti and others (¶¶ 4, 63, 80, 85-86).

33.     Lead Plaintiff alleged that Defendants also made materially misleading omissions by affirmatively touting FCHS's Compliance Program and Codes of Conduct and Ethics ("Compliance Program") (¶¶ 45-51) in each of its 10-Ks during the Class Period.  These statements were materially misleading because they reassured investors that (a) Defendants were on top of compliance issues – which also bound CEO Romandetti to adhere to a strict Code of Ethics – including

13

regarding conflict of interest issues; (b) the Compliance Program helped FCHS executives "meet[] our ethical obligations in conducting our business;" and (c) there were detailed and ample procedures in place to report any wrongdoing. In fact, Defendants retained Elite to falsely promote FCHS's stock; and the CEO (Romandetti), on behalf of FCHS and himself, was in egregious violation of FCHS's stated policies, including the Compliance Program and Disclosure Policy by participating in the market manipulation scheme for his personal benefit. ¶ 55.

34.    Lead Plaintiff further alleged that these statements were made with scienter – an intent to defraud – because, among other reasons, (a) Romandetti was intimately involved in the undisclosed stock manipulation scheme, (b) Romandetti signed the SOX certifications and Forms 10-K that contained the alleged misleading statements; (c) Romandetti therefore had personal knowledge of the materially misleading nature of the statements; and (d) Romandetti's knowledge was imputable to FCHS. ¶¶ 71-89.

35.    Lead Plaintiff alleged that both MAZ and the class purchased FCHS common stock at artificially inflated prices in reliance on Defendants' materially misleading statements, and that had Lead Plaintiff and the proposed class been aware of the truth, they would not have purchased FCHS common stock. ¶¶ 17, 102-03.

36.    Lead Plaintiff alleged that when the truth concerning Defendants' materially misleading statements was revealed to the market, through the DOJ

14

Indictment and SEC Complaint, the price of FCHS common stock declined nearly 65%, causing members of the proposed class significant damages.  ¶¶ 68-70.

### C.  Relevant Procedural History

#### 1.  Commencement of the Action, the Motions to Stay, and Appointment of Lead Plaintiff

37.    On March 29, 2019, MAZ filed a Complaint for Violations of the Federal Securities Laws and Demand for Jury Trial (ECF No. 1, the "Complaint"). The Complaint alleges that the Defendants made materially misleading statements with scienter in violation of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.  *See* § II.B, above.  MAZ alleged claims on behalf of itself and a proposed class of "all persons other than Defendants who purchased or otherwise acquired FCHS common stock from April 1, 2014 through November 14, 2018, both dates inclusive[], seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, against Defendants."  ¶ 1.

38.    On March 29, 2019, after filing the Complaint and in compliance with the PSLRA's requirement for "early notice to class members," MAZ published a press release on *PR Newswire* advising members of the proposed class that the Complaint had been filed, providing a summary of the claims in the Complaint, that the claims were brought on behalf of a class of investors who purchased FCHS common stock between April 1, 2014 and November 14, 2018, and that any class member could move the Court to serve as the lead plaintiff no later than May 28,

15

2019 (60-days after the notice was published). *See* 15 U.S.C. § 78u-4 (requirements of early notice to class members).  The 90-day time period for the Court to appoint a lead plaintiff was scheduled to (and did) end on June 27, 2019.

39.     On April 30, 2019, before the deadline for members of the proposed class to move the Court to serve as lead plaintiff and prior to the appointment of a lead plaintiff by the Court, FCHS filed a Motion to Dismiss and Incorporated Memorandum of Law (ECF No. 13, "FCHS Motion to Dismiss"); *see* § II.C.2 below.

40.     On May 10, 2019, MAZ filed an Unopposed Motion for (1) An Enlargement Of Time of 14 Days to Respond to [FCHS's] Motion to Dismiss, and (2) A Stay of the Deadlines for the Case Management Conference and for Plaintiff to Move for Class Certification, and Incorporated Memorandum of Law (ECF No. 19, "Unopposed Motion for Stay").  The Unopposed Motion for Stay argued that FCHS had consented to a 14 day extension of time to respond to the FCHS Motion to Dismiss, and in light of the PSLRA's mandatory discovery stay during the pendency of a motion to dismiss, the Case Management Conference and deadline to move for Class Certification should be stayed.

41.     That same day, MAZ filed a Motion (1) To Dismiss Without Prejudice, or Stay Briefing of, Defendant First Choice Healthcare Solutions, Inc.'s Motion To Dismiss, (2) To Establish an Orderly Procedure to Comply with the [PSLRA] and Conduct the Initial Stages of the Litigation, and (3) In the Alternative, for an Enlargement of Time of 30 Days to Respond to Defendant's Motion to Dismiss, and Incorporated Memorandum of Law (ECF No. 20, "Opposed Motion for Stay").

16

MAZ argued in the Opposed Motion for Stay that, among other things, under the PSLRA, the Court-appointed lead plaintiff was the fiduciary for the class, and that considering the motion to dismiss prior to the appointment of a lead plaintiff (who may file their own amended complaint), was contrary to the principles of the PSLRA and would be inefficient, not orderly, and a waste of judicial resources.

42.    On May 13, 2019, Romandetti filed a Notice of Objections stating that he did not object to the Unopposed Motion for Stay and objected to the relief requested in the Opposed Motion for Stay.  ECF No. 21.

43.    Also on May 13, 2019, Judge Hoffman issued an Order temporarily staying the deadlines for MAZ to respond to FCHS's Motion to Dismiss and for the Case Management Conference.  Judge Hoffman's Order set a hearing for May 29, 2019 concerning MAZ's two motions for stay, and set a deadline of May 22, 2019 for Defendants to file responses to MAZ's Opposed Motion for Stay.  ECF No. 23.

44.    On May 21, 2019, FCHS filed a Response in Opposition to MAZ's Opposed Motion for Stay.  ECF No. 25.  FCHS argued, among other things, that (a) the PSLRA contained no provision staying motions to dismiss until after a lead plaintiff was appointed, (b) staying consideration of the motion to dismiss was inconsistent with federal pleading standards, as it would encourage the filing of deficient or placeholder complaints, (c) FCHS would be prejudiced by a stay, and (d) the requested extension of 30 days was not necessary for MAZ to respond to the FCHS Motion to Dismiss.

45.     On May 28, 2019, MAZ filed a Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel, and Accompanying Memorandum of Law (ECF No. 29, "Lead Plaintiff Motion").  No other member of the alleged class sought appointment as lead plaintiff.

46.     On May 29, 2019, the Court issued an Order waiving the deadline for MAZ to file a motion for class certification, and directing the Parties to meet and confer concerning deadlines for a motion for class certification in connection with the case management report.  ECF No. 32.

47.     Also on May 29, 2019, Judge Hoffman held a hearing concerning MAZ's two motions for stay.  ECF No. 30.  That same day, Judge Hoffman issued an Order granting MAZ's motion for a 30 day extension of time to respond to the motions to dismiss, and set June 28, 2019 as the deadline to respond to the motions to dismiss.  ECF No. 33.  Also, in light of the PSLRA discovery stay, Judge Hoffman stayed the deadlines for the Case Management Conference and to prepare a Case Management Report pending a decision on the motions to dismiss.  Judge Hoffman denied the balance of MAZ's two motions for stay as moot.

48.     On June 12, 2019, Judge Hoffman issued a Report and Recommendation that MAZ be appointed lead plaintiff and Wolf Popper be appointed lead counsel pursuant to the PSLRA.  ECF No. 34.  Judge Hoffman recommended that the Court deny the request to appoint Rice Pugatch Robinson

18

Storfer & Cohen PLLC ("Rice Pugatch")[4] as "liaison counsel," but recommended that Ronald J. Cohen, then of Rice Pugatch, now known as Lorium PLLC, remain appointed as local counsel for MAZ in this litigation. ECF No. 34. No party objected to the Report and Recommendation. The Court issued an Order adopting and confirming the Report and Recommendation, thereby appointing MAZ as Lead Plaintiff and Wolf Popper as Lead Counsel. ECF No. 35.

### 2. The Motions to Dismiss and Judge Hoffman's Report and Recommendation that the Motions to Dismiss be Denied

49. As mentioned above, FCHS filed a Motion to Dismiss the Complaint. ECF No. 13; *see* § II.C.1 above. FCHS's Motion to Dismiss raised a number of arguments, including:

a. FCHS had no duty to disclose the alleged stock manipulation scheme or any uncharged criminal conduct;

b. MAZ did not properly allege any false or misleading statements which violated the Exchange Act or Rule 10b-5;

c. Only claims related to false financial reporting could support a claim for a false or misleading SOX certification;

d. FCHS's risk disclosures in its Form 10-Ks concerning stock price volatility were "forward looking" and protected by the PSLRA's safe harbor or the bespeaks caution doctrine, and hence could not support a claim for liability under the Exchange Act;

---

[4] In March 2021, the law firm Marshall Grant PLLC became a member of Rice Pugatch. Rice Pugatch changed its name to Lorium PLLC.

e. MAZ had not adequately pled the required element of reliance, and MAZ could not properly allege reliance on a class wide-basis because MAZ had alleged the price of FCHS common stock was manipulated and did not, and could not, allege that the market for FCHS common stock was efficient and, consequently, could not rely on the fraud-on-the-market presumption of reliance;

f. MAZ had not adequately pled the required element of scienter as to FCHS because Romandetti's actions were not imputable to FCHS under the adverse interest exception; and

g. The alleged proposed class was an improper fail-safe class.

50. On May 22, 2019, Romandetti filed a Motion to Dismiss the Complaint (ECF No. 28, "Romandetti Motion to Dismiss"). Romandetti adopted FCHS's arguments concerning Lead Plaintiff's supposed failure to allege any materially misleading statements, and also argued that:

a. The Complaint was an impermissible "shotgun pleading;"

b. The Complaint's allegations did not satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA because it did not identify a specific statement that MAZ and the class relied upon in purchasing FCHS common stock;

c. MAZ did not, and could not, properly allege reliance on a class-wide basis; and

20

d. MAZ's Section 20(a) claim for control person liability failed because the underlying Section 10(b) claim failed.

51.    On June 28, 2019, Lead Plaintiff filed a Memorandum of Law in Opposition to FCHS's and Romandetti's Motions to Dismiss (ECF No. 36, "MTD Opposition").  Lead Plaintiff argued, among other things, that

a. The omitted fact of the stock manipulation scheme was material because, among other reasons, it concerned the price of FCHS stock, the disclosure of the scheme resulted in a material decline in the price of FCHS stock, and FCHS's own Disclosure Policy conceded that information impacting FCHS's stock price should be considered material;

b. Defendants had a duty to disclose the stock manipulation scheme because, among other things, (i) violations of Rule 10b-5(a) and (c) create an independent duty to disclose such a scheme; (ii) Romandetti was the Company's highest ranking corporate officer and he personally orchestrated the stock manipulation scheme, traded on inside information (the existence of the scheme), and personally profited from the scheme; and (iii) Romandetti had a fiduciary duty as a director and officer of the Company to FCHS stockholders;

c. Defendants' material omission of the stock manipulation scheme rendered the statements identified in the Complaint concerning FCHS's stock price volatility, the retention of Elite, Romandetti's

21

status as a key executive, and FCHS's Compliance Program, as well as FCHS's SOX certifications signed by Romandetti, materially misleading;

d. Defendants' statements concerning the volatility of FCHS common stock were not forward looking and were not protected by the PSLRA safe harbor or the bespeaks caution doctrine;

e. The Complaint pled a strong inference of scienter as to Romandetti because, among other things, Romandetti orchestrated and oversaw the stock manipulation scheme and signed Forms 10-K and SOX certifications filed with the SEC on behalf of FCHS that contained the alleged materially misleading statements.  Further, neither FCHS nor Romandetti challenged the allegations of scienter as to Romandetti;

f. The Complaint pled a strong inference of scienter as to FCHS because Romandetti's scienter was imputable to FCHS as the Company's chief corporate officer and Chairman of its Board at the time the false and misleading statements were made and the adverse interest exception was not applicable because the alleged fraud was committed on behalf of, not against, FCHS;

g. The Complaint properly pled reliance by alleging MAZ relied on the omission of the fact of Romandetti's market manipulation of FCHS stock from Defendants' public statements, which rendered them misleading.  Further, (i) whether reliance on a class-wide basis and an

22

efficient market is sufficiently indicated is a question for class certification, not a motion to dismiss; (ii) the key indicator of an efficient market is a significant impact on a company's stock price when new information is disclosed to the market, and FCHS common stock fell nearly 65% when the stock manipulation scheme was first disclosed; and (iii) MAZ's allegations concern omissions, which would invoke the presumption of reliance as set forth in the U.S. Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and had also been found to be applicable in cases involving market manipulation;

h. The proposed class definition was not a fail-safe class, and in any event, questions concerning the appropriate class definition were best addressed on a motion for class certification, not a motion to dismiss;

i. The Complaint was not a "shotgun" pleading, and incorporating earlier allegations into later causes of action was necessary to (i) avoid duplication and (ii) prove the required element of an underlying violation of Section 10(b) when alleging a violation of Section 20(a);

j. The Complaint clearly identified, with particularity, the specific statements and omissions alleged to be relied upon when purchasing FCHS common stock; and

k. Lead Plaintiff had adequately alleged a claims for violations of Sections 10(b) and 20(a).

23

52. On October 16, 2019, Judge Hoffman issued a Report and Recommendation that the Court deny Defendants' motions to dismiss (ECF No. 37, "Motion to Dismiss R&R"). Judge Hoffman recommended the Court find that:

a. Lead Plaintiff had sufficiently alleged that the omission of the stock manipulation scheme was material;

b. Lead Plaintiff properly alleged that the Defendants had a duty to disclose the stock manipulation scheme;

c. Lead Plaintiff properly alleged that Romandetti's SOX certifications were materially misleading due to the failure to disclose the stock manipulation scheme;

d. Lead Plaintiff properly alleged that Defendants' risk disclosures concerning stock price volatility were materially misleading due to the failure to disclose the stock manipulation scheme;

e. Lead Plaintiff properly alleged that Defendants' risk disclosures concerning stock price volatility were not protected by the PSLRA safe harbor or the bespeaks caution doctrine;

f. Lead Plaintiff did not properly allege that Defendants' statements that Romandetti was "key" to the company, concerning the retention or Elite, or concerning FCHS's Compliance Program and Disclosure Policy were materially misleading due to the omission of the stock manipulation scheme;

24

g.  Defendants did not challenge Lead Plaintiff's allegations concerning Romandetti's scienter, and Romandetti's scienter was imputable to FCHS;

h.  The reliance inquiry should be deferred to a later point in the case, and, alternatively, Lead Plaintiff properly alleged reliance; and

i.  FCHS's argument concerning the class definition should be denied without prejudice to the ability to re-raise the argument at the class certification stage of this proceeding.

**3. Defendants' Objections to Judge Hoffman's Report and Recommendation that the Motions to Dismiss be Denied, and the Court's Order Adopting and Confirming the Report and Recommendation**

53.  On October 30, 2019, FCHS filed Objections to the Motion to Dismiss R&R (ECF No. 39, "FCHS Objections").  FCHS claimed several errors in the Motion to Dismiss R&R, including that:

a.  Judge Hoffman should have granted the motion to dismiss in part, and require Lead Plaintiff to re-plead its surviving claims and strike the non-surviving allegations from the Complaint;

b.  Statements made in SOX certifications are not actionable unless the alleged fraud is related to the financial information being certified;

c.  Defendants were not required to disclose the uncharged, unadjudicated market manipulation scheme;

25

d. Defendants' statements concerning stock price volatility were not actionable because they were forward looking and protected by the bespeaks caution doctrine;

e. Lead Plaintiff did not, and could not, properly allege reliance, including that Lead Plaintiff could not rely on the presumption of reliance as set forth in *Affiliated Ute* and could not rely on the fraud-on-the-market presumption; and

f. Romandetti's scienter cannot be imputed to FCHS.

54. On November 7, 2021, Romandetti filed Objections to the Motion to Dismiss R&R (ECF No. 41, "Romandetti Objections"). Romandetti adopted FCHS's arguments concerning the points listed in subparagraphs (a) through (e) in paragraph 53, above, and also argued that:

a. Judge Hoffman should have dismissed the Complaint as a shotgun pleading; and

b. Lead Plaintiff did not and could not properly allege reliance.

55. On November 21, 2019, Lead Plaintiff filed an Opposition to Defendants' Objections to the Motion to Dismiss R&R (ECF No. 44, "Objections Opposition"). Lead Plaintiff argued that Judge Hoffman's Report and Recommendation was "thoughtful and reasoned" and "correctly recommended that the Court deny Defendants' motions to dismiss," and that Defendants' objections were meritless. Specifically, Lead Plaintiff argued:

26

a. The paragraphs of the Complaint that FCHS claimed should be stricken from the Complaint were allegations of fact, and also related directly to the allegations of Defendants' scienter, and hence, contrary to FCHS's arguments, were still "at issue;"

b. Judge Hoffman correctly concluded that Defendants had a duty to disclose the stock manipulation scheme;

c. Judge Hoffman correctly concluded that Lead Plaintiff properly alleged Romandetti's SOX certifications were misleading;

d. The FCHS Objections presented legal authority and arguments concerning its SOX certifications that it did not present to Judge Hoffman, and those arguments should therefore be ignored;

e. Judge Hoffman correctly concluded that Lead Plaintiff properly alleged Defendants' risk disclosures concerning stock volatility were misleading and were not forward-looking or protected by the bespeaks caution doctrine;

f. Judge Hoffman correctly concluded that Lead Plaintiff properly alleged the element of reliance, and in any event, the question of reliance was best addressed at the class certification stage, not at the motion to dismiss stage; and

g. Romandetti was the President, CEO, and Chairman of FCHS, and Judge Hoffman was correct to find his scienter was imputable to FCHS.

27

56.    On February 14, 2020, the Court issued an Order adopting and confirming the Motion to Dismiss R&R (ECF No. 45, "MTD Order").  The Court concluded that:

a.  The Complaint was not a shotgun pleading;

b.  Judge Hoffman was correct to deny the motions to dismiss, and repleader was unnecessary because there was no burden on Defendants to identify the materially misleading statements affirmed by Judge Hoffman, and while certain allegations may not have amounted to actionable misrepresentations, they remained relevant to other disputed facts such as the existence of the stock manipulation scheme and Defendants' scienter;

c.  Judge Hoffman was correct to conclude that Lead Plaintiff properly alleged Romandetti's SOX certifications were materially misleading, and Defendants were incorrect when arguing that liability for misleading SOX certifications only applied to omissions concerning financial reporting;

d.  The Court would not consider legal authority that was not presented to Judge Hoffman in connection with the motions to dismiss;

e.  Judge Hoffman was correct to conclude that Defendants had a duty to disclose the stock manipulation scheme, and Lead Plaintiff properly alleged Defendants' risk disclosures concerning stock price volatility were materially misleading;

28

f.  The bespeaks caution doctrine did not apply because the Eleventh Circuit had not applied the bespeaks caution beyond statements in offering documents and the disclosures were alleged to be materially misleading when made because of Romandetti's knowledge of the stock manipulation scheme;

g.  Lead Plaintiff adequately alleged reliance; and

h.  Romandetti's scienter could be imputed to FCHS.

### 4.  The Discovery Phase of Litigation Commences

57.  On February 28, 2020, FCHS filed its Answer and Affirmative Defenses to the Complaint (ECF No. 48, "FCHS Answer").

58.  On March 3, 2020, Romandetti filed his Answer and Affirmative Defenses to the Complaint (ECF No. 49, "Romandetti Answer").

59.  On March 17, 2020, the Lead Plaintiff filed the Parties' joint Case Management Report.  ECF No. 53.  Prior to filing the Case Management Report, the Parties met and conferred concerning its contents and a schedule for the litigation of this Action.  On March 31, 2020, the Court issued its Case Management and Scheduling Order (ECF No. 55, "Case Management Order").

60.  On April 24, 2020, Lead Plaintiff served its First Set of Requests for the Production of Documents on All Defendants ("Document Requests").

### D. Mediation Before Simone K. Lelchuk, Esq. and Settlement in Principle

61.  With the discovery phase of the litigation commencing, a phase which would involve significant effort by the Parties to collect and produce documents,

take depositions, and prepare expert reports, the Parties agreed to conduct a mediation before an impartial third party.

62.   The Parties thereafter agreed to mediation before Simone K. Lelchuk, Esq., of Melnick ADR LLC and JAMS, an accomplished and widely-respected neutral.

63.   In advance of the mediation, the Parties submitted detailed mediation statements and reply mediation statements that addressed, among other things, issues related to liability and damages.

64.   The Parties conducted a full day, remote videoconference mediation with Ms. Lelchuk on May 6, 2020.  The mediation ended with an agreement in principle to settle and release all claims asserted against the Defendants in the Action in return for a cash payment to the Settlement Class of $1 million to be paid entirely by FCHS's Director and Officer Liability Insurance Policy (the "D&O Policy").

65.   The Settlement was thereafter memorialized in a Memorandum of Understanding ("MOU") dated May 21, 2020 negotiated by the Parties.  The Parties thereafter negotiated the terms of the more detailed Stipulation.

66.   On May 28, 2020, Lead Plaintiff filed a Joint Notice of Settlement with the Court.  ECF No. 58.

### E.   FCHS Files for Bankruptcy Protection

67.    On June 15, 2020, after the Parties had executed the MOU and while the Parties were negotiating the terms of the Stipulation, FCHS initiated the Bankruptcy Proceeding in the Bankruptcy Court.

68.    On June 15, 2020, FCHS filed a Suggestion of Bankruptcy with this Court (ECF No. 60, "Suggestion of Bankruptcy").  Pursuant to the provisions of Section 362(a)(3) of the Bankruptcy Code, the filing of the Bankruptcy Proceeding stayed this Action.

### F.   Negotiation of Settlement Documents

69.    After the Bankruptcy Proceeding was commenced, the Parties continued to negotiate the terms of the Stipulation.

70.    In particular, the filing of the Bankruptcy Proceeding raised the issue of whether Settlement Class Members who decided to exclude themselves from the Settlement (opt-out), if any, would have the right to bring their own individual claims against FCHS, as those stockholders would have to make those claims in the Bankruptcy Proceeding.

71.    Consequently, Lead Plaintiff negotiated terms such that Settlement Class Members who excluded themselves from the Settlement would be able to file proofs of claims against FCHS in the Bankruptcy Proceeding.  Ex. 1.C (Full Notice) ¶ 15.

72.    On October 9, 2020, after a short delay due to the many complexities raised by the Bankruptcy Proceeding in addition to the more standard complexities

31

involved in agreeing to the detailed terms in a securities class action settlement, the Parties reached final agreement on the Settlement and executed the Stipulation.

## G. Approval of the Settlement by the Bankruptcy Court and Preliminary Approval of the Settlement by this Court

73. Because of the Bankruptcy Proceeding, and because payment of the Settlement Amount would be made from FCHS's D&O Policy (arguably a part of FCHS's bankruptcy estate), FCHS needed Bankruptcy Court approval to enter into the Stipulation and Settlement.

74. Also, the Bankruptcy Court had to lift that automatic stay to allow the Parties to seek approval of the Stipulation and the Settlement in this Court.

75. On November 25, 2020, upon FCHS's motion, and following multiple remote hearings attended by me, along with Counsel for FCHS in this Action, the Bankruptcy Court issued an order that authorized FCHS to enter into a Settlement of this Action and lifted the automatic stay of this Action imposed by Section 362(a) of the Bankruptcy Code "solely to allow" the Parties to this Action "to seek approval of the Settlement Agreement and to perform thereunder consistent with its terms and the applicable rules." ECF No. 61.

76. On December 28, 2020, Lead Plaintiff filed an Unopposed Motion for (1) Preliminary Approval of Class Action Settlement; (2) Preliminary Certification of the Settlement Class; and (3) Approval of Notice to the Settlement Class (ECF No. 64, "Preliminary Approval Motion").  In support of the Preliminary Approval

32

Motion, Lead Plaintiff also filed (a) the Stipulation (ECF No. 64-1), (b) a proposed preliminary approval order (ECF No. 64-1, Ex. A), (c) a proposed Postcard Notice (ECF No. 64-1, Ex. A-1), (d) a proposed Full Notice (ECF No. 64-1, Ex. A-2), (e) a proposed Summary Notice (ECF No. 64-1, Ex. A-3), (f) a proposed Claim Form (ECF No. 64-1, Ex. A-4), (g) a proposed Order and Final Judgment (ECF No. 64-1, Ex. B), and (h) a declaration from MAZ in support of the Settlement (ECF No. 64-2, "MAZ Approval Declaration").

77.     On March 1, 2021, this Court issued the Preliminary Approval Order. ECF No. 67.  The Preliminary Approval Order:

a. Approved the Postcard Notice, Full Notice, Summary Notice, and Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Postcard Notice, publication of the Summary Notice over *GlobeNewswire* or a similar wire service, and creation of a settlement website for Settlement Class Members to access copies of the Full Notice, Claim Form, and other relevant Court documents;

b. Established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, or the Motion for Attorneys' Fees;

    c.  Set a schedule for the filing of final approval papers in support of the proposed Settlement, Plan of Allocation, and Lead Plaintiff's Motion for Attorneys' Fees; and

    d.  Set a hearing to determine whether the Settlement should be granted final approval as fair, adequate, and reasonable, which hearing is set for July 26, 2021 (the "Settlement Hearing").

## III.   THE TERMS OF THE SETTLEMENT

78.     Under the proposed Settlement, the Settlement Class consists of all persons or entities who purchased or otherwise acquired FCHS common stock between April 1, 2014, and November 14, 2018, both dates inclusive (the Class Period), and who did not sell all such securities prior to November 14, 2018, including Lead Plaintiff.  ECF No. 64-1 (Stipulation) ¶ A.38; *see also* ¶ 5 above.

79.     Importantly, the Settlement Class includes not just purchasers on the open market, but also those who otherwise acquired FCHS common stock.  Based on FCHS's historical public filings, significant holders of FCHS common stock during the Class Period did not buy their shares on the open market.

80.     In addition to excluding Defendants and those persons associated with Defendants who are typically excluded from similar settlements (persons and entities associated with or related to Defendants and the Excluded D&Os), the Settlement also excludes Steward Health Care System LLC ("Steward").  ECF No. 64-1 (Stipulation) ¶ A.38.  In 2018, Steward entered into a strategic partnership with FCHS, which was formalized in a stock purchase agreement that provided for,

among other things, the acquisition of five million FCHS shares by Steward. However, in February 2020, Steward brought an individual litigation against FCHS seeking to rescind that agreement, which would effectively cancel Steward's FCHS shares if the suit is successful. *See Steward Health Care Sys. v. First Choice Healthcare Sols.*, No. 2020-0131 (Del. Ch.). Consequently, Steward was excluded from the Settlement Class.

81. The Settlement provides for a $1 million payment in cash for the benefit of the Settlement Class. ECF No. 64-1 (Stipulation) ¶ A.37. Pursuant to the terms of the Stipulation, Defendants paid the Settlement Amount into the Escrow Account following preliminary approval of the Settlement.

82. The Net Settlement Fund, which is the $1 million Settlement Amount, plus accrued interest, less (a) Attorneys' Fees and Expenses awarded to Plaintiff's Counsel; (b) any Plaintiff PSLRA Award awarded by the Court; and (c) Notice and Administration Expenses, shall be used to pay approved claims of the Settlement Class Members in accordance with a Plan of Allocation to be approved by the Court. ECF No. 64-1 (Stipulation) ¶¶ C.2-3, C5.

83. If the Settlement receives the Court's final approval, in exchange for the benefits conferred by the Settlement, Lead Plaintiff and Settlement Class Members will release claims relating to the subject matter of the Action. The detailed, narrow release language is found in Paragraphs A.34-35 and Section I of the Stipulation (ECF No. 64-1).

35

## IV. THE RISKS OF CONTINUED LITIGATION

84. The Settlement provides Settlement Class Members with an immediate cash benefit of $1 million, representing not only a substantial portion of their recoverable damages, but a high percentage of maximum damages for a securities class action. Had Lead Plaintiff continued litigating the Action, Settlement Class Members would have faced numerous risks that could have precluded securing any recovery at all.

85. At the time a Settlement was reached, a class had not yet been certified, and although Lead Plaintiff is confident that it would have achieved class certification, Defendants argued strenuously during the course of litigation that the presumption of reliance as set forth in *Affiliated Ute* and the fraud on the market theory did not apply (meaning that a presumption of reliance would not apply, raising individual issues of reliance that would predominate over common issues) and that class certification was, therefore, inappropriate. *See* ECF No. 13 (FCHS Motion to Dismiss) at 19-22; and ECF No. 39 at 16-21 (FCHS Objections).

86. Even if Lead Plaintiff did succeed in obtaining class certification, many hurdles would remain, including Defendants' likely summary judgment motion, a trial, and appeals that would further delay the Settlement Class receiving any monetary benefit, and that would present additional risk that any judgment could be reduced in size or reversed entirely. Moreover, in light of Romandetti's then-pending criminal trial, a stay or delay of merits proceedings until that trial

(or a plea) would have likely further delayed any prospects of a recovery for Settlement Class Members.

87.   The Settlement also avoids the expense and delay of continued litigation, a key consideration here given the relatively small size of the damages.

88.   Further, at the time an agreement in principle to settle the Action was reached, FCHS's financial condition was precarious, a risk that was borne out by the Bankruptcy Proceeding.

89.   Lead Plaintiff respectfully submits that this is an excellent result that further supports the fairness, reasonableness, and adequacy of the Settlement, especially given that Lead Plaintiff still faced significant hurdles in prosecuting this Action and collecting any judgment.

## V.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE ISSUANCE OF NOTICE

90.   Lead Plaintiff has fully complied with all requirements of the Preliminary Approval Order to date.

91.   First, pursuant to the Preliminary Approval Order, Lead Counsel instructed its Court-approved Claims Administrator, A.B. Data, to disseminate the Postcard Notice (Ex. 1.A) by mail and to publish the Summary Notice (Ex. 1.B). The Postcard Notice and Summary Notice informed Settlement Class Members of a summary of the terms of the Settlement and directed Settlement Class Members to the settlement website, where they could download a copy of the Full Notice (Ex. 1.C) and Claim Form (Ex. 1.D).   The Postcard Notice, Summary Notice, and

37

settlement website also provided Settlement Class Members with contact information for A.B. Data, who would mail a Full Notice and Claim Form to Settlement Class Members that made such a request.

92.    On or about March 10, 2021, A.B. Data received from Lead Counsel a data file that was provided by counsel for the Defendants containing 827 names and addresses of potential Settlement Class Members.  On March 30, 2021, A.B. Data caused Postcard Notices to be sent by First-Class Mail, postage prepaid, to those 827 potential Settlement Class Members.  Declaration of Eric J. Miller Regarding (a) Mailing of Postcard Notice of Proposed Class Action Settlement; (b) Publication of Summary Notice; and (c) Report on Requests for Exclusions Received ("A.B. Data Decl." attached hereto as Exhibit 1) ¶ 3.

93.    A.B. Data also maintains a proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees that may hold securities in street name for beneficial holders ("Record Holder Mailing Database").  On March 30, 2021, A.B. Data caused Postcard Notices to be sent by First-Class Mail, postage prepaid, to the 4,991 mailing records contained in the Record Holder Mailing Database.  A.B. Data Decl. ¶ 4.

94.    As stated above, the Postcard Notice directs recipients to the settlement website, where copies of the Full Notice can be downloaded.  The Full Notice directs those who purchased or otherwise acquired FCHS common stock during the Class Period for the beneficial interest of any person or entity other than themselves, to, within ten days of receipt of the Notice, either (a) provide to the

Claims Administrator the name and last known address of each person or organization for whom or which they purchased or otherwise acquired FCHS common stock during such time period, or (b) request additional copies of the Notice to mail directly to the beneficial owners of such purchased or otherwise acquired FCHS common stock.

95.    As of June 25, 2021, A.B. Data has received an additional 381 names and addresses of potential Settlement Class Members to be mailed the Postcard Notice, from individuals or brokerage firms, banks, institutions, and other nominees.  A.B. Data has also received requests from brokers and other nominee holders for 1,480 Postcard Notices to be forwarded by the nominees directly to their customers.  A.B. Data Decl. ¶ 8.

96.    As of June 25, 2021, a total of 7,679 Postcard Notices (Ex. 1.A) have been mailed to potential Settlement Class Members and their nominees.  In addition, A.B. Data has re-mailed 36 Postcard Notices to persons and entities whose original mailings were returned by the U.S. Postal Service ("USPS") and for whom or which updated addresses were provided to A.B. Data by the USPS or ascertained through a third-party information provider to which A.B. Data subscribes.  A.B. Data Decl. ¶ 9.

97.    On March 30, 2021, the Summary Notice (Ex. 1.B) was published on *PR Newswire*, a wire service similar to *GlobeNewswire*.  A.B. Data Decl. ¶ 11.

98.    Also on March 30, 2021, A.B. Data established a toll-free telephone help line for Settlement Class Members to call and ask questions or request a copy of the Full Notice and Claim Form.  A.B. Data Decl. ¶ 12.

99.    The settlement website, www.firstchoicesecuritieslitigation.com, became operational on March 30, 2021.  A.B. Data Decl. ¶ 13.  As of June 25, 2021, the Full Notice has been downloaded 396 times and the Claim Form has been downloaded 436 times.  A.B. Data Decl. ¶ 14.

100.   This method of providing notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]."  Fed. R. Civ. P. 23(e)(1)(B).

101.   The Full Notice (Ex. 1.C) advises members of the Settlement Class of the essential terms of the Settlement, sets forth the procedure for objecting to, opting out of, and participating in the Settlement, and provides specifics on the date, time, and place for the Settlement Hearing.  The Full Notice also contains information regarding the Motion for Attorneys' Fees and the proposed plan of allocating the Settlement proceeds among members of the Settlement Class.

102.   As explained in the Final Approval Motion, the Notice fairly apprises members of the Settlement Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Federal Rule of Civil Procedure 23, and due process.

103.   The deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Lead Plaintiff's request for attorneys' fees and reimbursement of litigation expenses is July 12, 2021.   As of June 25, 2021, Lead Counsel has received no objections to the Settlement, Plan of Allocation, Plaintiff's Counsel's proposed award of Attorneys' Fees' and Expenses, or the Plaintiff PSLRA Award.  A.B. Data Decl. ¶ 16.

104.   The Deadline for Settlement Class Members to request exclusion from the Settlement is June 28, 2021.  As of June 25, 2021, Lead Counsel has received no requests for exclusion from the Settlement.  A.B. Data Decl. ¶ 15.

105.   Lead Counsel will file reply papers to address any objections or exclusions on or before July 19, 2021.  ECF No. 67 (Preliminary Approval Order) ¶ 19.

## VI.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

106.   Pursuant to the Preliminary Approval Order, and as set forth in the Full Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked no later than June 25, 2021.  As set forth in the Full Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the Plan of Allocation approved by the Court.

107.   As described below, the proposed Plan of Allocation is reasonable and treats all Settlement Class Members equally.   Each Settlement Class Member's

Recognized Loss will be calculated in accordance with the PSLRA's "per share basis" requirement (15 U.S.C. § 78u-4(a)(4)) and limitation on damages (15 U.S.C. § 78u-4(e)).  Each Settlement Class Member will receive its pro rata share of the Net Settlement Fund, based upon their Recognized Loss.  Consequently, the proposed Plan of Allocation treats Settlement Class Members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2)(D).

108.  Lead Counsel consulted with Lead Plaintiff's damages expert in developing the proposed Plan of Allocation.  Lead Counsel believes that the Plan of Allocation (Ex. 1.C (Full Notice) ¶ 9) provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Complaint.

109.  As described in the Full Notice (Ex. 1.C at p. 5), calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the plan are only a method to weigh, in a fair and equitable manner, the claims of Authorized Claimants against one another for the purpose of making *pro rata* allocations of the Net Settlement Fund.

110.  As stated in the Full Notice, the Plan of Allocation was developed in conjunction with Lead Plaintiff's damages consultant.  In developing the Plan of Allocation, Lead Plaintiff's damages consultant calculated the estimated amount

42

of alleged artificial inflation in the per share prices of FCHS common stock that was caused by Defendants' alleged misleading omissions.  In calculating the estimated artificial inflation allegedly caused by those omissions, Plaintiff's damages consultant considered the price change in FCHS common stock in reaction to the public disclosures that allegedly corrected the alleged omissions, adjusting the price change for factors that were attributable to market or industry forces, and for non-fraud related FCHS-specific information.  Ex. 1.C (Full Notice) at p. 5.

111.   In order for a Settlement Class Member to have a "Recognized Loss" under the Plan of Allocation, shares of FCHS common stock must have been purchased or otherwise acquired during the Class Period and not sold before November 14, 2018.  Claimants who purchased and sold all of their FCHS common stock before November 14, 2018 (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the stock price) will have no Recognized Loss under the Plan of Allocation with respect to those transactions because any loss suffered on those sales would not be the result of the alleged misstatements in the Action.  Ex. 1.C (Full Notice) at pp. 5-7.

112.   In accordance with the PSLRA, Recognized Loss Amounts for shares of FCHS common stock sold during the 90-day period after the end of the Class Period are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Class Period to the date of sale.  Ex. 1.C (Full Notice) at pp. 5-7.  Recognized Loss amounts for FCHS common

stock still held as of the close of trading on February 12, 2019—*i.e.*, the end of the 90-day look-back period—will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $0.38 per share, the average closing price for the stock during that 90-day period.  Ex. 1.C (Full Notice) at pp. 5-7.

113.    A Recognized Loss Amount will be calculated for each purchase or acquisition of FCHS common stock during the Class Period that is listed on the Claim Form and for which adequate documentation is provided.  If a Recognized Loss Amount calculates to a negative number or zero under the formula below, that Recognized Loss Amount will be zero.  Such Recognized Loss Amounts will be aggregated across all of an Authorized Claimant's purchases or acquisitions of FCHS common stock during the Class Period to determine the total "Recognized Loss" for each Authorized Claimant.

114.    Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

## VII.  THE FEE AND EXPENSE APPLICATION

### A.  Lead Plaintiff's Request for an Award of Attorneys' Fees

115.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Plaintiff is applying to the Court, on behalf of all Plaintiff's Counsel, for an award of attorneys' fees of 25% of the Gross Settlement Fund (or $250,000, plus interest earned at the same rate as the Gross Settlement Fund), and for reimbursement of litigation expenses that Plaintiffs' Counsel incurred in

44

connection with the prosecution of the Action from the Gross Settlement Fund in the amount of $29,895.11. Lead Plaintiff further requests a Plaintiff PSLRA Award.

116. In support of these applications, Plaintiff's Counsel submits this Declaration, and the attached Declaration of Ronald Cohen in Support of Lead Plaintiff's Motion for Attorneys' Fees and Litigation Expenses (attached hereto as Exhibit 2). These declarations list the lodestar of Plaintiff's Counsel, including the amount of time spent by each attorney and professional support staff member on the case, and the expenses for which Plaintiff's Counsel seek reimbursement.

117. Lead Plaintiff supports Lead Counsel's fee request. *See* ECF No. 64-2 (MAZ Decl.) at ¶¶ 16-19.

118. Based on the factors discussed below, and on the legal authorities discussed in the accompanying Motion for Attorneys' Fees, Lead Plaintiff respectfully submits that the request for fees and expenses should be granted.

119. The request for a fee based on a percentage of the Gross Settlement Fund is in line with the most typical method of awarding attorney fees in securities and other complex class actions in the Eleventh Circuit. This method of calculating Plaintiff's Counsel's fee is favored because it aligns the attorneys' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery efficiently and in the shortest amount of time.

### 1. Wolf Popper's Effort, Time and Costs and Expenses

120. Wolf Popper, the Court appointed Lead Counsel, was involved in all aspects of the prosecution and resolution of the Action, as set forth in this Declaration.

121. The information set forth in this Declaration concerning Wolf Popper's time, including in the schedule below, was prepared from daily time records regularly prepared and maintained by Wolf Popper in the ordinary course of business. I am the partner who oversaw Wolf Popper's activities in the litigation, and I, together with attorneys working under my direction, reviewed my firm's daily time records to confirm their accuracy. As a result of this review, I believe that the time reflected in the firm's lodestar calculation and the expenses and charges for which payment is sought are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation. Time expended in preparing the Motion for Attorneys' Fees has not been included in this report, and time for timekeepers who had worked less than 10 hours on the matter was also removed from the time report.

122. The time expended up to and including March 1, 2021, the date the Preliminary Approval Order was entered, hourly rates, and lodestars of Wolf Popper's attorneys and professional support staff are:

| Name | Title | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Chet B. Waldman | Partner | 265.50 | $895 | $237,622.50 |
| Joshua W. Ruthizer | Partner | 379.20 | $825 | $312,840.00 |
| Andrew Lencyk | Partner | 197.60 | $895 | $176,852.00 |

46

| Name | Title | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Antoinette Adesanya | Associate | 167.10 | $440 | 73,524.00 |
| Elissa M. Hachmeister | Associate | 117.50 | $450 | $52,875.00 |
| Sandra Vidal Pellon | Of Counsel | 30.60 | $435 | $13,311.00 |
| Daniel Berrick | Summer Associate | 58.90 | $380 | $22,382.00 |
| Ashley Huh | Law School Intern | 22.50 | $380 | $8,550.00 |
| Melissa Gianfagna | Senior Paralegal | 34.50 | $320 | $11,040.00 |
| Christopher Dunleavy | Clerk | 20.50 | $320 | $6,560.00 |
| **Total** | | **1,293.90** | | **$915,556.50** |

123.   The hourly rates shown are the current rates set by Wolf Popper for each individual.  For personnel who are no longer employed by Wolf Popper, the lodestar calculation is based upon the hourly rates of such person in his or her final year of employment by Wolf Popper.  The hourly rates are comparable to the regular current rates charged for Wolf Popper's services in non-contingent matters and/or the rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications.  *See, e.g., Chieftain Royalty Co. v. Marathon Oil Co.*, No. CIV-17-334-SPS, 2019 U.S. Dist. LEXIS 226386, at *40-41 (E.D. Ok. Mar. 8, 2019) (recognizing "partner rates ranging from $850 - $1,150 per hour" in shareholder and other complex litigation and citing cases and studies); *In re Amgen Inc. Sec. Litig.*, No. CV 7-2536 PSG (PLAx), 2016 U.S. Dist. LEXIS 148577, at *27-27 (C.D. Cal. Oct. 25, 2016) (in securities class action, approving hourly rates of $750-985 for partners, $500-800 for of counsel/senior counsel, and $300-725 for other attorneys); *see, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-md-2800-TWT, 2020 U.S. Dist. LEXIS 7841, at *262-263

47

(N.D. Ga. Mar. 17, 2020) ("The Court therefore finds class counsel's rates are reasonable and well supported, including specifically the hourly rates charged by Mr. Barnes ($1050); Mr. Canfield ($1000); Ms. Keller ($750), and Mr. Siegel ($935).").

124.    Wolf Popper's lodestar figures are based upon the firm's hourly rates, which do not include expense items.  Expense items are recorded separately, and these amounts are not duplicated in my firm's hourly rates.  The expenses incurred by Wolf Popper in connection with the prosecution of this Action are:

| Category | Amount |
|---|---|
| Mailing/Overnight Couriers | $34.10 |
| Telephone | $51.62 |
| Pro Hac Vice Admission Fee | $150.00 |
| Process Server | $164.50 |
| PR Newswire for PSLRA Notice | $280.00 |
| Court Fee to File a Civil Action | $400.00 |
| Travel | $796.83 |
| Photocopying, Printing, and Scanning | $1,122.55 |
| Mediation | $4,500.00 |
| Online Legal Research[5] | $15,685.56 |
| Expert Witness Fees | $4,800.00 |
| Travel for Settlement Hearing (partially estimated)[6] | $900.00 |
| **Total** | **$28,885.16** |

125.    Wolf Popper incurred a total of $28,885.16 in unreimbursed expenses in connection with the prosecution of this Action from its inception.  The expenses

---

[5] The charges reflected for on-line research are for out-of-pocket payments to the vendors for research done in connection with this litigation.  Online research is billed to each case based on actual time usage at a set charge by the vendor.  There are no administrative charges included in these figures.

[6] As of the date of this Declaration, the air travel and hotel costs for the Settlement Hearing have already been incurred and total $770.43.  Only the remaining costs (for taxi, meals and other incidentals) have been estimated.

incurred in this Action are reflected in the books and records of Wolf Popper, which are regularly prepared and maintained in the ordinary course of business. These records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.

### 2. The Time, Labor, Difficulty and Skill Involved Support the Requested Fee Award

126. Lead Counsel is highly skilled and experienced in securities litigation. Plaintiff's Counsel expended a substantial amount of time and effort litigating the Action. Wolf Popper is highly experienced in the area of securities litigation and class actions, and has successfully prosecuted numerous securities litigations and securities fraud class actions on behalf of investors, as detailed in its attached resume (*See* Ex. 3).

127. While Lead Plaintiff believed it developed a strong case, as set forth in the Complaint, Defendants made several arguments in their motions to dismiss (as described above) that could have ended this case at the beginning.

128. Second, Lead Plaintiff was the only movant to seek appointment as lead plaintiff, suggesting that the strength of Lead Plaintiff's case was not apparent and/or the maximum recoverable damages was small, and the case not was not highly desirable on its face.

129. Successfully pleading securities fraud here presented significant challenges, as evidenced by the multiple arguments raised by Defendants in their

49

motions to dismiss – including issues with respect to the falsity of Defendants' statements, scienter of FCHS, and reliance on a class-wide basis.

130.   Lead Counsel defeated Defendants' motions to dismiss, and also successfully opposed both Defendants' objections to Judge Hoffman's Report and Recommendation.

131.   Lead Counsel also successfully opposed FCHS's attempts to have its motion to dismiss heard before the Court appointed a lead plaintiff.

132.   The labor-intensive nature of this case also precluded Lead Counsel from pursuing other matters.  As is often the case with complex securities class actions, the attorneys involved would often have to spend significant stretches of time focusing exclusively or near-exclusively on litigating this Action.  The pleading, briefing, and work related to the Bankruptcy Proceeding required by the highly complex and technical matters in this case often required the careful attention of experienced senior attorneys at Wolf Popper and Lorium PLLC and could not be left solely to junior attorneys or staff.

133.   Lead Counsel believes that all of these factors support the requested fee award.

### 3. The Result Achieved and the Reasonableness of the Fee Request Support the Requested Fee Award

134.   The Settlement provides exceptional relief, especially in light of the costs, risks, and delay of further litigation.

135.    The Settlement provides for a monetary recovery of $1 million in cash for the Settlement Class.  Lead Plaintiff's damages consultant, using accepted methodologies, estimated that damages for the Settlement Class's claims (excluding Steward) are approximately $4.877 million.  *See* Ex. 1.C (Full Notice) at p. 1.

136.    The Settlement represents approximately 20% of the Settlement Class's estimated damages, well above the average recovery in class action securities litigation.  *See, e.g., Cabot E. Broward 2 LLC v. Cabot,* No. 16-61218-CIV-DIMITROULEAS/SNOW, 2018 U.S. Dist. LEXIS 192706, at *14-15 (S.D. Fla. Nov. 9, 2018) ("The usual recovery in [securities class action settlements] is less than 10% of the class members' estimated losses."); Cornerstone Research, Securities Class Action Settlements 2020 Review and Analysis (reporting that the median settlement, as a percentage of Cornerstone's "Simplified Tiered Damages," for cases with damages of less than $25 million was 19.7% in 2020).[7]

137.    Further, the market capitalization of FCHS was only $2.64 million as of June 12, 2020, the last trading day prior to FCHS's filing for bankruptcy; thus, the Settlement Amount represents approximately 38% of FCHS's market cap, an extraordinary number.  *See* Ex. 1.C (Full Notice) at p. 1.

---

[7] Available at www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2020-Review-and-Analysis (last visited June 18, 2021).

138.    Moreover, as elaborated more fully in the Motion for Attorneys' Fees, the requested fee is well within the range typically awarded by this District and other courts in the Eleventh Circuit in complex class actions.

### 4. The Risks and Economies of the Litigation Support the Requested Fee Award

139.    The risks undertaken by counsel in this matter and the economic considerations of litigating a complex securities class action such as this one favor approval of the requested fee award.

140.    As with all contingency fee cases, Lead Counsel faced a substantial risk that it would obtain no fee whatsoever.  From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel received no compensation during the one-and-a-half year-long course of the Action and have collectively incurred $29,895.11 in litigation expenses in prosecuting the Action for the benefit of the Settlement Class, in

52

addition to considerably more expenditure on overhead costs for the attorneys, staff, and resources needed to litigate this Action.

141.    Courts have repeatedly recognized that it is in the public interest to have experienced and qualified counsel privately enforce the securities laws. However, as recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs, and particularly institutional investors, take an active role in protecting the interests of investors.  If this important public policy is to be carried out, Plaintiffs' Counsel should be adequately compensated, taking into account the substantial risks undertaken in prosecuting securities class actions.

142.    Lead Counsel faced a substantial risk that the litigation could end without remuneration.  The Complaint could have been dismissed by the Court. And even after surviving that hurdle, were litigation to continue, Lead Plaintiff could face a granting of summary judgment to Defendants, a total loss at trial, or— even in the event of a victory at trial—a reversal on appeal.  Any of these occurrences would have deprived Lead Counsel of the opportunity to earn any fee whatsoever for years of work and expenditure.

143.    Moreover, even without a total dismissal of the case or a total loss at trial, Lead Plaintiff and Lead Counsel faced, and would continue to face, risks that their case could be reduced in size and value if Defendants' arguments concerning class-wide reliance were accepted at the class certification stage.

53

### 5.  The Reaction of the Settlement Class to the Fee and Expense Applications

144.   The positive reaction of the Settlement Class to the Motion for Attorneys' Fees to date further supports the reasonableness of the Motion.  The Notice advised Settlement Class Members that Lead Plaintiff would apply for fees for Plaintiff's Counsel not to exceed 25% of the Gross Settlement Fund, and that the deadline for filing objections to the fee application is July 12, 2021.  As of June 25, 2021, no member of the Settlement Class has filed an objection to the Settlement, Plan of Allocation, or the Motion for Attorneys' Fees, or the Plaintiff PSLRA Award.  A.B. Data Decl. ¶ 16.

145.   Moreover, Lead Plaintiff is a sophisticated institutional investor that closely supervised and monitored the prosecution and the settlement of the Action.  Lead Plaintiff believes Lead Counsel's fee and expense request to be reasonable.  ECF No. 64-2 (MAZ Decl.).  Further, Lead Counsel has represented Lead Plaintiff as lead plaintiff in another litigation that went to trial, and Lead Plaintiff is thus very familiar with Lead Counsel's work.

### 6.  Awards in Similar Actions and a Lodestar Cross-Check Support the Requested Fee Award

146.   As set forth more fully in the Motion for Attorneys' Fees, Lead Counsel's request for an award of 25% of the Gross Settlement Fund is in line with fees recently awarded in similar securities class actions and other complex class actions in this District, Circuit, and around the country.

54

147.   As set forth above and in Exhibit 2, Lead Counsel expended 1,293.90 hours and Local Counsel expended 48.00 hours, a total 1,341.90 hours in the prosecution and investigation of this Action up through March 1, 2021, the day the Preliminary Approval Order was entered.   The resulting total lodestar is $935,366.50 ($915,556.50 for Lead Counsel and $19,810 for Local Counsel).  In light of this, the requested fee of 25% of the $1 million Settlement Amount, or $250,000, yields a negative multiplier of 0.27.  Such a multiplier is well below the range of multipliers awarded by courts in this Circuit and around the country in comparable securities class actions, is fair and reasonable based upon the significant risks in this litigation, and by Lead Counsel's substantial efforts to obtain the highly favorable Settlement – which exceeds the rate of recovery for most securities class actions.[8]

148.   As stated above and in Exhibit 2, the lodestar summaries were prepared from daily time records regularly prepared and maintained in the ordinary course of business.  Plaintiffs' Counsel's hourly rates are the same as, or comparable to, the regular current rates charged for their services in non-contingent matters and/or the rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications that have been granted in this Circuit and others.

---

[8] Lead Counsel will also incur substantial additional hours and resources overseeing the Settlement claims administration process and preparing for, and appearing and arguing at, the Settlement Hearing.

55

149.   Additionally, many of Wolf Popper's attorneys – at all levels – have worked for Lead Counsel for years and have extensive experience in securities class action litigation.  *See, e.g.,* Ex. 3 (Wolf Popper Resume).  Each attorney that prosecuted this Action performed substantive work that directly benefitted the Settlement Class.  The time spent by each attorney was reasonable, non-duplicative, beneficial to effective and efficient litigation, and was important to Plaintiffs' Counsel's and Lead Plaintiff's ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful resolution of the case.

150.   In sum, based on the excellent result achieved for the Settlement Class, the quality of work performed, and the risks of prosecuting the Action against Defendants, Lead Plaintiff submits that its request for a 25% award to Plaintiff's Counsel is fair, reasonable, and consistent with other similar cases in this Circuit.

## B.  The Request for Reimbursement of Litigation Expenses

151.   Plaintiff's Counsel seeks reimbursement of $29,895.11 in litigation expenses, $28,885.16 incurred by Lead Counsel and $1,009.95 incurred by Local Counsel.  Lead Counsel respectfully submits that these expenses were reasonable and necessary considering the complexity of the litigation, and that reimbursement of these expenses would be appropriate and fair to the Settlement Class.

152.    Courts in this District and Circuit have held that counsel in complex class actions are entitled to be reimbursed for reasonable expenses of the exact type incurred here, such as expert witness fees; travel for meetings and hearings; paying the mediator; and other customary expenditures.

153.    Lead Counsel incurred these expenses at substantial risk to itself, and with no guarantee of receiving any reimbursement, or, indeed, any remuneration whatsoever.  Lead Counsel could not have effectively prosecuted the Action without incurring these expenses.  For example, Lead Counsel incurred over $15,600 in fees for online legal research and $4,800 in expert fees related to damages analysis.  Lead Counsel could not have successfully opposed Defendants' motions to dismiss or obtained the Settlement through mediation without such expenses.

154.    Lead Plaintiff's damages expert, Michael Marek of Financial Markets Analysis, LLC, is a highly experienced economics and market efficiency expert.  His services were necessary to assist Lead Counsel in evaluating damages and market efficiency issues, and to help develop the Plan of Allocation.

155.    Moreover, the expenses incurred by Lead Plaintiff in this Action were reasonable and in line with typical expenses incurred in a securities class action that Lead Plaintiff's reimbursement request has progressed to this stage of litigation.

156.    The requested expense reimbursement of $29,895.11 is less than the $30,000 upper limit provided for in the Notice, and moreover, as of June 25, 2021,

no potential Settlement Class Members have objected to the requested expense reimbursement.

157.    Finally, approval of the Settlement is independent from approval of the Motion for Attorneys' Fees.  Accordingly, any determination with respect to the Motion for Attorneys' Fees will not affect the Settlement, if approved.

### C.  Lead Plaintiff's Reimbursement Requests

158.    In accordance with the PSLRA, Lead Plaintiff seeks reimbursement of its reasonable costs and expenses (including lost wages) incurred directly in connection with its representation of the Settlement Class, in the amount of $5,000.

159.    Lead Plaintiff's representative, Walter Schenker (the principal of the general partner of MAZ) estimates that he devoted more than 40 hours to this Action that he would otherwise have spent working on behalf of MAZ, including by reviewing drafts and final copies of pleadings, court filings, and discovery requests, and attending the full-day mediation.  ECF No. 64-2 (MAZ Decl.) at ¶ 20.  Mr. Schenker is not paid by the hour, but he estimates his hourly rate to be $250 per hour.  ECF No. 64-2 (MAZ Decl.) at ¶ 21.  The $5,000 requested Plaintiff PSLRA Award amounts to 50% of the total lost wages spent by Mr. Schenker.  Mr. Schenker's hourly rate of $250 was approved by the Chief Judge of the District of Massachusetts in the case of *In re: PHC, Inc. Shareholder Litigation,* No. 11-11049-PBS, ECF No. 487 ¶ 12  (D. Mass. Apr. 2, 2019) (Saris, J.), (awarding MAZ a $25,000 service award).

160. Lead Plaintiff respectfully submits that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type. Lead Plaintiff's efforts during the Action are precisely the type that courts have found to support reimbursement to class representatives, and fully supports Lead Plaintiff's request for reimbursement.

161. As set forth in Lead Plaintiff's Declaration, Lead Plaintiff's support for the litigation is not contingent upon the award of a Plaintiff PSLRA Award. ECF No. 64-2 (MAZ Decl.) at ¶ 22.

162. Lead Plaintiff has, throughout the litigation of the Action, been fully committed to pursuing the interests of the Settlement Class. Lead Plaintiff's efforts are precisely the type that courts have found to support reimbursement to class representatives, and fully supports Lead Plaintiff's request for reimbursement.

## VIII. CONCLUSION

163. For all the reasons discussed above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.

164. Lead Counsel further submits that the requested attorneys' fee in the amount of 25% of the Gross Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total litigation costs and expenses in the total amount of $29,895.11 should also be approved.

165.   Finally, Lead Plaintiff submits that, in accordance with the PSLRA, reimbursement to Lead Plaintiff in the total amount of $5,000 should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 28th day of June, 2021, at New York, New York.

_____
Chet B. Waldman

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 28, 2021, I filed the foregoing with the

Court via CM/ECF, which will serve a true and correct copy of the foregoing via

email service on counsel of record in this matter:

Fritz J. Scheller, Esq.
fscheller@flusalaw.com
FRITZ SCHELLER, PL
200 E. Robinson Street
Orlando, FL 32801
Tel: 407.792.1285
Fax: 407.513.4146

*Attorneys for Defendant Christian Romandetti, Sr.*

Brian P. Miller, Esq.
Brian.Miller@akerman.com
Samantha J. Kavanaugh, Esq.
Samantha.Kavanaugh@akerman.com
Ross E. Linzer, Esq.
Ross.Linzer@akerman.com
AKERMAN LLP
Three Brickell City Centre
98 SE 7th Street, Suite 1100
Miami, FL 33130
Tel: 305.374.5600
Fax: 305.374.5095

*Attorneys for Defendant First Choice Healthcare Solutions, Inc.*

*/s/ Joshua W. Ruthizer*
Joshua W. Ruthizer